1   M. ANDREW WOODMANSEE (CA SBN 201780)
mawoodmansee@mofo.com
2   JEFFREY M. DAVID (CA SBN 265503)
jdavid@mofo.com
3   MARY PRENDERGAST (CA SBN 272737)
mprendergast@mofo.com
4   MORRISON & FOERSTER LLP
12531 High Bluff Drive
5   San Diego, California  92130-2040
Telephone: 858.720.5100
6

7   DAVID LOY (CA SBN 229235)
davidloy@aclusandiego.org
8   SEAN RIORDAN (CA SBN 255752)
sriordan@aclusandiego.org
ACLU FOUNDATION OF SAN DIEGO &
9   IMPERIAL COUNTIES
P.O. Box 87131
10   San Diego, California  92138-7131
Telephone: 619.232.2121
11

12   Attorneys for Plaintiffs
RAY ASKINS AND CHRISTIAN RAMIREZ

13

14                  UNITED STATES DISTRICT COURT

15               SOUTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| RAY ASKINS and CHRISTIAN RAMIREZ, | Case No. **'12 CV 2600 W    BLM** |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |
| v. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID V. AGUILAR, Deputy Commissioner of United States Customs and Border Protection; CALEXICO PORT DIRECTOR BILLY WHITFORD; SAN YSIDRO PORT DIRECTOR FRANK JARAMILLO; UNITED STATES CUSTOMS & BORDER PROTECTION OFFICERS DOES 1 through 15; and DOES 16 through 50, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1

COMPLAINT

sd-595551

1    Plaintiffs Ray Askins and Christian Ramirez (collectively, "Plaintiffs") bring this First and

2    Fourth Amendment action against the U.S. Department of Homeland Security, U.S. Customs and

3    Border Protection Deputy Commissioner David V. Aguilar, Calexico Port Director Billy

4    Whitford, San Ysidro Port Director Frank Jaramillo, U.S. Customs and Border Protection

5    Officers Does 1-15, and Defendants Does 16-50 (collectively, "Defendants"), and allege as

6    follows.

7                              **NATURE OF THE ACTION**

8        1.      This is a civil action to remedy violations of Plaintiffs' First and Fourth

9    Amendment rights by officers of U.S. Customs and Border Protection ("CBP"), an agency within

10   the Department of Homeland Security.

11       2.      The First Amendment right to freedom of speech includes the right to take

12   photographs and make video recordings of matters such as U.S. ports of entry and federal law

13   enforcement officers engaged in the public discharge of their duties.  The U.S. Department of

14   Justice ("DOJ") agreed in a letter providing guidance for potential settlement negotiations in

15   *Christopher Sharp v. Baltimore City Police Department, et. al.*, No. 1:11-cv-02888-BEL (D.

16   Md.), advising that "[r]ecording governmental officers engaged in public duties is a form of

17   speech through which private individuals may gather and disseminate information of public

18   concern, including the conduct of law enforcement officers."  (Exhibit A, DOJ Guidance Letter

19   dated May 14, 2012, at 2 (citations omitted).)  DOJ further advised that "the justification for this

20   right is firmly rooted in long-standing First Amendment principles" and that "[t]he right to

21   '[g]ather[] information about government officials in a form that can readily be disseminated to

22   others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion

23   of governmental affairs.'"  (*Id.* at 3 (citations omitted).)

24       3.      CBP has an unconstitutional policy and practice of prohibiting the use of cameras

25   and video recording devices at or near CBP-controlled facilities, including U.S. ports of entry,

26   without the CBP's prior approval.  Acting pursuant to this policy and practice, CBP officers

27   violated Plaintiffs' First Amendment rights by directing Plaintiffs to cease taking photographs

28   and erasing the photographs they did take of CBP personnel and buildings at U.S. ports of entry.

COMPLAINT

sd-595551

1        4.      Furthermore, in the course of violating Plaintiffs' free speech rights, CBP officers

2   also violated Plaintiffs' rights under the Fourth Amendment.  These officers did so pursuant to an

3   official policy and/or a longstanding practice of searching and/or seizing individuals, without any

4   legally sufficient justification, when the individuals use cameras and video recording devices at or

5   near such facilities without prior approval from CBP.  Specifically, Officers Does 1-15 subjected

6   Mr. Askins to the use of excessive force and to an unlawful search and seizure.  Other CBP

7   officers subjected Mr. Ramirez to an unlawful search and seizure.

8        5.      Plaintiffs' cases are not unique.  CBP officers frequently employ these policies

9   and/or practices to deter individuals from documenting potential misconduct by CBP officers and

10  to destroy evidence of such potential misconduct.  For example, CBP officers confronted

11  individuals who captured video footage of the killing of Anastasio Hernandez Rojas by CBP

12  officers at the San Ysidro port of entry on May, 28, 2010, and forced the individuals to erase that

13  footage.  In another example at the San Ysidro port of entry, on May 4, 2012, CBP officers

14  confronted Kevin Murphy, who captured video footage of several CBP officers pointing weapons

15  at family members in a van, and forced Mr. Murphy to erase the footage by threatening to smash

16  Mr. Murphy's phone if he did not do so.

17       6.      To remedy the First and Fourth Amendment violations, Plaintiffs seek injunctive

18  and declaratory relief against all defendants, and Plaintiff Askins seeks damages against Officers

19  Does 1-15.

20                                      **THE PARTIES**

21       7.      Plaintiffs Ray Askins and Christian Ramirez are, and at all relevant times were,

22  citizens of the United States.

23       8.      Defendant U.S. Department of Homeland Security ("DHS") is an executive

24  department of the United States.  U.S. Customs and Border Protection is an agency within DHS.

25       9.      Defendant David V. Aguilar is the Deputy Commissioner of the CBP.

26       10.     Officers Does 1-15 (the "Doe Officers") are, and at all relevant times were,

27  officers employed by the CBP, and were acting under color of authority of the laws of the United

28  States.  The true names of the Doe Officers, as well as the true names of Defendants Does 16-50

sd-595551

1   (collectively, with the Doe Officers, the "Doe Defendants") are unknown to Plaintiffs, who

2   therefore sue the Doe Defendants by fictitious names.  Plaintiffs reserve the right to amend this

3   Complaint to further identify the Doe Defendants when Plaintiffs have ascertained these

4   defendants' true names and capacities.

5       11.    All defendants are sued in their official capacities for declaratory and injunctive

6   relief.  Mr. Askins also sues Officers Does 1-15 in their individual capacities for damages.

7       12.    Injunctive relief is sought against each defendant as well as each defendant's

8   agents, assistants, successors, employees, attorneys, and all persons acting in concert or

9   cooperation with any of them or at the direction or under the control of any of them.

10                          **JURISDICTION AND VENUE**

11      13.    The Court has jurisdiction under 28 U.S.C. § 1331 because Defendants are acting

12  on behalf of the United States and this action arises under the First and Fourth Amendments to the

13  United States Constitution.

14      14.    The Court may grant declaratory and injunctive relief for the constitutional

15  violations alleged here pursuant to 5 U.S.C. § 702, which waives the sovereign immunity of the

16  United States for relief other than money damages; 28 U.S.C. § 2201; and/or Federal Rules of

17  Civil Procedure 57 and 65.  Additionally, pursuant to *Bivens v. Six Unknown Federal Narcotics*

18  *Agents*, 403 U.S. 388 (1971), the Court may award damages against the Doe Officers, who are

19  sued in their individual capacities.

20      15.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (e),

21  because the events that give rise to this action occurred within this district, and because one or

22  more defendants reside in this district.

23      16.    The Court has personal jurisdiction over Officers Does 1-15, all of whom, on

24  information and belief, are residents of the state of California.

25                                  **FACTS**

26                             **PLAINTIFF ASKINS**

27      17.    Mr. Askins is a U.S. citizen living primarily in Mexicali, Mexico.  He travels

28  frequently to the United States, often to attend meetings or to visit his home in Lake Arrowhead,

                                      4
                                                              COMPLAINT
sd-595551

1    California.  He maintains and contributes to a blog that primarily addresses environmental issues

2    and human rights abuses in the U.S.-Mexico border region.  This work involves extensive

3    research, investigation, and analysis of CBP border activities.  Additionally, this work has

4    culminated in numerous reports prepared by Mr. Askins and submitted to U.S. Representative

5    Bob Filner, whose congressional district includes the entire California-Mexico border.

6            18.    Mr. Askins's claims arise from his attempt to take photographs of the Calexico-

7    Mexicali port of entry for a presentation at a conference entitled "Health Impacts of Border

8    Crossings," held on May 4, 2012, in San Ysidro, California.  According to its website, the

9    conference was funded by the Southwest Consortium on Environmental Research and Policy.

10   The website also states: "This binational conference focuses on local health impacts of the U.S.-

11   Mexico border.  The emphasis is on avenues for reduction of exposures to traffic pollutants

12   experienced by people crossing the border at the U.S.-Mexico Ports of Entry, workers and the

13   community on both sides of the border.  The conference includes participation of researchers and

14   stakeholders from the San Diego-Tijuana region and other areas along the U.S.-Mexico border

15   with similar issues."  *See* http://www.healthyborders2012.com/#!about (attached as Exhibit B to

16   this Complaint).  Furthermore, the conference materials state that, as an outcome of the

17   conference, "[a] White Paper is to be sent to the Air Quality and Environmental Health Task

18   Forces of the EPA Border 2012 initiative as well as local and state agencies and regional

19   stakeholders along the border."

20           19.    In connection with his conference presentation, Mr. Askins wished to photograph

21   the secondary inspection area of the Calexico-Mexicali port of entry to demonstrate that the CBP

22   does not make full and proper use of this inspection area, leading to longer delays at the border

23   crossing and, accordingly, to more pollution arising from emissions of vehicles waiting in line to

24   cross the border or enter the port of entry.

25           20.    On or about April 18, 2012, Mr. Askins contacted CBP Officer John Campos by

26   phone and requested permission to take three or four photographs inside the secondary inspection

27   area at the Calexico port of entry the next day.  Officer Campos said that this would be

28   inconvenient, but otherwise did not object to the request.

sd-595551

21.     On or about April 19, 2012, Mr. Askins called Officer Campos to follow up. When Officer Campos did not answer, Mr. Askins left a voicemail message stating that, instead of taking photographs inside the building, Mr. Askins would stand on the street in Calexico and take photographs of the exit of the secondary inspection area.

22.     On or about April 19, 2012, at approximately 3:21 p.m., Mr. Askins was standing on the shoulder of a public street in Calexico, California, approximately 50-100 feet from the exit from the secondary inspection area at the Calexico port of entry.  From this vantage point, Mr. Askins took three or four photographs of the exit of the secondary inspection area, including the following photograph:



23.     While taking these photographs, Mr. Askins was not engaged in any form of commercial speech or activity.  Mr. Askins took these photographs for political and/or other non-commercial purposes.

24.     Additionally, when taking these photographs, Mr. Askins was not engaged in the act of crossing the border.  Mr. Askins was outside the port of entry on the U.S. side of the border when taking the photographs.

25.     Shortly after he took the photos, a number of male CBP officers (Officers Does 1-15) approached Mr. Askins.  One or two of the officers (Officer Doe 1 and/or Officer Doe 2)

COMPLAINT

sd-595551

1   demanded that Mr. Askins delete the photos.  When Mr. Askins stated that he would not do so,

2   Officer Doe 1 and/or Officer Doe 2 stated that they would smash the camera if Mr. Askins did not

3   delete the photos.  Mr. Askins again declined to delete the photos, explaining that they were his

4   property.  One or more officers (Officers Does 1-15) then handcuffed Mr. Askins from behind

5   and took his camera, passport, car keys, and hat.

6          26.     Throughout this encounter, the CBP officers—particularly Officer Doe 1—spoke

7   to Mr. Askins in an aggressive and threatening manner, despite the fact that Mr. Askins at no

8   point posed a threat to the safety of the officers and at no point actively resisted arrest.

9   Furthermore, Mr. Askins committed no crime and took no actions giving rise to a reasonable

10  suspicion or probable cause that he had committed or was about to commit a crime.

11         27.     After Mr. Askins was handcuffed and his possessions taken, Officer Doe 1

12  forcefully led Mr. Askins into a small room inside the secondary inspection area, holding Mr.

13  Askins's right arm in a tight grip that caused significant pain and bruising on the inside of Mr.

14  Askins's arm.  The officer told Mr. Askins to sit down.  Mr. Askins was not free to leave the

15  room.

16         28.     After about 20 minutes, Officer Doe 1 led Mr. Askins to a separate room where he

17  subjected Mr. Askins to an invasive and embarrassing physical search.  During the search, Mr.

18  Askins remained clothed and Officer Doe 1 used his hands to pat Mr. Askins's entire body.  Mr.

19  Askins felt that he was being groped, and experienced particular discomfort when Officer Doe 1

20  unnecessarily squeezed and touched Mr. Askins's groin area several times.

21         29.     One or more CBP officers (Officers Does 1-15) then told Mr. Askins that he was

22  free to go and returned his belongings.  Officer Doe 4 escorted him to the exit.  From the moment

23  CBP officers first detained Mr. Askins to the moment they told him he was free to go,

24  approximately 25-35 minutes elapsed.  The officers had no warrant or other justification for the

25  search and/or seizure of Mr. Askins's person or property.

26         30.     When Mr. Askins later scrolled through the pictures on his digital camera, he

27  discovered that all but one of the photographs he just had taken of the port of entry had been

28  deleted.

31.     On or about April 19, 2012, Mr. Askins sent a letter of complaint regarding the incident to Port Director Billy Whitford.  Director Whitford responded in writing.  In his response (attached as <u>Exhibit C</u> to this Complaint), Director Whitford stated:  "In response to the issues raised in your complaint, the area in question is currently under the jurisdiction of GSA [(General Services Administration)] and CBP.  CBP security policies prohibit visitors at CBP-controlled facilities from using cameras and video recording devices without the prior approval from the senior CBP official (Port Director or designee)."

32.     Mr. Askins hopes to continue to photograph the Calexico port of entry, San Ysidro port of entry, and other ports of entry in the future, to document air pollution and human rights abuses, but the policies, practices, and actions of CBP and its officers chill, prevent, hinder, and deter him from doing so.

**PLAINTIFF RAMIREZ**

33.     Mr. Ramirez is a U.S. citizen living in San Diego, California.  He crosses the U.S.-Mexico border approximately three to four times per month, often to visit family members living in Mexico.

34.     Mr. Ramirez works as the Human Rights Director at Alliance San Diego.  Alliance San Diego is a non-profit, non-partisan organization whose stated mission is to provide a means for diverse individuals to share information, collaborate on issues and mobilize for change in the pursuit of social justice, especially in low-income communities and communities of color.  The organization pursues this mission through targeted civic engagement programs and strategic coalitions that focus on specific issues and policy reforms, including issues related to immigrant rights at the U.S.-Mexico border.

35.     As a part of his job, Mr. Ramirez regularly visits the U.S.-Mexico border to observe law enforcement activity and monitor human rights issues.  He does this not only for work but also out of a sense of personal responsibility as a lifelong member of the border community.  He has long believed that it is important to document law enforcement activity at the border in order to address and hopefully to prevent the abuse of human rights.

COMPLAINT

sd-595551

36.    Mr. Ramirez's claims arise from his experience crossing the border at the San Ysidro port of entry on Father's Day 2010.  On or about that day—June 20, 2010—Mr. Ramirez and his wife crossed the border into Mexico to visit his father.  They parked on the U.S. side of the border and walked into Mexico through the pedestrian entrance at San Ysidro.

37.    After a late lunch, Mr. Ramirez and his wife returned to the United States.  They passed through primary inspection at the San Ysidro port of entry without incident.  They then crossed a pedestrian bridge that passes over, among other things, the southbound lanes of Interstate 5.

38.    While crossing this pedestrian bridge, Mr. Ramirez noticed that, at a southbound security checkpoint below him, which was staffed by CBP officers, women were being inspected and patted down by male CBP officers.  Mr. Ramirez's wife commented that the officers appeared to be pulling aside only women for inspection.

39.    Mr. Ramirez observed the checkpoint for approximately ten to 15 minutes.  During that time he took approximately ten pictures using his cell phone camera, out of concern that the CBP officers might have been acting inappropriately.

40.    While taking the photographs at issue on or about June 20, 2010, Mr. Ramirez was not engaged in any form of commercial speech or activity.  Mr. Ramirez took these photographs for political and/or other non-commercial purposes.

41.    Additionally, when taking these photographs, Mr. Ramirez was not engaged in the act of crossing the border.  Mr. Ramirez was in the United States when taking the photographs.

42.    While observing the checkpoint, Mr. Ramirez and his wife were approached by two men who appeared to be private security officers.  One of the private security officers asked for Mr. Ramirez's personal identification documents.  Mr. Ramirez explained that he and his wife had already passed through inspection and declined to hand over his documents again.

43.    One of the private security officers then ordered Mr. Ramirez to stop taking photographs.  Mr. Ramirez refused and took a picture of the private security officer.  Acting aggressively, the private security officer attempted to grab Mr. Ramirez.  Mr. Ramirez stopped taking photographs and said "let's go" to his wife.

COMPLAINT

sd-595551

44.   Mr. Ramirez and his wife then began to descend the pedestrian bridge, now followed by the private security officers, whom Mr. Ramirez heard make a radio call for backup. At the bottom of the bridge, approximately five to seven CBP officers were waiting.  They asked whether and why Mr. Ramirez had taken any photographs.  Mr. Ramirez responded that he had taken photographs because he had witnessed what he believed to be inappropriate activity by CBP officers at the checkpoint—namely, the patting down of women by male officers.

45.   The CBP officers at the bottom of the bridge then asked Mr. Ramirez to turn over his phone.  Mr. Ramirez refused and explained that he was willing only to show them the photographs.

46.   An officer in plain clothes then confronted Mr. Ramirez and asked for Mr. Ramirez's personal identification documents.  The officer later identified himself as a U.S. Immigration and Customs Enforcement ("ICE") agent.  Mr. Ramirez refused to turn over his documents and explained that they had already been inspected.  The ICE officer said to Mr. Ramirez, "Give me one other reason to take you down."  The officer took Mr. Ramirez's and Mr. Ramirez's wife's passports out of Mr. Ramirez's shirt pocket and went to a nearby office.

47.   A CBP officer then took Mr. Ramirez's phone and scrolled through the photos, making a comment about Mr. Ramirez's personal pictures.  When Mr. Ramirez later looked through the contents of his phone, he discovered that the CBP officer who took his phone had deleted all of the photos that Mr. Ramirez had just taken at the CBP checkpoint.

48.   Throughout this encounter, officers spoke to Mr. Ramirez in an aggressive and threatening manner, despite the fact that Mr. Ramirez at no point posed a threat to the safety of the officers and at no point actively resisted arrest.  Furthermore, Mr. Ramirez committed no crime and took no actions giving rise to a reasonable suspicion or probable cause that he had committed or was about to commit a crime.

49.   Approximately ten to 15 minutes after the ICE agent had taken the passports belonging to Mr. Ramirez and Mr. Ramirez's wife, the ICE agent returned with the documents and gave them back to Mr. Ramirez.  Mr. Ramirez and his wife were then allowed to continue on their way.

COMPLAINT

sd-595551

50.     During the entire encounter at the bottom of the bridge, which lasted approximately ten to 15 minutes from the time Mr. Ramirez and his wife reached the bottom of the bridge and were confronted by the CBP officers, to the time they were allowed to go, Mr. Ramirez and his wife were separated from each other by CBP officers.  The officers essentially created a buffer area around Mr. Ramirez while they questioned him and took his cell phone. Neither Mr. Ramirez nor his wife felt free to leave at any point during that time.  The officers had no warrant or other justification for the search and/or seizure of Mr. Ramirez's person or property.

51.     Mr. Ramirez hopes to continue to photograph the San Ysidro port of entry and other ports of entry in the future, in order to document human rights abuses and to monitor activity in his border community.  Indeed, he considers documenting such border issues to be a fundamental piece of his identity and part of his life experience.  But the policies, practices, and actions of CBP and its officers chill, prevent, hinder, and deter him from doing so.

## CLAIMS FOR RELIEF

### CLAIM ONE
**(VIOLATION OF THE FIRST AMENDMENT—FREEDOM OF SPEECH—
BY PLAINTIFF ASKINS AGAINST DEFENDANTS DEPARTMENT OF HOMELAND
SECURITY, COMISSIONER AGUILAR, AND OFFICERS DOES 1-15)**

52.     Plaintiff Askins incorporates by reference and re-alleges each preceding paragraph as if fully set forth herein.

53.     Mr. Askins has the right to freedom of speech, which includes the right to take photographs and make video recordings of matters such as U.S. ports of entry and federal law enforcement officers engaged in the public discharge of their duties.

54.     By engaging in the above-described conduct on or about April 19, 2012, Officer Does 1-15 violated Mr. Askins's First Amendment right to freedom of speech.

55.     In violating Mr. Askins's First Amendment rights, Officers Does 1-15 acted pursuant to an expressly adopted official CBP policy and/or a longstanding CBP practice of prohibiting the use of cameras and video recording devices at CBP-controlled facilities, including U.S. ports of entry, without the CBP's prior approval.  This policy and/or practice prevents,

1    restricts and/or hinders the ability of persons such as Plaintiffs to take photographs and make

2    video recordings of matters such as U.S. ports of entry and federal law enforcement officers

3    engaged in the public discharge of their duties.  This CBP policy and/or practice continues to be

4    an impermissible prior restraint on speech and to chill, deter, and infringe Mr. Askins's First

5    Amendment right to freedom of speech.

6         56.    Furthermore, the violation of Mr. Askins's First Amendment rights by Officers

7    Does 1-15 caused Mr. Askins to suffer harm.  As a result, Mr. Askins is entitled to monetary

8    damages from Officers Does 1-15 pursuant to the *Bivens* doctrine.

9         57.    The violation of Mr. Askins's First Amendment rights by Officer Does 1-15 was

10   also oppressive, malicious, and done with a willful and conscious disregard of Mr. Askins's

11   rights, justifying an award of punitive damages.

12
                                    **CLAIM TWO**
                **(VIOLATION OF THE FIRST AMENDMENT—FREEDOM OF SPEECH—**
13                  **BY PLAINTIFF RAMIREZ AGAINST DEFENDANTS**
                **DEPARTMENT OF HOMELAND SECURITY AND COMMISSIONER AGUILAR)**
14

15        58.    Plaintiff Ramirez incorporates by reference and re-alleges each preceding

16   paragraph as if fully set forth herein.

17        59.    Mr. Ramirez has the right to freedom of speech, which includes the right to take

18   photographs and make video recordings of matters such as U.S. ports of entry and federal law

19   enforcement officers engaged in the public discharge of their duties.

20        60.    By engaging in the above-described conduct on or about June 20, 2010, the CBP

21   violated Mr. Ramirez's First Amendment right to freedom of speech.

22        61.    In violating Mr. Ramirez's First Amendment rights, the CBP officers acted

23   pursuant to an expressly adopted official CBP policy and/or a longstanding CBP practice of

24   prohibiting the use of cameras and video recording devices at CBP-controlled facilities, including

25   U.S. ports of entry, without the CBP's prior approval.  This policy and/or practice prevents,

26   restricts and/or hinders the ability of persons such as Plaintiffs to take photographs and make

27   video recordings of matters such as U.S. ports of entry and federal law enforcement officers

28   engaged in the public discharge of their duties.  This CBP policy and/or practice continues to be

sd-595551

1  an impermissible prior restraint on speech and to chill, deter, and infringe Mr. Ramirez's First

2  Amendment right to freedom of speech.

3  **CLAIM THREE**
**(VIOLATION OF THE FOURTH AMENDMENT—UNLAWFUL SEARCH AND**
4  **SEIZURE—BY PLAINTIFF ASKINS AGAINST DEFENDANTS DEPARTMENT OF**
**HOMELAND SECURITY, COMISSIONER AGUILAR, AND OFFICERS DOES 1-15)**
5

6       62.     Plaintiff Askins incorporates by reference and re-alleges each preceding paragraph

7  as if fully set forth herein.

8       63.     By engaging in the above-described conduct on or about April 19, 2012, CBP

9  Officers Does 1-15 searched and seized Mr. Askins's person and/or property without a warrant,

10  probable cause, reasonable suspicion, consent, exigent circumstances, or any other justification,

11  in violation of Mr. Askins's Fourth Amendment right to freedom from unreasonable search and

12  seizure.

13       64.     In violating Mr. Askins's Fourth Amendment rights, the CBP officers acted

14  pursuant to an expressly adopted official CBP policy and/or a longstanding CBP practice of

15  searching and seizing individuals without a warrant, probable cause, reasonable suspicion,

16  consent, exigent circumstances, or any other justification, when the individuals use cameras and

17  video recording devices at or near CBP-controlled facilities, including U.S. ports of entry, without

18  the CBP's prior approval.

19       65.     Furthermore, the conduct of Officers Does 1-15 caused Mr. Askins to suffer harm.

20  As a result, Mr. Askins is entitled to monetary damages from Officers Does 1-15 pursuant to the

21  *Bivens* doctrine.

22       66.     The unreasonable search and seizure by Officer Does 1-15 was also oppressive,

23  malicious, and done with a willful and conscious disregard of Mr. Askins's rights and safety,

24  justifying an award of punitive damages.

25

26

27

28

sd-595551

**CLAIM FOUR**
**(VIOLATION OF THE FOURTH AMENDMENT—EXCESSIVE USE OF FORCE—BY PLAINTIFF ASKINS AGAINST DEFENDANTS DEPARTMENT OF HOMELAND SECURITY, COMISSIONAR AGUILAR, AND OFFICERS DOES 1-15)**

67.     Plaintiff Askins incorporates by reference and re-alleges each preceding paragraph as if fully set forth herein.

68.     By engaging in the above-described conduct on or about April 19, 2012, including gripping Mr. Askins's right arm with such force as to cause significant pain and bruising, without provocation or justification, Officer Doe 1 violated Mr. Askins's Fourth Amendment right to freedom from the use of excessive force.

69.     Furthermore, the conduct of Officer Doe 1 caused Mr. Askins to suffer harm.  As a result, Mr. Askins is entitled to monetary damages from Officer Doe 1 pursuant to the *Bivens* doctrine.

70.     Officer Doe 1's excessive use of force was also oppressive, malicious, and done with a willful and conscious disregard of Mr. Askins's rights and safety, justifying an award of punitive damages.

**CLAIM FIVE**
**(VIOLATION OF THE FOURTH AMENDMENT—UNLAWFUL SEARCH AND SEIZURE—BY PLAINTIFF RAMIREZ AGAINST DEFENDANTS DEPARTMENT OF HOMELAND SECURITY AND COMISSIONAR AGUILAR)**

71.     Plaintiff Ramirez incorporates by reference and re-alleges each preceding paragraph as if fully set forth herein.

72.     By engaging in the above-described conduct on or about June 20, 2010, the CBP officers searched and seized Mr. Ramirez's person and/or property without a warrant, probable cause, reasonable suspicion, consent, exigent circumstances, or any other justification, in violation of Mr. Ramirez's Fourth Amendment right to freedom from unreasonable search and seizure.

73.     In violating Mr. Ramirez's Fourth Amendment rights, the CBP officers acted pursuant to an expressly adopted official CBP policy and/or a longstanding CBP practice of searching and seizing individuals without a warrant, probable cause, reasonable suspicion,

COMPLAINT

sd-595551

consent, exigent circumstances, or any other justification, when the individuals use cameras and video recording devices at or near CBP-controlled facilities, including U.S. ports of entry, without the CBP's prior approval.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Preliminarily and permanently enjoin all Defendants, their successors, agents, servants and employees, and anyone acting in concert with Defendants, from preventing, impeding, or otherwise interfering with Plaintiffs' First Amendment free speech rights to take photographs and make video recordings of U.S. ports of entry and federal law enforcement officers engaged in the public discharge of their duties;

B.     Preliminarily and permanently enjoin all Defendants, their successors, agents, servants and employees, and anyone acting in concert with Defendants, from violating Plaintiffs' Fourth Amendment rights by searching and seizing Plaintiffs and/or Plaintiffs' cameras or video recording devices without a warrant, probable cause, reasonable suspicion, consent, exigent circumstances, or any other justification, when Plaintiffs use cameras and video recording devices at or near CBP-controlled facilities, including U.S. ports of entry.

C.     Declare Defendants' conduct to be unlawful;

D.     Award Plaintiff Askins general, compensatory, statutory, nominal, and/or punitive damages against CBP Officers Does 1-15 for the violations of his First and Fourth Amendment rights, in an amount to be proven at trial;

E.     Award Plaintiffs' costs, including reasonable attorneys' fees; and

F.     Award such other relief as the Court deems proper.

///

///

///

///

///

///

sd-595551

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all issues so triable.


Dated: October 24, 2012                    MORRISON & FOERSTER LLP


                                           By:    ___s/M. Andrew Woodmansee___
                                                  M. ANDREW WOODMANSEE
                                                  MAWoodmansee@mofo.com

                                                  Attorneys for Plaintiffs
                                                  RAY ASKINS and CHRISTIAN RAMIREZ

COMPLAINT

sd-595551