# Exhibit C

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PHILLIP MOCEK,

        Plaintiff,

vs.                                         No. CIV 11-1009 JB/KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE AVIATION POLICE
DEPARTMENT, MARSHALL KATZ, in
his official capacity as Chief of Police of the
Albuquerque Aviation Police Department,
JONATHAN BREEDON, GERALD
ROMERO, ANTHONY SCHREINER,
ROBERT F. DILLEY a/k/a BOBBY
DILLEY, LANDRA WIGGINS, JULIO
DE LA PENA, and DOES 1-25, inclusive,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Individual Federal Defendants' Motion

to Dismiss, filed June 1, 2012 (Doc. 25)("MTD"). The Court held a hearing on November 20,

2012. The primary issues are: (i) whether Plaintiff Phillip Mocek has alleged a plausible claim

that Defendants Transportation Security Administration officers Jonathan Breedon, Gerald

Romero, and Anthony Schreiner, (collectively, the "TSOs") violated his rights under the First

Amendment to the United States Constitution; (ii) whether Mocek has alleged a plausible claim

that the TSOs violated his rights under the Fourth Amendment to the United States Constitution;

(iii) whether the TSOs are entitled to qualified immunity on Mocek's claims; and (iv) whether

the Court has jurisdiction over Mocek's claims for declaratory relief from the TSOs in their

official capacity. The Court will grant the MTD. Mocek has not sufficiently alleged that the

TSOs plausibly violated his First Amendment rights through ordering him to cease recording and

subsequently summoning the police, and, even if they had, the TSOs are entitled to qualified immunity because Mocek's alleged right to gather news at an airport screening checkpoint and to record police activity in public are not clearly established. Mocek has also not sufficiently alleged that he suffered a Fourth Amendment violation at the hands of the Defendants Albuquerque Aviation Police Department officers Robert F. Dilley, Landra Wiggins, and Julio De La Pena (collectively, "the AAPD officers"). The TSOs, therefore, cannot be liable for having proximately caused Mocek's alleged Fourth Amendment injuries, because Mocek has not sufficiently alleged that the TSOs' conduct led to the deprivation of his rights under the Fourth Amendment. Further, the TSOs did not violate clearly establish law by summoning the AAPD officers, because the TSOs summoned the AAPD officers after Mocek would not comply with the TSOs' reasonable order for Mocek to stop filming. The TSOs are, thus, entitled to qualified immunity from Mocek's Fourth Amendment claims, because the TSOs did not engage in tortious or unlawful conduct which they knew or reasonably should have known would lead to the AAPD officers depriving Mocek of his constitutional rights. Lastly, Mocek has not brought his claims against the TSOs in their official capacity under a statute in which the TSA has waived its sovereign immunity, and thus the Court will dismiss Mocek's claims for declaratory relief against the TSOs for lack of jurisdiction.

## **FACTUAL BACKGROUND**

Mocek is an "outspoken advocate of free software, open standards, government transparency, drug policy reform, and civil liberties." Complaint for Damages, Injunctive Relief, and Declaratory Relief Demand for Jury Trial ¶ 1, at 1-2, filed Nov. 14, 2011 (Doc. 1)("Complaint"). Mocek began to "harbor reservations" regarding the Transportation Security Administration's ("TSA") passenger identification procedures in 2007, and from that time did

not always show documentation of identity when flying on commercial airlines. Id. ¶ 1, at 2, ¶ 27, at 6. "Typically, once TSA staff realized he did not intend to present I.D., Mocek would be diverted to a separate line to await assistance and additional questioning from another TSA agent." Id. ¶ 28, at 6. Mocek would usually be allowed to board his flights without showing identification, although he noticed that his person and his bags were searched more thoroughly when he did not show identification than when he did. See id. ¶ 1, at 2, ¶ 29, at 6-7.

Around mid-2008, TSA announced that passengers who "willfully refused" to show identification would not be allowed to pass through screening checkpoints, but that passengers who had misplaced their identification or whose identification were stolen would be allowed to pass through if they complied with alternative procedures. Id. ¶ 30, at 7.

Mocek research the TSA's regulation and policies regarding photography, video recording, and filming at airport screening locations in 2009, and learned that TSA does not prohibit any of these actions at a screening location. See Complaint ¶ 2, at 2; id. ¶ 32, at 7-8. He was informed, through whom he believed to be sources expounding TSA police, that TSA does not allow passengers to take pictures of the monitors at checkpoints, but that taking pictures generally was permitted so long as it did not interfere "with the screening process or slow[] things down." Id. ¶ 32, at 8. A TSA employee at the Albuquerque International Sunport Airport ("Albuquerque Sunport"), in Albuquerque, New Mexico, informed Mocek that there are not any state or local laws prohibiting photography in public areas of the Albuquerque Sunport, but the TSA employee also advised Mocek that he should contact the Albuquerque Sunport's public affairs staff in advance to coordinate photography. Mocek believed that these statements "represented official TSA rules and policies." Id. ¶ 37, at 9. When Mocek inquired regarding the necessity of coordinating photography in advance, the same TSA employee informed Mocek that

advance coordination of photography was a "local practice and not available in writing," but that advance coordination would allow TSA to inform law enforcement officers at the checkpoint of the photography.  Id. ¶ 39, at 9.  The TSA employee informed Mocek that the TSA screening checkpoint at the Albuquerque Sunport is a "restricted area and just for ticketed passengers."  Id. ¶ 39, at 9 (internal alterations omitted).  The TSA employee later informed Mocek, after another inquiry from him, that the information the employee provided was "a recommendation," and that TSA "only encourage[s] individuals to contact TSA in advance so we can facilitate the photography."  Complaint ¶ 40, at 9.  When Mocek asked if he could disregard the employee's statement that advance coordination is "required," the employee reiterated that her statement was a recommendation, and that advance coordination was only encouraged so that TSA "can facilitate the photography."  Id. ¶ 41, at 9-10.  Mocek believed, from this exchange, that "neither TSA nor state or local laws prohibited him from photography or filming at the TSA checkpoint" at the Albuquerque Sunport, other than filming the TSA monitors.  Id. ¶ 42, at 10.

On November 15, 2009, Mocek attempted to fly out of the Albuquerque Sunport without providing identification.  Although he possessed a Washington state driver's license, he had given his license to his travelling companion, Jesse Gallegos, before approaching the TSA screening checkpoint.  See id. ¶ 43, at 10.  Mocek expected that he may encounter the "new identification procedure" which TSA announced in 2008 and was concerned that he may face retaliation for his "willful . . . refusal to show documentation of identity."  Id. ¶ 3, at 2.

When Mocek reached the TSA podium, he presented his boarding pass to a TSA employee, but did not present identification.  He informed the TSA employee that "it was his understanding that he was not required to produce any such documents, only his boarding pass."  Complaint ¶ 44, at 10.  The TSA employee told Mocek to stand in a different line nearby, where

Mocek waited.  See id. ¶ 44, at 10.

      Breedon then approached Mocek and asked him if he had any other forms of identification, such as a credit card, which might help to identify him, and Mocek responded that he did not believe he was required to produce identification.  Breedon informed Mocek that he was correct and asked Mocek if he could verify his identity in another way.  Mocek stated that he would not provide any form of identification, because he believed he was not required to provide identification.  Breedon told Mocek that he would contact the TSA's Security Operations Center, which would attempt to verify Mocek's identity, and that if the Security Operations Center could not verify Mocek's identity, he would not be allowed to board the plane.  See id. ¶ 45, at 10-11.  None of the TSA employees present indicated that they had any intent to involve law enforcement at that time.  See id. ¶ 45, at 11.

      Mocek then began using his camera to video "what he perceived to be an atypical, alternative identification policy."  Id. ¶ 46, at 11.  Breedon told Mocek to stop filming, but Mocek responded that he did not believe that filming in a "publicly accessible" area was illegal.  Complaint ¶ 46, at 11.  Breedon attempted to take Mocek's camera, and told him that no photography or videotaping was permitted at the checkpoint.  See id. ¶ 46, at 11.  Breedon then called for police assistance.  See id. ¶ 47, at 11.

      Romero and Schreiner approached Breedon and Mocek.  See id.  Romero "ordered Mocek repeatedly to put down the camera and attempted to grab either Mocek or the camera."  Id. ¶ 48, at 11.  Mocek "remained calm and restrained" throughout the incident, while the TSOs became increasingly agitated.[1]  Complaint ¶ 5, at 2.  Mocek did not consent to being searched.

---

[1] The TSOs attach to their MTD a statement from Breedon, which relates that, after the AAPD officers arrived at the screening checkpoint, "the situation escalated to the point where an AAPD officer informed Mocek he would not be allowed to fly."  Statement from Jonathan

See id. ¶ 71, at 16.

The AAPD officers arrived soon thereafter.  TSA employees complained to the AAPD officers that Mocek would not cease filming, was "taking pictures of all of us," and was "causing a disturbance."  Id. ¶ 49, at 11-12.  Dilley told Mocek to comply with the TSA employees' instructions and that, if he did not, Mocek would be escorted out of the airport.  Mocek asserted that he was not causing a commotion, was not attempting to hinder TSA employees from doing their job, and was complying with all TSA rules and regulations.  See id. ¶ 51, at 12.  When Dilley again informed Mocek that he could either comply or be escorted out of the airport, Mocek stated that he "did not believe there was a rule that barred him from using a camera in publicly accessible areas of the airport."  Id. ¶ 52, at 12.  Wiggins informed Mocek that he could not film at the screening checkpoint, a federal checkpoint, but Mocek asserted that he had looked into the legality of his actions and that he could film.  Wiggins responded that "you can be arrested, then you can check into it more."  Complaint ¶ 52, at 12.

The AAPD officers then attempted to escort Mocek out of the airport, and Mocek stated that he did not understand why he was being escorted out, but he did not refuse to comply with the AAPD officers' order that he leave.  See id. ¶ 53, at 12; id. ¶ 69, at 16.  Dilley stopped attempting to escort Mocek out of the airport and asked to see Mocek's identification.  Dilley informed Mocek that he would need to see his identification or else Mocek would be arrested for concealing his identity.  See id. ¶ 54, at 12.  Mocek stated that he did not have identification to

Breedon at 3, filed June 1, 2012 (Doc. 25-2).  The TSOs also attach a statement from Schreiner, in which he describes Mocek as a "hostile male," "belligerent," and relates that Mocek was taking photographs "in a threatening manner."  Statement from Anthony M. Schreiner at 1, filed June 1, 2012 (Doc. 25-3).  The Court will not rely upon these statements, and thus the MTD is not converted into a motion for summary judgment.  See Fed. R. Civ. P. 12(d)("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

show Dilley. Dilley then informed Mocek that he was part of a criminal investigation for disturbing the peace, and was required to show identification. Mocek asserted that he had not disturbed the peace and when asked again by Dilley to provide identification, Mocek stated that he wanted to talk to an attorney. See id. ¶ 54, at 12. Dilley subsequently arrested Mocek. See id. ¶ 55, at 13. Mocek was in a publicly accessible area of the Albuquerque Sunport during these interactions with TSA agents and AAPD officers. See Complaint ¶ 5, at 1.

Dilley and Wiggins then walked Mocek to the AAPD office at the Albuquerque Sunport, where they placed him in an airport holding cell. See id. ¶ 57-67, at 13. The holding cell was approximately four by eight feet in size. See id. ¶ 57, at 13. The officers searched Mocek's belongings. See id. ¶ 57, at 13. About three hours later, Dilley drove Mocek to the Metropolitan Detention Center. See id. ¶¶ 62-65, at 14. Dilley's incident report stated that Mocek committed a "disturbance by Disorderly Conduct" at the Albuquerque Sunport, refused to identify himself, and refused to comply with a criminal trespass order. Complaint ¶ 68, at 15. Dilley's statement related that Mocek was "causing a disturbance by yelling" and that Mocek had refused to lower his voice even though Dilley ordered him to lower his voice four times. Id. ¶ 68, at 15. De La Pena's incident report relates that TSA agents informed the AAPD officers that Mocek was "causing a disturbance and yelling at officers." Id. ¶ 70, at 16 (internal quotation omitted). Audio and video recording from the incident reveal that Dilley never asked Mocek to lower his voice, and that Mocek remained clam throughout the incident. See id. ¶ 69, at 15. Video recording also indicates that passengers continued to pass through the checkpoint during the incident without hesitation. See id. ¶ 71, at 16, ¶ 73, at 17.

Mocek was charged on four counts for this incident: (i) disorderly conduct; (ii) concealing identity with intent to obstruct, intimidate, hinder or interrupt; (iii) resisting,

obstructing or refusing to obey an officer; and (iv) criminal trespass.  <u>See</u> Complaint ¶ 7, at 3. On January 20, 2011, a jury in Bernalillo County Metropolitan Court, Case No. CR 2573709, tried Mocek.  <u>See id.</u> ¶ 86, at 20.   Mocek was able to restore his video footage, which had been deleted on his camera while his belonging remained at the Albuquerque Sunport and he was at the Detention Center, and used that footage in the state court trial.  <u>See id.</u> ¶ 9, at 3, ¶¶ 83,85, at 20.  On January 21, 2011, a jury acquitted Mocek of all four charges.  <u>See id.</u> ¶ 9, at 3, ¶ 88, at 21.

<u>**PROCEDURAL BACKGROUND**</u>

Mocek asserts that his Complaint arises under: (i) the United States Constitution; (ii) the Civil Rights Act, 42 U.S.C. § 1983; (iii) The Declaratory Relief Act, 28 U.S.C. §§ 2201-02; and (iv) <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971)("<u>Bivens</u>").  <u>See</u> Complaint ¶ 11, at 3.  Mocek asserts that the Court has jurisdiction over his Complaint under 28 U.S.C. §§ 1331, 1332, 1343, and 2201, and has supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a).  <u>See</u> Complaint ¶ 12, at 3-4.  Mocek asserts that venue is proper, because the acts set forth in the Complaint occurred in Bernalillo County.  <u>See</u> Complaint ¶ 13, at 4 (citing 28 U.S.C. §§ 1391(b),(e)).   Mocek also asserts that he has complied with the New Mexico Tort Claims Act, NMSA 1978 § 41-4-16, by "presenting a government claim within 90 days of the date upon which the cause of action accrued."  Complaint ¶ 14, at 4.

Mocek brings claims against the following Defendants: (i) the City of Albuquerque; (ii) the AAPD; (iii) Marshall Katz, in his official capacity as Chief of Police at the AAPD; (iv) Breedon, in his individual capacity and his official capacity as a TSA employee and the Lead Transportation Security Officer during the incident; (v) Romero, in his individual and official capacities as a TSA employee and the Transportation Security Manager during the incident; (vi)

- 8 -

Schreiner, in his individual and official capacities as a TSA employee and the Supervisory Transportation Officer during the incident; (vii) Dilley, in his individual and official capacities as an officer of the AAPD who participated in Mocek's arrest; (viii) Wiggins, in his individual and official capacities as an AAPD officer; (ix) De La Pena, in his individual and official capacities as an officer of the AAPD; and (x) certain unnamed Does, who Mocek alleges are responsible in some manner for his injuries and damages. See Complaint ¶¶ 16-25, at 4-5.

Mocek asserts that the "Defendants' unlawful and unconstitutional conduct resulted in Mocek's arrest, detention, seizure and attempted destruction of his property, institution of baseless criminal proceedings against him, and other financial and emotional distress." Complaint ¶ 89, at 21. He asserts that he incurred "in excess" of $34,000.00 in legal fees for his legal defense to the criminal charges against him. Complaint ¶ 90, at 21. Mocek also asserts that the Defendants have "set a dangerous standard and sent a message to individuals" flying through the Albuquerque Sunport that "they should be fearful of exercising their right to interstate air travel without having to provide documentation of identity and their right to photograph and film in publicly accessible areas of the airport," because the TSA employees or AAPD officers may conspire to retaliate against individuals so acting, and may arrest such individuals. Complaint ¶ 91, at 21. Mocek asserts that the Defendants' conduct "in threatening arrest and prosecution would chill a person of ordinary firmness from continuing to engage in lawful, constitutionally protected activity." Complaint ¶ 91, at 21.

Mocek brings seven claims. He asserts as Count I an action under Bivens against the TSOs and Does 1-25, in their individual capacities, for having violated his First Amendment rights. See Complaint ¶¶ 92-93, at 21-22. Mocek asserts that these Defendants' "policies, practices, and conduct in unlawfully ordering Plaintiff to cease video and audio recording" of

them, and then summoning law enforcement officers, resulted in his unlawful arrest, the search and seizures of his camera, an attempted destruction of the "evidence" on his camera, and the filing of criminal charges against him, all of which "were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted." Complaint ¶ 93, at 21-22.

Mocek asserts as Count II an action against the AAPD officers and Does 1-25 in their individual capacities, for the violation of his First and Fourteenth Amendment rights, under 42 U.S.C. § 1983. Mocek asserts that these Defendants' "policies, practices, and conduct," which Mocek asserts includes his unlawful arrest, the search of his camera, and an attempt to destroy "evidence" by deleting the contents of his camera, "were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and chill Plaintiff from such activity in the future." Complaint ¶ 95, at 22.

Mocek asserts in Count III that the TSOs and Does 1-25 violated his Fourth Amendment rights, and Mocek brings this claim under Bivens against the TSOs in their individual capacities. See Complaint at 22. Mocek asserts that these Defendants' "policies, practices, and conduct in summoning law enforcement," which Mocek asserts resulted in him being subjected to excessive force, the search of his person, the seizure of his camera, and an attempt to destroy "evidence," "in willful, wanton, and reckless disregard" of his rights, violated his right to be free from unreasonable search and seizure, and from excessive force. Complaint ¶ 97, at 23.

Mocek asserts in Count IV that the AAPD officers and Does 1-25 violated his Fourth and Fourteenth Amendment rights, and he brings this claim under 42 U.S.C. § 1983. Mocek argues that these Defendants' "policies, practices, and conduct in seizing and arresting Plaintiff without reasonable suspicion or probable cause," and these Defendants' use of excessive force, searching

his person and seizing his camera, and attempting to destroy "evidence" by deleting the contents of his camera, were actions done in "willful, wanton, and reckless disregard of Plaintiff's rights," and violated Mocek's rights to be free from unreasonable search and seizures and excessive force under the Fourth Amendment.  Complaint ¶ 99, at 23.

Mocek asserts as Count V a claim against the AAPD officers and Does 1-25 in their individual capacities for damages that he incurred as a result of these Defendants' "policies, practices, and conduct," which included seizing and arresting him knowingly without probable cause or legal justification.  Complaint ¶ 101, at 23-24.

Mocek asserts as Count VI a claim against the AAPD officers and Does 1-25 for malicious abuse of process, on the grounds that these Defendants instituted criminal judicial proceedings against Mocek in misuse of the legal process by "filing a criminal complaint against [him] without probable cause, through the providing of information while knowing it to be false, in furtherance of the illegitimate end of retaliating against [him] for his video and audio recording of them."  Complaint ¶ 103, at 24.

Mocek asserts as Count VII a claim against the City of Albuquerque for damages under Monell v. Dept. of Social Servs. of the City of New York, 436 U.S. 658 (1978), and under 42 U.S.C. § 1983.  See Complaint at 24.  Mocek asserts that the City of Albuquerque "through its policymakers had in force and effect a policy, practice, or custom to prohibit lawful photography and filming in publicly accessible areas of the Albuquerque airport, even though no statute or ordinance prohibits such photography and filming."  Complaint ¶ 105, at 24.  Mocek asserts that the City of Albuquerque also had in place a policy, practice, or custom "to require individuals to provide documentation of identity even when providing such documentation is not required."  Complaint ¶ 105, at 24.  Mocek alleges that the City of Albuquerque had a policy, practice, or

- 11 -

custom to "arrest or threaten to arrest individual who seek to engage in such lawful actions." Complaint ¶ 105, at 24. Mocek asserts that the City of Albuquerque had a "policy, practice, or custom" to "engage in retaliatory behavior" against individuals who "seek to exercise their lawful right to use cameras in areas where no legitimate time, place, and manner restrictions were in place." Complaint ¶ 106, at 25. Mocek asserts that the City of Albuquerque had a "policy, practice, or custom to fail to properly discipline, train, and supervise City police officers . . . in the legality of not having to provide documentation of identity, in the legality of filming in the Albuquerque airport, and in the illegality of retaliating against individuals who seek to exercise their lawful rights." Complaint ¶ 107, at 25. Mocek asserts that the City of Albuquerque's policy makers had "actual or constructive knowledge of these unlawful practices yet failed to take any reasonable or adequate steps to remedy them." Complaint ¶ 108, at 25. Mocek asserts that the City of Albuquerque led its law enforcement officers to believe that "misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated, making it foreseeable that officers would violate individuals' rights in precisely the manner in which Plaintiff's rights were violated." Complaint ¶ 109, at 25. Mocek asserts that the City of Albuquerque's policy makers were "deliberately indifferent to this risk." Complaint ¶ 109, at 25. Mocek asserts that the City of Albuquerque's "policies, practices, or customs were the moving force behind Plaintiff's constitutional injuries, false arrest, and malicious abuse of process, causing damages to Plaintiff." Complaint ¶ 110, at 25.

Mocek asserts as Count VIII a claim for declaratory relief under 28 U.S.C. §§ 2201-2202 against "all defendants in their official capacities." Complaint at ¶ 112, at 26. Mocek asserts that an "actual, present, and justiciable controversy" exists between him and the Defendants regarding their "rights and duties with respect to the Defendants' conduct described herein."

Complaint ¶ 112, at 26. Mocek asserts that the Defendants deny that their conduct violates his rights under the Constitution and the "laws of the United States," and Mocek asserts that he is afraid that he will "again be subject to such unlawful and unconstitutional actions." Complaint ¶ 112, at 26. Mocek "seeks a judicial declaration that Defendants' conduct deprived Plaintiff of his rights under the Constitution and the laws of the United States." Complaint ¶ 112, at 26.

Mocek request the following relief: (i) "a judicial declaration that Defendants' actions as alleged in this Complaint violated the First and Fourth Amendments of the United States Constitution;" (ii) "a court order enjoining Defendants from prohibiting the use of cameras and other recording devices in publicly accessible areas of the Albuquerque airport where no legitimate time, place, and manner restrictions are in place," and prohibiting the Defendants from retaliation "against individuals who seek to exercise their right to use such cameras and other recording devices;" (iii) "a court order requiring Defendants to undertake training and other prophylactic measure to ensure Defendants' conduct is not repeated in the future;" (iv) compensatory, nominal, and special damages; (v) prejudgment and post judgment interest; (vi) costs and expenses, under 42 U.S.C. § 1988 and 28 U.S.C. § 2412; and (vii) "other relief as is just and proper." Complaint at 26-67. Mocek also demands a jury trial. See Complaint at 27.

Mocek takes issue with certain statements he asserts Breedon and Schreiner made regarding the incident. See Complaint ¶ 74, at 17. He does not provide a date for either statement. Neither does he quote more than a few phrases from either statement, instead Mocek includes a summary of the statements. See Id. ¶¶ 75, 77, at 17-19. Mocek asserts that "Breedon's statement importantly indicates that he did not request police involvement until he asked Mocek to cease using his camera." Id. ¶ 76, at 18. Mocek quotes Breedon's statement that the situation "escalated again," after the AAPD officers arrived. Id. ¶ 75, at 18. Mocek asserts

that Breedon fails to mention that "much of the escalation was due to the conduct of the officers and not Mocek, who throughout remained calm and composed." Id. ¶ 76, at 18. Mocek quotes from Schreiner's statement's description of Mocek as "hostile" and "belligerent," and Schreiner's statement that Mocek took photographs "in a threatening manner." See Complaint ¶ 77, at 18. Mocek asserts that Schreiner's description of him is not supported out by video footage of the incident. He also asserts that the statement does not explain how Mocek took pictures in a "threatening manner." Id. ¶ 78, at 19.

The TSOs move the Court, pursuant to rule 12(b)(a) of the Federal Rules of Civil Procedure, for the entry of an order dismissing Mocek's claims against them for failure to state a claim upon which relief can be granted. Mocek's claims against the City of Albuquerque, the AAPD, and members of the AAPD are not at issue in the MTD. See Memorandum in Support of Individual Federal Defendants' Motion to Dismiss at 1, filed June 1, 2012 (Doc. 25-1)("MTD Memo."). In support of the motion, the Individual Federal Defendants refer to their memorandum of law and two exhibits. The TSOs attached to their MTD statements from Breedon and Schreiner regarding the incident. See Statement from Jonathan Breedon; Statement from Anthony M. Schreiner (collectively "the TSO statements"). The TSOs rely on these statements in their MTD to relate that Breedon "indicated he would contact the TSA's Security Operations Center to attempt to verify the Plaintiff's identity so that he could fly," MTD at 13 (citing Statement from Jonathan Breedon at 1), and to assert that the Complaint "demonstrates that the TSA defendants were not responsible for the complained-of injuries, namely the Plaintiff's arrest, the handling of his property, or the filing of criminal charges," MTD at 16 (citing Statement from Anthony M. Schreiner at 2).

Mocek opposes this motion. See MTD at 1. The TSOs contend that they are entitled to qualified immunity on both of the constitutional claims against them. The TSOs assert that the

- 14 -

Court should dismiss his First Amendment retaliation claim because they "acted reasonably, under the circumstances, in requesting that the Plaintiff cease recording their activities at the airport's security checkpoint," which the TSOs assert is a nonpublic forum.  MTD Memo. at 2. The TSOs also contend that they did not cause the injuries Mocek alleges resulted from the violation of his First Amendment rights -- specifically, the TSOs argue that they did not cause Mocek to be arrested, or his person or property to be searched.  The  TSOs further assert that "it was not clearly established that Plaintiff had a First Amendment right to video record TSOs conducting alternative screening procedures to verify his identity at a security checkpoint," and they are thus entitled to qualified immunity on this claim.  MTD Memo. at 2.  Regarding Mocek's Fourth Amendment claims, the TSOs assert that Mocek has not shown that his Fourth Amendment rights were violated, because the Complaint does not allege that the TSOs "caused or participated in his seizure or the search, and alleged mishandling, of his property."  MTD Memo. at 2.  The TSOs assert that "'summoning law enforcement,' is not a clearly established violation of the Plaintiff's Fourth Amendment Rights."  MTD Memo. at 2 (quoting Complaint ¶ 97, at 23).

To allege a violation of Mocek's rights under the First Amendment, the TSOs argue that Mocek must establish:

> (1) that the plaintiff was engage in constitutionally protected activity; (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action as substantially motivated as a response to the plaintiff's exercise of constitutional protected conduct.

MTD Memo. at 10-11 (quoting Klen v. City of Loveland, 661 F.3d 498, 508 (10th Cir. 2011)). The TSOs assert that Mocek must allege facts which allow the court to "draw the reasonable inference that defendant is liable for the misconduct alleged," and that a complaint which

includes facts "'merely consistent with' a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief.'"  MTD Memo. at 11 (quoting Ashcroft v. Iqbal, 556 U.S. 6626, 678 (2009))(internal citations omitted)).

The TSOs contend that no court has recognized Mocek's alleged "constitutionally protected right to record audio and video."  MTD Memo. at 11 (quoting Complaint ¶ 93, at 21-22).  The TSOs further contend that, even if Mocek has a right to the activity alleged, the restrictions imposed by the TSOs were reasonable and permissible under the First Amendment, and further, that "there is no causal connection between the individual federal defendants' actions and the injury he claims resulted from his engagement in protected activity."  MTD Memo. at 11.

The TSOs assert that "publicly-owned airports such as Albuquerque International Sunport are nonpublic fora."  MTD Memo. at 11 (citing Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679 (1992)).  The TSOs assert that restrictions on speech at an airport terminal "need only be reasonable."  MTD Memo. at 11 (citing Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683).  The TSOs further assert that, "'when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum.'"  MTD Memo. at 12 (quoting Davenport v. Washington Educ. Ass'n, 551 U.S. 177, 189 (2007)).

The TSOs assert that Congress created the Transportation Security Administration ("TSA") to maintain "'security in all modes of transportation'" and that this charge requires TSA to "'provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft.'"  MTD Memo. at 2-3 (quoting 49 U.S.C. § 114(d); 49 U.S.C. § 44901(a)). The TSOs contend that the screening requirement requires TSA agents to confirm "that the

traveler who presents himself at the security checkpoint shares the same identity as the individual named on the boarding pass in order to ensure that all passengers have been appropriately vetted against federal watch lists pursuant to 49 U.S.C. § 44903(j)(2)(C)."  MTD Memo. at 3.  The TSOs assert that this screening must take place before boarding, and that the screening is "critical to TSA's ability to efficiently and effectively carry out its duties, and is mandatory [p]recondition for boarding and flying on commercial airlines."  MTD Memo. at 3 (citing 49 U.S.C. § 44901(a)).   The TSOs also assert that passengers are prohibited from interfering with screening personnel who are performing their duties at an airport screening checkpoint.  See MTD Memo. at 3-4 (citing 49 C.F.R. § 1540.109).

The TSOs point out that Mocek willingly refused to provide identification to TSA agents at the Albuquerque Sunport.  See MTD Memo. at 4; id. at 13.  The TSOs also point out that Mocek inquired about the legality of taking photographs at security checkpoints at a TSA website before the incidents in the Complaint occurred.  See MTD Memo. at 4; id. at 12-13.  The TSOs assert that a TSA website informed Mocek that "there was no general prohibition against taking photographs 'as long as you're not interfering with the screening process or slowing things down.'"  MTD Memo. at 4 (quoting Complaint ¶¶ 31-32, at 7-8).  The TSOs also point out that a TSA employee at the Albuquerque Sunport informed Mocek was informed by a TSA that the security checkpoint is a "restricted area . . . just for ticketed passengers," and that he should coordinate in advance with TSA officials if he wished to film at or near the screening checkpoint, which the TSOs point out Mocek did not do.  See MTD Memo. at 4-5; id. at 13 (citing Complaint ¶ 32, at 7-8; id. ¶ 37, at 9; id. ¶¶ 39-41, at 9-10).

The TSOs assert that, during the incident, Breedon informed Mocek that he would "'need to stop filming,'" but that Mocek continued to film and stated that he believed that filming was

not illegal. MTD Memo. at 5 (quoting Complaint ¶ 46, at 11). The TSOs point out that Mocek repeatedly refused to stop filming, despite Romero asking Mocek to stop. MTD Memo. at 5 (citing Complaint ¶¶ 48-48, at 11-12; id. ¶ 69, at 15-16). The TSOs point out that, when AAPD officers were allegedly summoned to the scene, the AAPD officers indicated to Mocek that he was causing a commotion, but Mocek continued to record. See MTD Memo. at 6 (citing Complaint ¶¶ 49-52, at 11-12). The TSOs point out that AAPD officers informed Mocek that he was part of a criminal investigation and required him to produce his identification, and that AAPD officers ultimately arrested Mocek for concealing his identity. See MTD Memo. at 6-7 (citing Complaint ¶¶ 54-55, at 12-13; id. ¶ 57, at 13).

The TSOs assert that these actions were reasonable responses to Mocek's "attempt to create a disturbance by willfully refusing to provide his I.D. and filming the alternative screening process that ensued." MTD Memo. at 13. The TSOs assert that checkpoint disturbances can be dangerous situations, and a disturbance at a checkpoint could allow others to evade security. They also assert that federal law allows TSA employees to summon "a checkpoint screening supervisor and law enforcement officer" when a disturbance occurs. MTD Memo. at 13-14 (quoting 67 Fed. Reg. 8340, 8344)(citing 49 C.F.R. § 1542.215). The TSOs assert that Mocek's "refusal to provide I.D. and his video recording of the screening process raised legitimate concerns about transportation security." MTD Memo. at 14. The TSOs also contend that a "reasonable TSA officer could not responsibly assume that the Plaintiff was neither attempting to evade the security system nor testing the system responses for future operations." MTD Memo. at 14. The TSOs also assert that they must have discretion to stop a passenger from recording security procedures, so as to protect the public from passengers with malicious intent, even though filming the procedures is not prohibited. See MTD Memo. at 14. The TSOs assert that

Breedon took reasonable action under the circumstances by attempting to end Mocek's disruption and by requesting the assistance of the AAPD officers. <u>See</u> MTD Memo. at 15.

The TSOs argue that Mocek has failed to show that the TSOs' actions would "chill a person of ordinary firmness form continuing to engage in a protected activity." MTD Memo. at 15 (citing <u>Klen v. City of Loveland</u>, 661 F.3d 508). The TSOs assert that the Complaint shows that they are not responsible for the injury that Mocek allegedly suffered through his arrest, from the handling of his property, and from the filing of criminal charges against him. <u>See</u> MTD Memo. at 16 (citing Complaint ¶¶ 49-67, at 11-15; <u>id.</u> ¶ 83, at 20; <u>id.</u> ¶ 93, at 21-22). The TSOs assert that the Complaint clearly sets forth that Dilley, and not any of the TSOs, "made the decision to arrest the Plaintiff." MTD Memo. at 16 (citing Complaint ¶¶ 51-55, at 12-13).

The TSOs also assert that Mocek has failed to allege a Fourth Amendment violation, because "the Plaintiff's recitation of the facts does not allege that TSA defendants personally participated in or directed the police defendants in this case to search or seize the Plaintiff or his belongings." MTD Memo. at 18 (citing Complaint ¶ 97, at 23). The TSOs point out that Mocek has not alleged that they used any force against him, searched him or his camera, or seized his camera. <u>See</u> MTD Memo. at 18. The TSOs assert that Mocek has not provided any facts indicating that they used any "excessive force, or any force," in the incident, and contend that facts do not support the allegations in Counts III and IV. MTD Memo. at 18 n.10. The TSOs assert that, according to the Complaint, their involvement with Mocek ended as soon as the AAPD officers arrived. <u>See</u> MTD Memo. at 18-19 (citing Complaint ¶¶ 51-52, at 12; <u>id.</u> ¶ 54, at 12). The TSOs assert that the United States Court of Appeals for the Eighth Circuit has found that a defendant who summons the police is not liable for alleged Fourth Amendment violations committed by police who arrest a plaintiff, because the action of summoning the police was not

- 19 -

"the proximate cause" of the plaintiff's claimed injuries.  MTD Memo. at 19 (citing <u>Green v. Nocciero</u>, 676 F.3d 748, 755 (8th Cir. 2012)).  The TSOs contend that, similarly, they did not cause the Fourth Amendment violations of which Mocek complaints.  <u>See</u> MTD Memo. at 19-20.

The TSOs also assert that the rights which Mocek alleges were violated are not clearly established.  The TSOs assert that an allegedly violated right must be clearly established under case law which finds the same right was violated in a similar context.  <u>See</u> MTD Memo. at 20 (citing <u>Saucier v. Katz</u>, 533 U.S. at 209).  The TSOs contend that, if "officers of reasonable competence could disagree on the issue, a right is not clearly established."  MTD Memo at 21 (citing <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

The TSOs contend that there is no case law precedent for a factual scenario such as that which Mocek alleges, and the TSOs assert that the absence of case law precedent demonstrates that the right Mocek alleges was violated was not clearly established.  <u>See</u> MTD Memo. at 21.  The TSOs also assert that case law "clearly indicates that an individual does not have the right to remain outside the attention of law enforcement when the individual is acting in a manner that sparks suspicion in a reasonable officer's mind."  MTD Memo. at 21 (citing <u>United States v. Cothran</u>, 286 F.3d 173, 176 (3rd Cir. 2002)).  The TSOs further assert that the "question of whether there is a clearly established right to videotape police conduct in a public forum or public street . . . is unsettled in the Circuits."  MTD Memo. at 22.  The TSOs point out that, while the United States Court of Appeals for the First Circuit and the United States Court of Appeals for the Eleventh Circuit have recognized the right to videotape police conduct in public, the United States Court of Appeals for the Third Circuit and the United States Court of Appeals for the Fourth Circuit have denied holding that the right is clearly established.  <u>See</u> MTD Memo. at 22 (citing <u>Smith v. City of Cumming</u>, 212 F.3d 133, 1333 (11th Cir. 2000); <u>Glik v. Cunniffe</u>, 655

- 20 -

F.3d 78, 82-84 (1st Cir. 2011); Kelly v. Borough of Carlisle, 622 F.3d 248, 251 (3rd Cir. 2010); Szymecki v. Houck, 353 F. App'x 852, 853 (4th Cir. 2009)).

      The TSOs additionally assert that the line of cases addressing whether there is a clearly established right to videotape the police in public is distinguishable from the right which Mocek asserts was violated, because: (i) "airport security checkpoints are not public fora and First Amendment activity at such checkpoints is subject to reasonable restrictions;" and (ii) "TSOs are not law enforcement officials and the Plaintiff conceded that the law enforcement authority exercised in his case that allegedly gave rise to the constitutional violations was performed by the police and not the TSOs." MTD Memo. at 23. The TSOs assert that videotaping TSA agents at a security checkpoint is similar to videotaping police officers' conduct while at a traffic stop, which the Third Circuit held was not a clearly established constitutional right. See MTD Memo. at 22 (citing Kelly v. Borough of Carlisle, 622 F.3d at 251). The TSOs assert that videotaping TSA agents at a security checkpoint is unlike videotaping police from a distance in a public park, which the First Circuit found was a clearly established right. See MTD Memo. at 22 (citing Glik v. Cunniffe, 655 F.3d at 85). The TSOs further argue that the right is not clearly established in the Tenth Circuit, because there is no decision from the Tenth Circuit, or from the Supreme Court, which is on point, and there is as split of authority in other circuits. See MTD Memo. at 24 (citing Wilson v. Layne, 526 U.S. 603, 618 (1999)). The TSOs assert that the "fact that there is disagreement between the judges makes it clear that qualified immunity on the Plaintiff's First Amendment claim is appropriate for TSA defendants." MTD Memo. at 24.

      The TSOs similarly assert that the Fourth Amendment right which Mocek alleges was violated -- to be free from the TSOs "summoning law enforcement" -- is not clearly established, and further, the TSOs contend that their actions were "within the boundaries of acceptable

constitutional behavior." MTD Memo. at 25-27 (citing Complaint ¶ 97, at 23). The TSOs assert that the "vast majority of airport search cases involve challenges to the actions of the officers who <u>actually</u> conducted the searches," but that Mocek has rather alleged claims against the TSOs based upon actions with which they "had nothing to do." MTD Memo. at 25 (emphasis in original). The TSOs contend that, although there is "no clearly established weight of authority from other courts concerning the 'summoning' of law enforcement," nor is there Supreme Court or Tenth Circuit precedent on point, "courts that have considered the issue have found no constitutional violation when the police make their own independent decision to arrest or search." MTD Moo. at 25 (citing <u>Green v. Nocciero</u>, 808 F. Supp. 2d at 850). The TSOs assert that Mocek has only challenged the TSOs' "ability to contact law enforcement upon being confronted with a passenger who raises security concerns by refusing to comply with the agency's screening procedures or follow the direction of the TSOs." MTD Memo. at 26. The TSOs contend that, because "it is not clearly established that referring a passenger who refuses to follow the directions of TSO's to local law enforcement for further investigation violates the Fourth Amendment," the TSOs are entitled to qualified immunity. MTD Memo. at 26.

Lastly, the TSOs contend that Mocek is not entitled to declaratory relief that his constitutional rights were violated, because, the TSOs assert, his constitutional rights were not violated. <u>See</u> MTD Memo. at 26-27.

Mocek responded to the MTD on June 30, 2012. <u>See</u> Plaintiff's [Amended] Opposition to Federal Defendants' Motion to Dismiss, filed June 30, 2012 (Doc. 30)("Response"). Mocek first contends that the TSOs have attempted to "mischaracterize" and "recast" the allegations in his Complaint. Response at 2. Mocek asserts that he did not "premeditate" to video-record his interactions with TSA employees and, rather, asserts that he began to use his camera at the

Albuquerque Sunport only "after it became clear that Albuquerque TSA employees were subjecting him to an 'atypical, alternative identification policy.'" Response at 2 (quoting Complaint ¶ 46, at 11). Mocek asserts that he was unaware that attempting to pass through security without identification would "result in him being denied access to the secure areas of the airport, including departure gates," because he had previously successfully flown without identification. Response at 2 (citing Complaint ¶¶ 27-28, at 6). Mocek also asserts that the MTD falsely portrays him "as a disorderly passenger intent on acting disruptively." Response at 3. Mocek asserts that, as set forth in the Complaint, he "at no time acted disruptively," and was rather "calm and restrained" when law enforcement and TSA agents became increasingly agitated. Response at 3 (citing Complaint ¶¶ 4-5, at 2; id. ¶¶ 69, 71-72, at 15-17). Mocek asserts that there is no evidence that he disturbed passengers. See Response at 3. Mocek asserts that this re-characterization of his actions is an attempt by the Defendants to "falsely accuse Mocek of disorderly conduct," the same charge of which a jury acquitted him in 2009. Response at 4.

Mocek also asserts that the Complaint establishes that the TSOs violated his First Amendment rights. See Response at 4. Mocek contends that, although the AAPD officers conducted the arrest and seizure, the TSOs "must answer for the unlawful, unreasonable and unconstitutional order to cease recording events of public interest occurring in a public place." Response at 5. Mocek asserts that the TSOs' orders created a constitutional injury, and that his video recording was lawful, peaceful, and not causing a threat to any person. Mocek asserts that his injury was "compounded" when the TSOs "enlisted the police to give force to their unconstitutional demand." Response at 5.

Mocek asserts that "a reasonable construction of the Complaint shows that the federal defendants caused plaintiff an injury that would chill a person of ordinary firmness from

continuing to engage in that activity." Response at 8. Mocek asserts that the First Amendment protects the public's right to gather information and that this protection extends equally to all citizens engaged in newsgathering. See Response at 6-7 (citing Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576, 586-88 (1980); First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978); Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978)). Mocek asserts that intent is an element of a claim for retaliation against a plaintiff's expression of his or her civil rights and that the TSO's actions were "substantially -- if not entirely -- motivated by plaintiff's exercise of constitutionally protected conduct." Response at 7-8 (citing Thomas v. Carpenter, 881 F.2d 828, 829 (9th Cir. 1989), cert denied 494 U.S. 1028 (1990), 497 U.S. 1003 (1990); Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000); Lackey v. Cnty. of Bernalillo, 166 F.3d 1221 (10th Cir. 1999)(unpublished table decision)).

Mocek asserts that the TSOs violated his First Amendment rights by attempting to stop his newsgathering, when Romero and Breedon "ordered Mocek to put down the camera and repeatedly tried to seize the camera." Response at 8 (citing Complaint ¶¶ 46, 48, at 11). Mocek asserts that his actions did not violate any law, regulation or policy, and he points out that he remained in the publicly-accessible areas of the Albuquerque Sunport at all times of the incident. See Response at 8. Mocek asserts that the TSOs "intended to do everything they could to prevent" the exercise of his rights, and that the purpose of the TSOs' orders was to "not only chill but freeze his right to gather information about public officials conducting public duties in a public place." Response at 8. Mocek asserts that the TSOs' actions, as he alleges in the Complaint, would be sufficient to chill a plaintiff of ordinary firmness from continuing to video record at the screening checkpoint. See Response at 9.

- 24 -

Mocek asserts that the TSOs' actions were "substantially motivated as a response" to his exercise of "constitutionally protected conduct." Response at 9. Mocek points out that he was ordered to "cease doing anything" only after he began filming the TSO's activities. Response at 9. Mocek asserts that he was falsely described as "hostile," "belligerent," and accused of "taking photographs in a threatening manner," after he asserted that taking pictures was not prohibited, and that he was arrested for having recording the TSOs' activities. Response at 9-10.

Mocek also asserts that his right to gather news is clearly established. See Response at 10. Mocek asserts that TSA's "own policy was clear and had been communicated in writing, directly to the Plaintiff, as well as to the general public: Recording was permitted." Response at 10. Mocek asserts that it was not only TSA's policy to allow recording at security checkpoints, but also that the law permitted such recording. See Response at 10. Additionally, Mocek asserts that the clearly established law does not require a "case directly on point," but rather that "a general constitutional rule can apply with obvious clarity to the specific conduct in question, even though such conduct has not previously been held unlawful." Response at 10-11 (citing Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2093 (2011); York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)). Mocek asserts that his Complaint sets forth the violation of a "general constitutional rule." Response at 11 (internal quotation omitted).

Mocek asserts that the United States Courts of Appeals for the First, Third, and Ninth Circuits have "held that recording police officers and officials in the course of carrying out their duties is directly protected by the First Amendment." Response at 11 (citing Glik v. Cunniffe, 655 F.3d at 82-84; Gilles v. Davis, 427 F.3d 197, 212 (3d Cir. 2005); Fordyce v. City of Seattle, 55 F.3d 436, 438-39 (9th Cir. 1995)). Mocek asserts that the "weight of circuit authority thus supports" his right to gather news via his video and audio recording. Response at 11. Mocek

asserts that the cases to which the TSOs cite in support of their contention that the Circuits are split on the issue, Kelly v. Borough of Carlisle and Szymecki v. Houck, post-date the events of the Complaint, and thus do not demonstrate a split of circuit authority. See Response at 11-12, 12 n.5. Mocek further contends that these cases are factually distinguishable in that the First Circuit in Glik v. Cunniffe "rejected the use of these cases in the defendants' attempts to support qualified immunity," and held that neither case was relevant "to the determination of whether the right to film police in the performance of their duties in a public place was clearly established." Response at 12. Mocek also asserts that, in relying on Szymecki v. Houck, the TSOs are relying on an unpublished authority which holds no precedential value. Lastly, Mocek asserts that, in Glik v. Cunniffe, the First Circuit distinguished Kelly v. Borough of Carlisle, because the factual situation of attempting to videotape a police officer during a traffic stop was "worlds apart" from the arrest in Glik v. Cunniffe, which occurred in a public park, and because videotaping during the traffic stop raised concerns of public danger because of the moving vehicles. Response at 12 (citing Glik v. Cunniffe, 655 F.3d at 84). Mocek also asserts that the court in Kelly v. Borough of Carlisle recognized a "broad right to videotape police," save for when the videotaping was done without an expressive purpose.[2] Response at 12 (citing Kelly v. Borough of Carlisle, 622 F.3d at

---

[2] Mocek does not define what "an expressive purpose" means. See Response at 12-13. In Kelly v. Borough of Carlisle, the Third Circuit clarified that an expressive purpose is akin to "speech," and distinguishes an "expressive purpose" from information gathering.

> In Whiteland Woods, L.P. v. Township of West Whiteland, we held that a planning committee's adoption of a resolution prohibiting videotaping of public meetings did not violate the First Amendment. 193 F.3d 177, 183 (3d Cir.1999). We analyzed that case as one involving the First Amendment right to access information, and declined to apply the speech forum doctrine because it "[t]raditionally ... applies to 'expressive' or 'speech' activity," and the alleged constitutional violation "consisted of a ... right to receive and record information," not "speech or other expressive activity."

262).  Mocek asserts that he has an expressive purpose: "documenting what he perceived to be an atypical, alternative identification policy."  Response at 12-13.

Mocek asserts that what the TSOs refer to as a "lack of clarity" in this area is evidence that Mocek's activity was constitutionally protected: "The 'terseness' and 'brevity' of First Amendment discussion in those cases that have recognized a right to film government officials or matters of public interest in public spaces is a result of the fundamental and virtually self-evident nature of the First Amendment's protections in this area."  Response at 13 (citing Glik v. Cunniffe, 655 F.3d at 85)(internal quotations omitted).  Mocek contends that, in 2009, TSA employees "stated unequivocally that recording was permitted in public areas," and that there is no confusion about the constitutionality or legality of Mocek's conduct during the incident.  Response at 14.

Mocek also asserts that the Complaint clearly sets forth that the TSOs violated his Fourth Amendment rights.  See Response at 14.  Mocek contends that the TSOs' assertion that the AAPD officers were contacted because of Mocek's lack of identification is "wholly inaccurate" and a direct contradiction of the Complaint.  Response at 15.  Mocek asserts that he would not have been arrested but-for the TSOs' actions.  See Response at 15.  Mocek asserts that the TSOs had "no basis whatsoever for summoning" the AAPD officers, and that the "false statements about Mocek's behavior" were pretexts for calling the AAPD to the scene, and thus the TSOs' actions are "necessarily linked to the false arrest."  Response at 16.  Mocek asserts that he has established causation between the TSOs' actions and his arrest by showing that the TSOs "'set in motion a series of events'" which they "'knew or reasonably should have known would cause others'" to deprive him of his constitutional rights.  Response at 17 (quoting Snell v. Tunnell,

Kelly v. Borough of Carlisle,  622 F.3d at 262.

920 F.2d 673, 700 (10th Cir. 1990), cert denied, 299 U.S. 976 (1991)). Mocek asserts that the TSOs put into motion a series of events that was designed to cause Mocek harm, because the TSOs did not have the authority to arrest him. See Response at 17. Mocek further asserts that he was arrested unlawfully and that the Complaint sets forth a cause of action for unlawful arrest. See Response at 17 (citing Hodge v. Lynd, 88 F. Supp. 1232, 1234 (D.N.M. 2000); Complaint ¶¶ 20-22, at 4-5; id. ¶¶ 46-49, at 11-12). Mocek asserts that any question whether the Complaint adequately sets forth the facts for a cause of action for unlawful arrest should be resolved in his favor, as the TSOs have the responsibility of proving that Mocek's injuries resulted from other concurrent causes. See Response at 18 (citing Northington v. Marin, 102 F.3d 1562 (10th Cir. 1996); Caballero v. City of Concord, 956 F.2d 204, 206 (9th Cir. 1992); Graham v. Connor, 490 U.S. 386 (1989)). He further asserts that the TSOs hold the evidence of who caused Mocek to be unlawfully arrested, and thus he should not be faulted for not pleading that information. See Response at 18 (citing Mendocino Envtl. Ctr. v. Mendocino Cnty., 14 F.3d 457, 463-64 (9th Cir. 1994)).

Mocek also asserts that the TSOs did not have probable cause to arrest him, and that the statements they have submitted regarding Mocek's arrest are insufficient to provide the "facts and circumstances" necessary to support finding probable cause. Response at 18-29 (citing Whiteley v. Warden, 401 U.S. 560, 568 (1971)). Mocek asserts that, unlike the plaintiff in Green v. Nocciero, a case upon which the TSOs rely, Mocek did not engage in disorderly conduct that would support his arrest, as he argues that he did not refuse to leave the airport and was arrested only pursuant to the AAPD's command that he follow the TSOs' orders. See Response at 20 (citing Green v. Nocciero, 676 F. 3d at 751). Mocek contends that his arrest is more similar to that where a defendant provides false information to support a search warrant, which, under

- 28 -

Tenth Circuit precedent, would negate a qualified immunity defense. See Response at 20 (citing Beard v. City of Northglenn, 24 F.3d 110 (10th Cir. 1994)).

Regarding the TSOs' asserted qualified immunity defense, Mocek argues that the law is clear, and not confusing, that recording is permitted at the security checkpoint, and that he may not be arrested without probable cause. See Response at 20. Mocek argues that the "qualified immunity inquiry in unlawful arrest cases is an objective one, focusing on whether 'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." Response at 20 (quoting Hunger v. Bryant, 112 S. Ct. 534, 537 (1991)(per curiam)). Mocek also asserts that the TSOs' knowledge is "relevant, since the objective analysis is focused on a reasonable officer confronted with the clearly established law and information 'readily available' to the officer." Response at 20 (quoting Romero v. Fay, 42 F.2d 1472, 1476-77 (10th Cir. 1995)). Mocek argues that he was not acting in a disorderly manner, he was not asked to leave the screening checkpoint, and that he did not stop recording because he was "completely within his rights, as he was violating no law or regulation." Response at 21. Mocek further argues that the TSOs were "incompetent" in summoning the police and "illegally demand[ing] that Plaintiff stop filming," which led to his arrest and prosecution. Response at 21. Mocek argues that, "[a]t a minimum," the TSOs should have stopped "their complaint about recording," and determined whether to let him board the plan or ask him to leave the airport, and that the TSOs should not have summoned the police unless they determined that he was violating a regulation by "recording or by refusing to comply with a requirement to leave the airport." Response at 21. Mocek asserts that, because the TSOs' actions did not proceed in that order, they were asking the AAPD to enforce an unconstitutional demand "and made false statements to effectuate the arrest." Response at 21.

Mocek asserts that, under the Supreme Court's precedent, "no 'likelihood of recurrence' need be shown if the injury suffered in the past has 'continuing, present adverse effects.'" Response at 21 (quoting <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 102 (1983)(citing <u>O'Shea v. Littleton</u>, 4145 U.S. 488, 496 (1974); <u>Rizzo v. Goode</u>, 423 U.S. 362, 372 (1976)).  Mocek asserts that an injury to one's First Amendment freedom of expression is a "class constitutional injury with such continuing present effects," and that a "chilling effect on free speech is . . . a sufficient continuing injury to merit standing to enjoin the unconstitutional statute or policy."  Response at 21 (citing <u>Secretary of State of Maryland v. Joseph H. Munson Co.</u>, 467 U.S. 947, 956-57 (1984); <u>Dumbrowski v. Pfister</u>, 380 U.S. 479, 491 (1965)).  Mocek further asserts that police conduct which "violates, infringes or deters expressive activity protected by the First Amendment" poses a "continuing, present adverse effect" sufficient to grant a plaintiff standing to challenge the police conduct.  Response at 22 (citing <u>Meese v. Keense</u>, 481 U.S. 465, (1987); <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984); <u>Laird v. Tatum</u>, 408 U.S. 1, 14 (1972)).  Mocek thus asserts that he need not demonstrate a likelihood that the unconstitutional conduct of which he complains will re-occur "so long as the chilling effect of the past violations is justified by the realistic possibility that the violations will recur."  Response at 22 (alterations omitted).

The TSOs replied to Mocek's Response that the "constitutional claims against the [TSOs] . . . must be dismissed because the allegations in the [C]omplaint are insufficient to plausibly give rise to the inference of unconstitutional conduct on the part of these federal employees." Reply to Plaintiff's Opposition to the Individual Federal Defendants' Motion to Dismiss at 1, filed July 27, 2012 (Doc. 33)("Reply").  The TSOs first argue that, because Mocek did not dispute their position that "their response to the Plaintiff's actions was reasonable and therefore did not violate the First Amendment," he has conceded the TSOs' stance.  Reply at 2.  The TSOs

- 30 -

further point out that Mocek did not contest that the Albuquerque Sunport is a nonpublic fora, a
location in which restrictions on speech need only be reasonable, nor did Mocek argue that the
TSOs engaged in viewpoint discrimination, or that the TSOs would be unreasonable to limit First
Amendment activity where that activity causes a disruption at a screening checkpoint. See Reply
at 2-3. The TSOs further contend that the Complaint's facts "clearly demonstrate that the
Plaintiff's actions were disruptive and caused the TSO defendants to divert considerable
resources to deal with the Plaintiff's attempt to challenge the system." Reply at 3. The TSOs
point out that at least five TSA employees were required to handle Mocek at the screening
checkpoint, because he refused to provide identification, and that the employees had to leave
their other duties to respond to Mocek before he began video recording. See Reply at 3-4. The
TSOs assert that Mocek's intentional challenge to TSA security procedures raised a security
concern, which was heightened when he began video recording the officers dealing with his
refusal to provide identification. The TSOs further argue that Mocek caused a disturbance by
requiring the involvement of multiple TSA employees, "who should have been performing other
duties." Reply at 4. The TSOs assert that it is reasonable for them to "ask disruptive or
suspicious passengers to cease filming at the checkpoint and, if necessary, refer them to law
enforcement officers quickly, for further inquiry" given TSA's mission to identify dangerous
materials or individuals at the screening checkpoint. Reply at 4.

The TSOs again assert that they did not cause Mocek's arrest, and other adverse actions,
of which he complains in Count I. See Reply at 4. The TSOs assert that, because Mocek admits
that AAPD officers arrested him, he has failed to show that the TSOs' actions caused Mocek to
suffer an injury which would chill a person of ordinary firmness from continuing to engage in
that activity. See Reply at 4-5. The TSOs further assert that the AAPD officers did not intend to

arrest Mocek before or upon their arrival to the scene, but rather that the AAPD officers decided to arrest Mocek after he refused to provide the AAPD officers with identification. <u>See</u> Reply at 5.

The TSOs also argue that the Complaint does not mention Mocek's right to "gather information," the right which the TSOs allegedly violated. Reply at 5. The TSOs further point out that, even if Mocek was exercising his First Amendment right to gather information, he has nonetheless failed to state a cause of action for the violation of that right, because he alleges that he did not stop recording the TSOs, despite their repeated requests that he cease. <u>See</u> Reply at 5. The TSOs thus argue that they did not interfere with this right to gather news, because he did not stop recording when the TSOs directed him to stop. <u>See</u> Reply at 5-6.

Regarding Mocek's alleged Fourth Amendment injury, the TSOs assert that Mocek is wrong to causally connect the TSOs to the AAPD officers' actions, because under Mocek's "theory of causation, anyone who contacts the police is then responsible for allegations of police misconduct." Reply at 6. The TSOs assert that, in a <u>Bivens</u> action against individual federal agents, "personal participation in the alleged misconduct is necessary." Reply at 6 (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. at 677). The TSOs assert that, because the AAPD officers, not the TSOs, committed Mocek's alleged Fourth Amendment injury, he has failed to plead a cause of action under the Fourth Amendment against the TSOs. <u>See</u> Reply at 6. The TSOs further assert that the Complaint makes clear that the AAPD officers did not intend to arrest Mocek, and only arrested him after he refused to provide the officers with identification. <u>See</u> Reply at 6 (citing Complaint ¶¶ 51-55, at 12-13). The TSOs assert that, as set forth in the Complaint, they did not participate in the decision to arrest Mocek. <u>See</u> Reply at 6-7 (citing Complaint ¶¶ 51-55, at 12-13). The TSOs assert that Mocek concedes that the AAPD officers did not intend to arrest him in

- 32 -

his Response.  See Reply at 7 (citing Response at 9, 16).  The TSOs also assert that they were not

the proximate cause of Mocek's arrest.  See Reply at 7-8 (citing CSX Transp., Inv. v. McBridge,

131 S. Ct. 2630 (2011); Green v. Nocciero, 676 F.3d at 753).  They argue that their summoning

the AAPD did not cause Mocek's arrest and that their actions were too remote from the arrest to

be the proximate cause.  In support of this contention, the TSOs assert that the AAPD officers did

not rely upon the information which the TSOs provided them in deciding to arrest Mocek.  See

Reply at 8.

Regarding Mocek's response to their qualified immunity defense, the TSOs assert that

Mocek has defined his rights in "very general terms" and has failed to provide any case law

which supports the factual scenario presented to the TSOs.  Reply at 8-9.  The TSOs further

assert that recording TSA agents at a nonpublic screening checkpoint is very different from a

bystander recording police activity in a public park from a distance, as was held to be a protected

First Amendment activity in Glik v. Cunniffe.  The TSOs thus assert that Mocek's alleged right to

record TSA agents, who are not law enforcement officers, at a screening checkpoint was not

clearly established.  See Reply at 9.

The TSOs further assert that, even if "the right to film police activities at a distance in a

public space was relevant to this case," the Circuits have split regarding whether that right is

clearly established, and there is no Supreme Court or Tenth Circuit case on point.  Reply at 9.

The TSOs also argue that Mocek takes the Third Circuit's position in Kelly v. Borough of

Carlisle, "completely out of context," when Mocek argues that the Third Circuit "'acknowledged

that there is a right to videotape police,' narrowed only by the qualification that 'videotaping

without an expressive purpose may not be protected.'"  Reply at 10 (quoting Response at 12).

The TSOs assert that the Third Circuit recognized a Circuit split regarding the right to video

- 33 -

record police activity in public.  See Reply at 11.

The TSOs also assert that Mocek's reliance on TSA policy to support his alleged clearly established right to videotape TSA agents is incorrect, because officials "'sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.'"  Reply at 11 (quoting Davis v. Scherer, 468 U.S. 183, 194 (1984)).  The TSOs assert that, without a Tenth Circuit or Supreme Court case on point, the existence of a TSA policy cannot establish a clearly established right for Mocek.  See Reply at 11 (citing Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d 1150, 1155 (10th Cir. 2010)).  The TSOs thus assert that, even if there were a TSA policy that permitted video recording of TSA agents, that policy does not create a clearly established right for Mocek to video record TSA agents at a screening checkpoint.  See Reply at 11 (citing Herring v. Keenan, 218 F.3d 1171, 1180 (10th Cir. 2000)).

The TSOs also assert that Mocek has not alleged the violation of a clearly established right under the Fourth Amendment, because he provides no case for his position that summoning police officers makes the TSO agents responsible for the harm which followed the summons.  See Reply at 12.  The TSOs assert that Mocek has not provided a case which supports his proposition that persons who are not law enforcement personnel that request assistance from law enforcement personal are liable for constitutional violations that the law enforcement personnel commit.  The TSOs assert that, under Green v. Nocciero, courts which have considered similar conduct have found that persons who are not law enforcement personnel committed no constitutional violation when the police made their own independent decision to arrest or search.  The TSOs also assert that the AAPD officers' decision to arrest Mocek was made independent from any information which the TSOs provided to the officers.  See Reply at 12.

- 34 -

Lastly, the TSOs assert that Mocek has not suffered any constitutional violations at the TSOs' hands, and thus, he is not entitled to declaratory relief against them. See Reply at 12.

The Court held a hearing on November 20, 2012. See Transcript of Hearing, taken Nov. 20, 2012 ("Tr.").[3] The TSOs began by asserting that this "is a classic case in which qualified immunity is appropriate because the plaintiff has not alleged a clearly established constitutional [] violation." Tr. at 4:12-15 (Martin). The Court suggested that the parties first discuss what the alleged constitutional violation is, even though the order of inquiry does not matter in qualified immunity cases, because the Court finds that determining qualified immunity is easier once any disputes regarding an alleged violation have been resolved. See Tr. at 4:19-5:2 (Court). The Court inquired whether TSA has a policy on video recording at checkpoints, and the Court indicated it may be concerned if news reporters are treated differently than individuals, such as Mocek, when either attempts to record TSA activities. See Tr. at 5:3-11 (Court).

The TSOs responded that TSA has a policy and that, "in general," recording and photographing of TSA activities at a checkpoint is permitted, but that TSA employees are permitted some discretion to stop the recording or photographing of a screening process because of the sensitive information which may be documented. Tr. at 5:11-17 (Martin). The TSOs asserted that, in Mocek's case, security issues were raised, because he began recording after an alternative screening process was initiated. See Tr. at 6:3-6 (Martin). The TSOs nonetheless asserted that the presence of a policy does not create a clearly established constitutional right, under Tenth Circuit and Supreme Court case law, and thus argued that the presence of any TSA policy is "not terribly relevant" to Mocek's claims. See Tr. at 6:11-22 (Martin). The TSOs

---

[3] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

asserted that the validity of Mocek's claims rests upon whether the TSOs acted reasonably. <u>See</u> Tr. at 6:22-24 (Martin).

The Court noted that, on a motion to dismiss, it must read the allegations in the Complaint as set forth by Mocek, and the Court stated that it must thus assume that Mocek was not creating a disturbance, and thus the TSOs are wrong to characterize the incident as increasingly confrontational. <u>See</u> Tr. at 6:25-7:5 (Court). The Court noted that the TSOs are not attempting to convert the MTD into one for summary judgment. <u>See</u> Tr. at 7:1-13 (Court, Martin). The TSOs disagreed, and asserted that the Court does not need to accept Mocek's "conclusory statements," such as Mocek's definition of "disturbance" including "raising your voice." Tr. at 7:8-16 (Martin).

The Court then addressed the statements which the TSOs attached to their MTD -- statements from the TSOs regarding the incident, the same statements to which the TSOs allege Mocek refers to in the Complaint. <u>See</u> Tr. at 7:10-13 (Martin); <u>id.</u> at 17:17-18 (Court). The Court stated that it had not seen statements or police reports attached in previous 42 U.S.C. § 1983 cases, and the Court thus inquired of the TSOs why it should be allowed to consider the statements attached to the MTD. <u>See</u> Tr. at 7:17-25 (Court). The TSOs responded that they should be allowed to attach the statements, because Mocek refers to them in his Complaint. <u>See</u> Tr. at 8:9-13 (Court, Martin).

The Court turned to defining the alleged violation and inquired of the TSOs what TSA's position is regarding photographing. <u>See</u> Tr. at 9:20-23, 10:1-7 (Court). The Court noted that there is no federal regulation regarding Mocek's conduct. <u>See</u> Tr. at 10:9-11 (Court). The TSOs asserted that, because "we are in a nonpublic forum the Supreme Court has indicated . . . that the actions of the TSO[s] had to be reasonable to avoid there being a First Amendment violation."

- 36 -

Tr. at 10:12-16 (Martin). The Court inquired why it was relevant to the reasonableness of the TSOs' actions that Mocek attempted to pass through the screening checkpoint without identification, because the "whole[] point of him wanting to film is he wants to film an encounter in which he doesn't have" identification. Tr. at 11:2-5 (Court). The TSOs asserted that they could not have known Mocek's intention at the time, but the Court questioned whether the relevant inquiry was whether the TSOs knew of Mocek's intention or whether Mocek was aware of a prohibition on filming. See Tr. at 11:11-15 (Martin, Court). The TSOs asserted that the "test" for their actions is whether they were acting reasonably, and that they could not have known whether Mocek was attempting to film "vulnerabilities of the system" or "setting a [distraction] so other people can go[] around the [] system." Tr. at 11:16-22 (Martin). The TSOs asserted that the Circuits which have dealt with similar situations have not focused their inquiry on the purpose of a plaintiff's filming. See Tr. at 12:1-4, 12:9-10 (Martin).

The Court questioned whether, under the TSOs' interpretation of the law, the government may allow a First Amendment activity in a nonpublic forum, the regulation of which is subject to a reasonableness standard. See Tr. at 12:18-13:1 (Court, Martin). The Court inquired whether such a standard allows government officials to "pick and choose on that day" who would be allowed to engage in First Amendment activity. Tr. at 13:3-5 (Court). The TSOs asserted that, rather, government officials have "discretion at security checkpoints." Tr. at 13:6-9 (Martin). The TSOs asserted that the government's discretion does not extend to viewpoint discrimination, but rather the government has discretion to stop disruptive First Amendment activities, such as the Supreme Court upheld in Int'l Soc. for Krishna Consciousness, Inc. v. Lee. See Tr. at 13:17-14:2 (Martin). The TSOs asserted that, at the time of the incident, Mocek did not attempt to propagate a viewpoint, but rather, a viewpoint was set forth only in his Complaint. See Tr. at

14:3-9 (Martin).

Regarding the alternative screening procedures through which the TSOs took Mocek, the TSOs asserted that Mocek could go through the alternative procedures as many times as he would like without identification and be allowed to board a plane.  See Tr. at 14:15-18 (Court, Martin).  The TSOs stated that the alternative procedures allow TSA employees to confirm a person's identity through a series of questions, which also allow TSA to determine if a person without identification is on a watch list.  See Tr. at 14:18-25 (Martin).  The TSOs stated that the alternative procedures require the person without identification to cooperate.  See Tr. at 15:1-3 (Court, Martin).  The TSOs asserted that, rather than answering their questions, Mocek began filming during the alternative screening procedures.  See Tr. at 15:3-8 (Martin).  The Court inquired whether the TSOs called the police because of Mocek's filming, given that he did not get to the point in the alternative screening where he answered questions, and the TSOs asserted that the police were not summoned because of Mocek's filming and that the alternative screening procedures had begun before the police were summoned.  See Tr. at 15:9-19 (Court, Martin). The TSOs stated that the latter phases of the alternative procedures were not completed, because Mocek began filming and would not stop, and the TSOs did not want Mocek filming the alternative procedures.  See Tr. at 15:20-25 (Martin).  The TSOs stated that, although there is not a specific policy regarding the filming of alternative procedures, Mocek is not allowed to film the monitors during the screening procedures.  See Tr. at 16:4-9 (Martin).  The TSOs stated that, from Mocek's position -- ten to twenty feet away from the main screening line -- he could film the entire checkpoint location.  See Tr. at 16:14-22 (Martin, Court).

The TSOs argued that defining the constitutional violation that Mocek suffered is difficult from Complaint's facts, because Mocek did not assert a First Amendment right to gather news as

the basis for his actions in the Complaint. See Tr. at 17:15-23 (Martin). The TSOs further asserted that the issue is whether Mocek had a constitutionally protected right to film TSA employees at the checkpoint and not whether there was a regulation on videotaping at a checkpoint. See Tr. at 18:6-15 (Martin). The TSOs asserted that the Circuits have split regarding whether recording police activity in a public place is a constitutionally protected activity, and thus the TSOs did not violate a clearly established law by attempting to keep Mocek from recording at the checkpoint. See Tr. at 18:15-25 (Martin).

Mocek asserted that the First Amendment issue is whether the TSOs may stop somebody from filming at the screening checkpoint. See Tr. at 20:15-22 (Court, Boelcke). Mocek asserted that the "fact that they stopped him from filming right when he started is viewpoint discrimination." Tr. at 21:2-4 (Boelcke). The Court inquired what Mocek's response is to the TSOs' position that the TSOs did not discriminate against Mocek's viewpoint, because they were unaware that Mocek was expounding a viewpoint through filming. See Tr. at 21:6-10, 21:15-17 (Court). Mocek asserted that the TSOs "assumed what his viewpoint was and based on their assumptions they told him to stop." Tr. at 21:18-21 (Boelcke). The Court inquired whether Mocek's actions at the time were "somewhat ambiguous," and whether Mocek believes the TSOs would not be allowed to interfere with filming if the person filming the TSOs were attempting to hassle them. Tr. at 22:6-9, 22:12-17 (Court). Mocek asserted that "hassling" would be a different situation than the events set forth in the Complaint. Tr. at 22:22-24 (Boelcke). Mocek asserted that, even if the TSOs did not have knowledge of his viewpoint at the time, stopping him without knowing his viewpoint could be viewpoint discrimination as well. See Tr. at 23:8-15 (Court, Boelcke). The Court inquired what Mocek's purpose was for filming the TSOs, and Mocek's counsel, Ms. Mary Louise Boelcke, replied that she does not know. See Tr. at 24:4-9

(Court, Boelcke).

The Court inquired why, if Mocek agrees that the standard for gauging the TSOs' actions is reasonableness, Mocek does not agree that they acted reasonably. See Tr. at 24:10-20 (Court, Boelcke). Mocek asserted that he has a constitutional right to film public officials and gather information in a public space, and that any action which interferes with those rights "is unreasonable," regardless whether the government actors can assert a reason for their interference. Tr. at 24:21-25:5 (Boelcke). Mocek pointed out that, in United States v. Wells, 789 F. Supp. 2d 1270 (N.D. Okla. 2011), the United States District Court for the Northern District of Oklahoma found that police officers had no privacy interests in surveillance videos from a hotel room which filmed the police officers while they were conducting a search of the room. See Tr. at 25:6-16 (Boelcke). Mocek asserted that the TSOs similarly have no privacy interest in the material which he was recording, in so far as the TSOs were conducting a search of private citizens. See Tr. at 25:16-24 (Boelcke). Mocek asserted that, just as the court in United States v. Wells found that an expectation of privacy should not allow law enforcement officers to carry out activities in secret, the TSOs have no expectation of privacy in their work conducted in a public area of the airport. See Tr. at 26:2-13 (Boelcke).

The Court stated that it does not believe the TSOs are attempting to argue that they had a privacy interest in the activity which Mocek was attempting to film. See Tr. at 26:21-22 (Court). The Court stated that the reasonableness standard for TSA employees regarding First Amendment protected activity seems to be "fairly low," given that if every passenger chooses not to conform to TSA's procedures, security concerns would be quickly raised. Tr. at 27:1-7 (Court). Mocek stated that he would agree that, had he been verbally assaulting the TSOs, then they would have been able to reasonably restrain his freedom of expression, but that he would

- 40 -

have to do more than just speak to the TSOs to give them reason to restrain his First Amendment rights.  See Tr. at 27:12-21 (Court, Boelcke).

Mocek asserted that the Complaint establishes the elements for a cause of action for the violation of his First Amendment rights.  See Tr. at 27:24-25 (Boelcke).  Mocek asserted that he was engaging in a constitutionally protected activity: videotaping government officials in a public area in the airport.  See Tr. at 28:3-7 (Boelcke).  Mocek asserted that he suffered an injury which would chill a person of ordinary firmness from continuing to engage in the activity when the TSOs attempted to take away his camera, and summoned AAPD officers to "have him arrested and seize his property."  Tr. at 28:12-17 (Boelcke).  Lastly, Mocek asserted that the TSOs' "adverse actions" were motivated as a response to his constitutionally protected conduct, in that the TSOs summoned the AAPD officers "because he was taking photographs in a 'threatening manner'" and allegedly causing a disturbance.  Tr. at 28:18-24 (Mocek).  Mocek asserted that he never refused to leave the airport and did not disobey any of the TSOs' orders except the order that he stop filming them.  See Tr. at 29:2-7 (Boelcke).

Mocek stated that he does not agree with the TSOs that the Court may rely upon the additional facts set forth in the statements attached to the MTD.  See Tr. at 29:10-14 (Court, Boelcke).  Mocek did not indicate that he desired to convert the MTD into one for summary judgment.  See Tr. at 29:10-30:6 (Court, Boelcke).  Mocek asserted that, when extra evidence is submitted on a motion to dismiss, it should be converted into a motion for summary judgment.  See Tr. at 30:3-6 (Boelcke).  The Court noted that the Tenth Circuit has some limited law which allows a court to consider the underlying contract in a breach of contract case or securities documents in a securities case.  See Tr. at 30:7-17 (Court).  Mocek contended that the TSOs' statements are not the basis of the Complaint and, thus, are "more tangential to [the] Complaint

than a contract would be in a case on a contract or a securities case, where the entire case rests on that one document." Tr. at 30:18-23 (Boelcke).

Mocek stated that he believes the clearest indication that TSA officers are not allowed to stop a person who is filming without making a disturbance is the Supreme Court's line of cases regarding an individual's right to gather information and news in a public place. See Tr. at 31:13-19 (Court, Boelcke). Mocek admitted that there are no Tenth Circuit cases directly on point, but asserted that the standard applied to the TSOs' actions is whether their conduct was reasonable, in light of the ability of police officers to record every interaction they have with the public. See Tr. at 32:3-9 (Boelcke).

The TSOs responded that they are not basing their MTD on the legal theory that their expectation of privacy was violated. See Tr. at 32:17-20 (Martin). The TSOs further asserted that, because Mocek admits that his viewpoint was not made clear to them, the TSOs were acting reasonably in the interests of security in stopping him from causing a disruption, or "preventing the process from bogging down." Tr. at 32:19-33:3 (Martin). The TSOs argued that they were not acting incompetently when they called the AAPD to assist. See Tr. at 33:5-8 (Martin). The TSOs further asserted that, if Mocek is allowed to summarize their statements, they should be allowed to provide the complete statements, as they have, attached to the MTD. See Tr. at 33:9-16 (Martin). The TSOs asserted that there is no Supreme Court case regarding the right to videotape police officers in a public place and that the only cases in which the Supreme Court has dealt with the issue is in the unrelated context of news reporters having access to police meetings. See Tr. at 33:22-34:2 (Martin).

The Court stated that it is inclined to grant the TSOs' MTD with regard to Mocek's First Amendment claim, at least because the law is not clearly established, and possibly because the

TSOs were not engaging in viewpoint discrimination. See Tr. at 34:12-19 (Court). The Court stated that, in light of the Circuit split in similar cases, "it would be difficult to say that there's been a violation of clearly established law," even if the Court does not address the constitutional violation beyond stating what the alleged violation is. Tr. at 34:22-35:6 (Court).

Regarding Mocek's Fourth Amendment claims, the TSOs contended that his allegations are "conclusory" and that the Complaint specifically provides that the AAPD arrested Mocek. Tr. at 35:9-36:9 (Martin). The TSOs thus argued that Mocek has not pled that they personally participated in the constitutional violation, as Ashcroft v. Iqbal requires. See Tr. at 36:10-14 (Martin). The TSOs further argued that, in light of the Eight Circuit's decision in Green v. Nocciero, the TSOs' actions did not proximately cause Mocek's complained-of Fourth Amendment violations. See Tr. at 36:14-17 (Martin). The TSOs also argued that Mocek's complained of constitutional violation is not clearly established, because he did not plead a single case in which a defendant is liable for law enforcement officers' constitutional violations for having only summoned the law enforcement. See Tr. at 36:18-24 (Martin).

Mocek asserted that the TSOs set in motion a series of events which caused his ultimate arrest, a situation akin to a malicious abuse of process or malicious prosecution where an arrest is predicated upon false statements or statements made with reckless disregard for the truth. See Tr. at 37:16-23 (Boelcke). The Court stated that the Constitution requires a personal involvement in an alleged constitutional violation for a defendant to be liable; thus, once law enforcement are called, a defendant whose action ended with calling the law enforcement cannot be liable for the law enforcement officers' alleged constitutional violations. See Tr. at 38:4-13 (Court). Mocek asserted that the TSOs used information which they knew was false to summons the AAPD officers, and thus they can be held liable for the constitutional violations which followed. See Tr.

- 43 -

at 38:18-39:4 (Boelcke). Mocek asserted that he is not arguing for a "collective [] knowledge doctrine," but rather that, because the TSOs called the AAPD officers on the premise that Mocek was not "obeying an order," and the TSOs knew that their order to Mocek to stop filming was not valid, the TSOs "set in motion the []acts that resulted in his arrest." Tr. at 39:8-24 (Boelcke).

The Court responded that, although there is certainly but-for causation by the TSOs' actions, but-for causation may not be enough to hold the TSOs liable. See Tr. at 40:3-4 (Court). The Court stated that its "sense is that once the A[A]PD was called there was no more involvement with TSA" and thus the TSOs could not be held liable for the constitutional violations which the AAPD officers committed. Tr. at 40:9-14 (Court). Mocek asserted that the TSOs were present during his entire interactions with the AAPD. See Tr. at 40:15-18 (Boelcke).

The Court inquired of the TSOs whether the Court would have to decide if there is a Fourth Amendment violation present before deciding if the alleged violation was contrary to clearly established law. See Tr. at 41:7-11 (Court). The TSOs asserted that the Court need not decide whether there was a Fourth Amendment violation, because the Complaint clearly sets forth that the AAPD officers arrested Mocek, and that the officers did not decide to arrest Mocek before arriving at the screening checkpoint, thus indicating that the TSOs' information relayed to the AAPD officers did not provide the basis for Mocek's arrest. See Tr. at 41:12-19 (Martin)(citing Complaint ¶ 54, at 12-13). The TSOs asserted that, to the extent Mocek is alleging that they violated his Fourth Amendment rights by having told the AAPD officers to arrest Mocek, the Complaint sets forth that the AAPD officers decided to arrest Mocek after arriving at the scene, and not before, as would be true if the AAPD officers' decision was based upon the TSOs' information. See Tr. at 41:7-20 (Martin). The TSOs also asserted that they left Mocek's immediate vicinity when the AAPD officers arrived and were speaking a distance away

with Mocek's traveling companion.  See Tr. at 43:6-21 (Martin).  The TSOs asserted that, even though the TSOs relayed to the AAPD officers that Mocek was causing a disturbance by impeding their normal job functions, the AAPD officers did not decide to arrest Mocek until Mocek refused to provide the officers with identification.  See Tr. at 45:23-46:16 (Martin).  The TSOs asserted that the Court should review their statements to refute some of Mocek's allegations regarding the incident.  See Tr. at 45:2-23 (Martin).  The TSOs asserted that, under New Mexico law, a person may be arrested for failing to provide identification in the course of an ongoing police investigation.  See Tr. at 47:10-16 (Martin).  The Court inquired whether the AAPD's investigation was dependent upon the existence of criminal activity, which, possibly, the TSOs led the AAPD officers to believe was occurring when they summoned the officers.  See Tr. at 47:17-20, 47:23-25 (Court).  The Court inquired whether the police may ask for identification for any purpose, and counsel for the TSOs, Mr. Edward J. Martin, responded that he is not certain.  See Tr. at 49:1-6 (Court, Martin).

The TSOs nonetheless contended that the issue with Mocek's alleged Fourth Amendment violation is whether the TSOs proximately caused Mocek's complained-of injuries.  See Tr. at 49:6-17 (Martin).  The Court stated that it is concerned that, if the TSOs remained at the location, and the AAPD officers' investigation required reasonable suspicion of criminal activity to ask for identification, then Mocek's arguments regarding a "collective information" or "intervention" doctrine could hold more sway.  Tr. at 49:18-50:2 (Court).  The TSOs asserted that they are not law enforcement officers, and that they summoned the AAPD because of their concerns regarding security and Mocek's disruptions, and that it was the AAPD officers who determined whether criminal activity was occurring.  See Tr. at 50:2-7 (Martin).  The TSOs asserted that they are not allowed to make arrests, and that they are "required to have prior arrangements with

either local police or private security agencies to take care of these types of issues, because TSA [employees] are neither trained nor authorized to do such things." Tr. at 50:17-23 (Court, Martin). The TSOs stated that they are trained regarding the scope of the permissible searches under the Fourth Amendment, but that their training is limited and "fairly basic," and that, if they are in doubt, they are trained to call law enforcement officers. Tr. at 51:8-25 (Court, Martin). The TSOs stated that their training on excessive force is limited to them being trained not to arrest anybody, and that they may only conduct pat-downs. See Tr. at 52:2-6 (Court, Martin).

The Court stated that it is inclined to think that, "once TSA calls law enforcement, [] they are much in the same situation as a private citizen calling law enforcement, [and] they're not going to be responsible for any of the alleged constitutional activity of the police at that point." Tr. at 52:21-53:2 (Court). The Court stated that there may be other claims available against the TSOs, but the Court does not see a Fourth Amendment claim against them, because they were not personally involved nor did they direct the alleged constitutional violation. See Tr. at 53:2-11 (Court).

Regarding his claim for declaratory relief, Mocek asserted that his claim is against the TSOs in their official capacity, and, because qualified immunity only extends to claims against the TSOs in their individual capacity, Mocek's request for declaratory judgment should remain notwithstanding a decision by the Court to dismiss the claims against the TSOs in their individual capacity. See Tr. at 54:6-11 (Boelcke). Mocek asserted that he could still have a claim against the government for a constitutional violation even if the TSOs receive qualified immunity individually, and that he would thus still have a claim against the TSA, which the MTD did not raise. See Tr. at 54:16-22 (Boelcke). Mocek stated that he would still seek a declaratory judgment that "citizens have a right to use cameras and other recording devices in the

publicly accessible areas of the Albuquerque airport," and would seek an injunction stopping TSA employees from being allowed to "retaliate against individuals who seek to exercise that right by using cameras or other recording devices." Tr. at 55:3-8 (Boelcke). Mocek stated that he would also still seek an order requiring the TSA to undertake training "and other prophylactic measures to ensure that the [D]efendants do not keep people from exercising their rights in those areas." Tr. at 55:16-20 (Boelcke). Mocek asserted that the MTD does not address this claim, because even if the TSOs are entitled to qualified immunity because Mocek's rights were not clearly established, Mocek could still receive declaratory relief stating that his constitutional rights were violated. See Tr. at 55:23-56:4 (Boelcke).

The TSOs asserted that the Mocek has not made a claim that "the United States did not follow its own procedures" and stated that they do not believe that Mocek's requests for declaratory relief could remain even if the TSOs are entitled to qualified immunity. See Tr. at 56:10-16 (Court, Martin). The TSOs asserted that Mocek has requested declaratory relief related to his alleged constitutional violations, and thus, if his alleged constitutional violations are dismissed, his request for declaratory relief cannot remain. See Tr. at 56:14-23 (Martin). The TSOs contended that TSA is not named as a defendant in this case, and that Mocek is not entitled to declaratory relief if "there's no constitutional violation and is not clearly established." Tr. at 57:10-17 (Martin, Court).

The Court inquired of Mocek whether he would have a claim for declaratory relief against the TSOs if the Court finds that there was no First or Fourth Amendment violation, and Mock stated that he would not. See Tr. at 58:2-9 (Court, Boelcke). Mocek stated that it would be a "different situation" if the Court finds that the TSOs are entitled to qualified immunity because their actions were not in violation of a clearly established law. Tr. at 58:12-16 (Court,

- 47 -

Boelcke).  The Court informed the parties that it has a case on a similar issue, in which the Court found that a genuine issue of material fact existed as to a plaintiff's alleged constitutional violations, but the Tenth Circuit reversed the Court on the grounds that the Court should have proceeded directly to determining whether the law is clearly established.  See Tr. at 58:24-59:7 (Court).  The Court suggested that the parties examine the Tenth Circuit's opinion: Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011).  See Tr. at 59:1-14 (Court, Wild).

The TSOs asserted that Mocek's only claim against any Defendant in their official capacity is his request for declaratory relief, and that they are not being sued in their official capacity for Mocek's alleged constitutional injuries under the First or Fourth Amendment, because Bivens actions are not available against individuals in their official capacity.  See Tr. at 60:17-61:1 (Martin, Court).  The TSOs further asserted that declaratory relief is not available against individuals.  See Tr. at 61:10-16 (Martin).

The Court stated that it is unsure how it will deal with Mocek's request for declaratory relief.  See Tr. at 61:21-22 (Court).  The Court stated that it is inclined to grant the MTD, although it would take the parties' arguments regarding Mocek's request for declaratory relief under advisement.  See Tr. at 62:4-6 (Court).  The Court allowed both parties to file additional briefings regarding Mocek's request for declaratory relief.  See Tr. at 63:24-64:1 (Court, Martin); id. at 65:4-7 (Boelcke, Court).

The TSOs filed a supplemental briefing after the hearing, in which they assert that Mocek "failed to provide a jurisdictional basis for his request for declaratory relief against the federal defendants in their official capacities."  Individual Federal Defendants' Supplemental Briefing, filed Nov. 29, 2012 (Doc. 43)("Supp. Brief").  The TSOs assert that the Declaratory Relief Act, 28 U.S.C. § 2201, does not provide federal courts with an independent basis for subject-matter

- 48 -

jurisdiction over a claim against the United States, which is a claim against a federal employee in his or her official capacity. See Supp. Brief at 1 (citing Atkinson v. O'Neil, 867 F.2d 589, 590 (10th Cir. 1989); Schulke v. United States, 544 F.2d 453, 455 (10th Cir. 1976)). The TSOs assert that a federal court does not have subject-matter jurisdiction "over claims against the United States for which it has not waived sovereign immunity," and contends that Mocek's asserted bases of jurisdiction -- 28 U.S.C. §§ 1331, 1332, and 1343 -- are not statutes under which the United States has waived sovereign immunity. Supp. Brief at 2 (citing Iowa Tribe of Kan. & Neb. v. Salazar, 607 F.2d 1225, 1232 (10th Cir. 2010). The TSOs assert that §§ 1331 and 1332 are grants of "general jurisdiction and require an accompanying waiver of sovereign immunity." Supp. Brief at 2 (citing Merida Delgado v. Gonzales, 428 F.3d 916, 919 (10th Cir. 2005); Gen. Ry. Signal Co. v. Corcoran, 921 F.2d 700, 703 (7th Cir. 1991)). The TSOs also assert that the Tenth Circuit has found that § 1343(a)(4) does not waive the United States' sovereign immunity. See Supp. Brief at 3 (citing Trackwell v. United States Gov't, 472 F.3d 1242, 1244 (10th Cir. 2007)). The TSOs thus assert that Mocek has failed to bear his burden of proving that the Court has jurisdiction over his claims against the TSOs in their official capacity. See Supp. Brief at 3 (citing Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999)).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the

- 49 -

light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  <u>Ridge at Red Hawk, LLC</u>

<u>v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

<u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting <u>Bell Atl. Corp. v. Twombly</u>,

550 U.S. at 570)(internal citations omitted).

## LAW REGARDING DOCUMENTS OUTSIDE THE PLEADINGS ON A MOTION TO DISMISS

Generally, the sufficiency of a complaint must rest on its contents alone.  <u>See</u> <u>Casanova v.</u>

<u>Ulibarri</u>, 595 F.3d 1120, 1125 (10th Cir. 2010); <u>Gossett v. Barnhart</u>, 139 F. App'x 24, 24 (10th

Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts

pled in the complaint.").[4]  Emphasizing this point, the Tenth Circuit, in <u>Carter v. Daniels</u>, 91 F.

App'x 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the

district court must examine only the plaintiff's complaint.  The district court must determine if

the complaint alone is sufficient to state a claim; the district court cannot review matters outside

of the complaint."  91 F. App'x at 85.  There are three limited exceptions to this general

principle: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v. Makor</u>

---

[4] <u>Gossett v. Barnhart</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that <u>Gossett v. Barnhart</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Court analogized to a statute of limitations -- and found that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

The Court has previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, interviews and letters attached to a motion to dismiss which evidence that a plaintiff was aware of the

defendant's alleged fraud before the statutory period expired may not be used in the Court's ruling. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, **22-23 (D.N.M. Aug. 23, 2012)(Browning, J.). The Court determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contest alone, as the complaint did not incorporate the documents by reference, let alone refer to the documents. See 2012 WL 3656500, at **22-23. On the other hand, in a securities class-action, the Court has found that a defendant's operating certification, to which plaintiffs refer in their complaint, and which is central to whether the plaintiffs' adequately alleged a loss, falls within an exception to the general rule, and may be considered by the Court when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cnty Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).

## RELEVANT LAW ON BIVENS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS

In Bivens, the Supreme Court recognized that citizens may obtain money damages for injuries suffered as a result of federal agents' violation of the Fourth Amendment. See 403 U.S. at 395-397. "In Bivens -- proceeding on the theory that a right suggests a remedy -- this Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" Ashcroft v. Iqbal, 556 U.S. at 675 (quoting Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001)). Copar Pumice Co., Inc. v. Morris, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, at *13 (D.N.M., Oct. 23, 2009)(Browning, J.), aff'd 639 F.3d 1025 (10th Cir. 2011)(noting that, in Bivens, the Supreme Court held that "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good

- 53 -

the wrong done.' 403 U.S. at 396–397.").

Bivens suits are the "federal analog" to suits brought against state officials under 42 U.S.C.§ 1983.  Ashcroft v. Iqbal, 556 U.S. at 675-76.  Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Unlike suits under § 1983, Bivens does not allow a plaintiff to seek equitable relief -- he or she may only seek damages for alleged constitutional violations, and must look to other areas of the law to receive equitable relief for his or her injuries.  See Bivens, 403 U.S. at 410 (Harlan, J., concurring)("For people in Bivens' shoes, it is damages or nothing.").  Additionally, a Bivens suit is not available for every alleged constitutional violation that a federal actor commits.  The Supreme Court has explained that, where Congress "provides an alternative remedy," which Congress intends "by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself" to preclude a remedy in federal court, a federal court should decline to exercise jurisdiction over the matter under Bivens.  Bush v. Lucas, 462 U.S. 367, 378 (1983).  A federal court should also decline to exercise jurisdiction under Bivens when "special factors counseling hesitation," Bivens, 403 U.S. at 396, are present, such as: questions related to federal fiscal policy, United States v. Standard Oil, Co., 332 U.S. 301, 311 (1947); the "unique disciplinary structure of the military establishment" when implicated in a suit seeking damages for the alleged violations of superior officers, Chappel v. Wallace, 462 U.S. 296, 304 (1983); and cases which "arise out of or are in the course of activity incident to service" in the military, United States v. Stanley, 483 U.S. 669, 684-85 (1987).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts. Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S.Ct. 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per

curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1.      Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether

in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted). See also Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's precedent and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports without usual reluctance to decide constitutional questions unnecessarily"). Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: When (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d at 1180-81(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181. "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S.Ct. at 2080. See Camreta v. Greene, 131 S.Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). Cf. Glover v. Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *30 n.5 (D.N.M. Sept. 27, 2012)(Browning, J.)(expressing concern of Justice Elena Kagan's comments about "large" and "small" cases, and noting that, as a trial court judge, the Court must both find the law and facts correctly and accurately, but must also give its attention and time to each litigant before the Court). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the qualified immunity issue. See Kerns v. Bader, 663 F.3d at 1182.

### 2. Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep.

<u>Sch. Dist.</u>, 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" <u>Lobozzo v. Colorado Dept. Of Corrections</u>, 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting <u>Zweibon v. Mitchell</u>, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." <u>Currier v. Doran</u>, 242 F.3d 905, 923 (10th Cir. 2001). <u>See</u> <u>Medina v. City & Cnty. of Denver</u>, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting <u>Saucier v. Katz</u>, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." <u>Pierce v. Gilchrist</u>, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S.Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on point is not required, the Supreme Court held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S.Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, that although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." Kerns v. Bader, 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be

defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

### RELEVANT LAW REGARDING PLEADING ALLEGATIONS IN THE CONTEXT OF QUALIFIED IMMUNITY

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The "degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: . . . . Fair notice under Rule 8(a)(2) depends on the type of case."  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008)(citing Phillips v. County of Allegheny, 515 F.3d 224, 231-232 (3d Cir. 2008).  Although the same standard applies "in evaluating dismissals in qualified immunity cases as to dismissals generally, complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants."  Robbins v. Oklahoma, 519 F.3d at 1249 (quoting Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir. 1997))(internal quotations omitted).  The Tenth Circuit has articulated the standard required to give adequate notice to government actors sued in their individual capacities under § 1983:

In § 1983 cases, defendants often include the government agency and a number

of government actors sued in their individual capacities. Therefore, it is particularly important in such circumstances that the complaint make clear exactly <u>who</u> is alleged to have done <u>what</u> to <u>whom</u>, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.

<u>Robbins v. Oklahoma</u>, 519 F.3d at 1249-1250 (emphasis in original).

## <u>LAW REGARDING FIRST-AMENDMENT RETALIATION CLAIMS</u>

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006)(quoting <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 n.10 (1988)). It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." <u>Hartman v. Moore</u>, 547 U.S. at 256 (citation omitted). In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights." <u>How v. City of Baxter Springs</u>, 217 F. App'x 787, 797 (10th Cir. Feb. 22, 2007). <u>See</u> <u>Perez v. Ellington</u>, 421 F.3d 1128, 1131 (10th Cir. 2005)("The First Amendment bars retaliation for exercising the right of association."). The Tenth Circuit has explained that "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." <u>How v. City of Baxter Springs</u>, 217 F. App'x at 797 (quoting <u>Worrell v. Henry</u>, 219 F.3d 1197, 1212 (10th Cir. 2000)). To establish a claim of retaliation, outside the employment context, for exercising the right to associate guaranteed under the First Amendment, a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would

chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's exercise of the constitutionally protected activity substantially motivated the defendant's adverse action. See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v. Henry, 219 F.3d at 1212). In line with Hartman v. Moore, the Tenth Circuit has held that a plaintiff must establish the following elements to allege a cause of action under the First Amendment against a defendant who is not his employer:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000).

Klen v. City of Loveland, Colo., 661 F.3d 498, 508 (10th Cir. 2011).

When analyzing whether a defendant's actions would have a chilling effect, a court is to "focus, of course, . . . upon whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled," thus conducting an objective, and not subjective inquiry. Smith v. Plati, 258 F. 3d 1167, 1177 (10th Cir. 2001). If a plaintiff is seeking to prove the causal connection between the retaliatory animus of a third party, and the action of another, the Tenth Circuit requires that "the plaintiff . . . show a causal connection between the third-party's animus and the action." Leverington v. City of Colorado Springs, 643 F.3d 719, 731 n.10 (10th Cir. 2011).

### 1. **Newsgathering and the First Amendment.**

While newsgathering has some First Amendment protection, its protection does not necessarily include a right to access all news-worthy information. The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the

- 63 -

law,'" that right is limited, by its terms, to the ability to gather information from sources legally that are legally available to the public. Houchins v. KQED, Inc., 438 U.S. 1, 10-12 (1978)(quoting Branzburg v. Hayes, 408 U.S. 665, 681-82 (1972)). "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." Branzburg v. Hayes, 408 U.S. at 684. First Amendment protection over newsgathering, which ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source. Houchins v. KQED, Inc., 438 U.S. at 10-12 (citing Branzburg v. Hayes, 408 U.S. at 680). Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[5] Houchins v. KQED, Inc., 438 U.S. at 10-11.

Also, the Supreme Court has found that an international passenger who asserted that the Secretary of State's refusal to validate his passport to travel to Cuba violated his First Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might

---

[5] As the Tenth Circuit has noted:

[T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question. See, e.g., Press–Enter. Co. v. Superior Court, 478 U.S. 1, 8 . . . (1986)(finding a conditional right of access to California pre-trial criminal proceedings). Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir.1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

Smith v. Plati, 258 F.3d 1167, 1178 n.10 (10th Cir. 2001).

affect such policies," had not suffered a First Amendment violation. Zemel v. Rusk, 381 U.S. 1, 16-17 (1965). The Supreme explained that:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

Zemel v. Rusk, 381 U.S. at 16-17.

According to the Tenth Circuit, it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control." Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978)). "This applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public." Smith v. Plati, 258 F.3d at 1178 (citing Houchins v, KQED, Inc., 438 U.S. at 11; Pell v. Procunier, 417 U.S. 817, 834 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850 (1974); Branzburg v. Hayes, 408 U.S. at 684-85; Zemel v. Rusk, 381 U.S. at 17). See Okla. Hosp. Ass'n v. Okla. Pub. Co., 748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that, whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834)).

**2.    Recording Police Conduct and the First Amendment.**

Neither the Tenth Circuit nor the Supreme Court has directly addressed a right -- constitutional or otherwise -- to record police or law enforcement activity in public. In McCormick v. City of Lawrence, 130 F. App'x 987, 988-989 (10th Cir. 2005)(unpublished), the Tenth Circuit was presented with an appeal from two plaintiffs -- self-identified "constitutional

rights activists and vocal critics of the Lawrence, Ks., police department" -- from a grant of summary judgment in favor of police officers whom the plaintiffs asserted violated their First Amendment rights by retaliating against them for their recording of "officers' conducting a sobriety checkpoint on June 28, 2002, and a traffic stop on July 13, 2002." 130 F. App'x at 988. The plaintiffs asserted that the officers had retaliated by "threatening plaintiffs with arrest, charging them with crimes, attacking them, searching their video and audio recording devices, and destroying tapes." 130 F. App'x at 988. The district court dismissed the plaintiff's First Amendment claims, finding first that the plaintiffs' protests were "fighting words," McCormick v. Lawrence, 325 F. Supp. 2d 1191, 1201- 02 (D. Kan., 2004), and not protected speech, and that the "destruction of recording was not a clearly established First Amendment violation." McCormick v. Lawrence, 130 F. App'x at 988. On appeal, the Tenth Circuit agreed, and affirmed the district court "for substantially the same reasons stated by the district court." 130 F. App'x at 988-989.

Other Circuits that have found a First Amendment right to photograph or video tape police conduct qualify the right as "subject to reasonable time, manner, and place restrictions." E.g., Smith v. Cumming, 212 F.3d at 1333. Even the First Circuit, which found that the right was "unambiguously" established by "[b]asic First Amendment principles, along with case law from this and other circuits," noted that the right "is not without limitations. . . . [and] may be subject to reasonable time, place, and manner restrictions." Glik v. Cunniffe, 655 F.3d 78, 82, 84 (1st Cir. 2011). The First Circuit looked to the Supreme Court's decisions in First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978) and Houchins v. KQED, Inc., 438 U.S. at 11, and determined that, under the First Amendment's "proscriptions on laws abridging the freedom of speech, or of

- 66 -

the press," and the Supreme Court's decisions upholding the public's access to legally --

available information, the "filming of government officials engaged in their duties in a public

place, including police officers performing their responsibilities, fits comfortably within these

principles." <u>Glik v. Cunniffe</u>, 655 F.3d at 83 (internal quotations omitted). The First Circuit

stated that the gathering of information "about government officials in a form that can readily be

disseminated to others serves a cardinal First Amendment interest in protecting and promoting

'the free discussion of governmental affairs.'" <u>Glik v. Cunniffe</u>, 655 F.3d at 83 (quoting <u>Mills v.</u>

<u>Alabama</u>, 384 U.S. 214, 218 (1966)). Applying these principles, the First Circuit found that a

plaintiff had a First Amendment right to record police officers in the Boston Common, a public

park -- "the apotheosis of a public forum" -- in which the government has a "sharply

circumscribed" ability to limit the exercise of First Amendment activity. 655 F.3d at 84. The

First Circuit noted that the plaintiff had "filmed the officers from a comfortable remove, and

neither spoke to nor molested them in any way (except indirectly responding to the officers when

they addressed him)," which amounted to a "peaceful recording of an arrest in a public space that

does not interfere with the police officers' performance of their duties," and was thus not

"subject to limitation." 655 F. 3d at 84 (internal quotations removed).

  The Eleventh Circuit and the United States Court of Appeals for the Ninth Circuit have

also recognized a right to videotape police activity in public. In <u>Smith v. Cumming</u>, the Eleventh

Circuit found that a plaintiff had a First Amendment right to videotape police conduct, grounded

in the First Amendment's protection of "the right to gather information about what public

officials do on public property, and specifically, a right to record matters of public interest." 212

F.3d at 1333. Similarly, the Ninth Circuit has stated that the First Amendment "right to film

matters of public interest" extends to a plaintiff videotaping a police protest march. Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995).

On the other hand, the Third Circuit has found, looking to its own precedent and that of other Circuits, that there is "insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on fair notice that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment." Kelly v. Borough of Carlisle, 622 F.3d 248, 262 (3d Cir. 2010). Although the Third Circuit's ruling was dispositive on whether the right was clearly established, and did not address whether the arrest or seizing the camera was a constitutional violation, the Third Circuit pointed out that other cases fell short of finding that similar conduct violated the a Constitution. See 622 F.3d at 262. The Third Circuit noted that, while Eleventh Circuit in Smith v. Cummings announced a "broad right to videotape police," the Third Circuit's own precedent in Giles v. Davis, 427 F.3d 197 (3d Cir. 2005), suggested a "narrower right," and only implied that the plaintiff's conduct might not be protected. Kelly v. Borough of Carlisle, 622 F.3d 262. Lastly, the Third Circuit stated that any right to record matters of public concern is "not absolute; it is subject to reasonable time, place, and manner restrictions." Kelly v. Borough of Carlisle, 622 F.3d at 262. Similarly, in an unpublished opinion, the Fourth Circuit has found that there is not a clearly-established right to record police activities on public property. See Szymecki v. Houck, 353 F. App'x 852, 853 (4th Cir. 2009).

3. **Reasonable Time, Place, and Manner Restrictions on Speech in the Public Forum.**

"[T]he Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius v. NAACP

Legal Def. & Ed. Fund, Inc., 473 U.S. 788, 802 (1985). "Traditional public fora are defined by the objective characteristics of the property, such as whether, "'by long tradition or by government fiat,' the property has been 'devoted to assembly and debate.'" Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (quoting Perry Educ. Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37, 45 (1983)). "The government can exclude a speaker from a traditional public forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. at 677 (quoting Cornelius v. NAACP Legal Defense & Ed. Fun., Inc., 473 U.S. at 800).

"Designated public fora . . . are created by purposeful governmental action." Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. at 677. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. at 802. Accord Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992)(designated public forum is "property that the State has opened for expressive activity by part or all of the public"). The Supreme Court looks to the "policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. at 802. "If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. at 677.

"Other government properties are either nonpublic fora or not fora at all." Arkansas

Educ. Television Comm'n v. Forbes, 523 U.S. at 655 (citing Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 678-79).   Governmental restrictions on access to a nonpublic forum are valid so long as "the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."   Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 800.

> With respect to activities on government property, the Constitution does not require 'the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'

Ramos v. Carbajal, 508 F. Supp. 2d 905, 913 (D.N.M. 2007)(Browning, J.)(quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800).

The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes."   United States v. Kokinda, 497 U.S. 720, 726 (1990).

> Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny.   Regulation of speech on property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny.   But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness.

United States v. Kokinda 497 U.S. at 726-27 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 45-46)(internal citations omitted).   The Supreme Court has determined that this tripartite framework is necessary, because "[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."   Cornelius v. NAACP

Legal Def. & Educ. Fund, Inc., 473 U.S. at 803.  The Supreme Court has explained that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129-30 (1981)).

The Supreme Court determined in Int'l Soc. for Krishna Consciousness, Inc. v. Lee that airport terminals are nonpublic fora and thus subject to reasonable time, place, and manner restrictions.  See 505 U.S. at 679-83.  In reaching this decision, the Supreme Court found that the "tradition of airport activity does not demonstrate that airports have historically been made available for speech activity."  505 U.S. at 680-81.  The Supreme Court noted that, "given the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having 'immemorially . . . time out of mind' been held in the public trust and used for purposes of expressive activity."  505 U.S. at 680 (quoting Hague Comm. for Indus. Org., 307 U.S. 496, 515 (1939)).  The Supreme Court stated that, given the "rather short history of air transport," various religions and non-profit organizations had only come to use commercial airport terminals in recent years as a "forum for the distribution of literature, solicitation of funds, the proselytizing of new members, and other similar activity," the conduct at issue in the case.  Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 680.  The Supreme Court also noted that airport terminals are unlike other "transportation nodes," which the plaintiffs asserted are fora in which free speech is historically protected, because airport terminals are public locations, which include security checkpoints, and because the Federal Aviation Administration "not infrequently" restricts public access to airport terminals.  505 U.S. at 681.

The Supreme Court further noted that airport terminals, whose primary purpose is to "provide services attractive to the marketplace," are not forum which have a principal purpose of promoting the "'free exchange of ideas.'" 505 U.S. at 682 (quoting Cornelius v. NAACP Legal Def. & Ed. Fund, Inc., 473 U.S. at 800). The Supreme Court noted that the purpose of airport terminals is "passenger air travel, not the promotion of expression," with an emphasis on efficient air travel. Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 681. On this basis, the Supreme Court found that "neither by tradition nor purpose can the terminals be described as satisfying the standards we have previously set out for identifying a public forum." Id. at 505 U.S. at 681.

Regarding reasonable time, place and manner restrictions on speech in a nonpublic forum, the Supreme Court emphasized in Int'l Soc. for Krishna Consciousness, Inc. v. Lee that the "restriction need only be reasonable; it need not be the most reasonable or the only reasonable limitation." 505 U.S. at 683 (internal citation omitted)(emphasis in original). Before the Supreme Court was an airport's prohibition on solicitation within the terminal. The Supreme Court found that the prohibition was reasonable, noting that solicitation often has a "disruptive effect . . . on business." 505 U.S. at 683. The prohibition also kept passengers from having to alter their paths within the terminal to avoid solicitors, which could cause congestion and inefficiency, and be costly to the airport and passengers therein, "as a flight missed by only a few minutes can result in hours' worth of subsequent inconvenience." 505 U.S. at 683-84. The Supreme Court also noted that passengers in an airport are often on tight schedules and may not complain about inappropriate solicitation out of a desire to catch their flight. Additionally, the airport had allowed solicitors to continue their activities on the sidewalk outside the terminals, an

area frequented by the general public, and thus the solicitors were not completely cut-off from reaching airport passengers. See 505 U.S. at 684-85.

In sum, the Supreme Court stated that the "inconveniences to passengers and the burden on the [airport] officials flowing from solicitation activity may seem small, but viewed against the fact that pedestrian congestion is one of the greatest problems facing the three terminals, . . . the [airport] could reasonably worry that even such incremental effects would prove quite disruptive." 505 U.S. at 685. The Supreme Court also noted that, if every group of solicitors were allowed inside the terminal, as the airport would be required to permit so as to remain view-point neutral, the concern regarding congestion and crowd control would only be accentuated. The Supreme Court thus concluded that the airport's ban on all solicitation within the terminal was a reasonable time, place and manner restriction in the nonpublic forum of an airport terminal. See 505 U.S. at 685.

## RELEVANT LAW ON THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV). It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

- 73 -

1.     **Arrests and Probable Cause**.

Probable cause must support an arrest, "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). See Tennessee v. Garner, 471 U.S. 1, 7 (1985). "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion." United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted). The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. See Beck v. Ohio, 379 U.S. 89, 96 (1964). "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000,

- 74 -

1006 (10th Cir. 2002)). Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 2. **Relevant Law on Excessive Force.**

"Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Saucier v. Katz, 533 U.S. 194, 207 (2001). See Cordova v. Aragon, 569 F.3d 1183, 1188 (10th Cir. 2009)("A Fourth Amendment claim of excessive force is analyzed under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries."). Hence, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(quoting Graham v. Connor, 490 U.S. at 1151-52)(internal quotation marks and citations omitted). Additionally, a court must judge the reasonableness of a particular use of force from the "perspective . . . of the information possessed by the [officers]." Weigel v. Broad, 544 F.3d at 1152 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))(citations and internal quotes omitted).

When analyzing a § 1983 claim for both excessive force and unlawful arrest, a court must

- 75 -

look first at whether the arrest was lawful, and then at whether the officers' use of force was reasonable in light of the lawfulness of the arrest. The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007)(emphasis added). Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Cortez v. McCauley, 478 F.3d at 1126. See Smith v. Kenny, 678 F. Supp. 2d 1124, 1161 (D.N.M. 2009)(Browning, J.)(noting that the finding whether the officers' use of force is "commensurate with the circumstances" depends upon whether the arrest was lawful). Thus, if it is clear that the amount of force used would have been reasonable if the detention or arrest had been appropriate, then the plaintiff can recover damages only for the unlawful arrest -- including any damages that flow from the officers' use of force during the arrest -- but there will be no separate excessive-use-of-force claim. See Cortez v. McCauley, 478 F.3d at 1127 (holding that a plaintiff must present evidence that the force used was more than that which would be required in effectuating a lawful arrest for the plaintiff to prevail in obtaining damages for both an unlawful arrest, and the use of excessive force).

- 76 -

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS

The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 675 ("Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  <u>See</u> <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  <u>See</u> <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1307-08 (10th Cir. 1998).  The Tenth Circuit has recognized that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and a unforeseeable intervening act has not terminated their liability.  <u>Martinez v. Carson</u>, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting 42 U.S.C. § 1983; <u>Trask v. Franco</u>, 446 F.3d 1036, 1046 (10th Cir. 2006)(internal quotation marks omitted)).

### 1.    <u>Supervisory Liability.</u>

The Tenth Circuit has held that supervisors are not liable under 2 U.S.C. § 1983 "unless there is an affirmative link between the constitutional deprivation and the supervisor's exercise of control or direction, his personal participation, or his failure to supervise."  <u>Kiesling v. Troughton</u>, 107 F.3d 880, 1997 WL 111256, at *2 (10th Cir. 1997)(unpublished table decision)(citing <u>Meade v. Grubbs</u>, 841 F.2d 1512, 1527 (10th Cir. 1988)).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that

their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations omitted)(internal quotation marks omitted). Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at **25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199. The Tenth Circuit noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in

ways we do not need to address to resolve this case." 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct." 614 F.3d at 1200-01. The specific example that the Tenth Circuit gave to illustrate this principle was Rizzo v. Goode, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, police commissioner, and other city officials liable under 42 U.S.C. § 1983 for constitutional violations committed by unnamed individual police officers. See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371). The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations." Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

### b. Non-Supervisory Liability.

A government actor[6] may be liable for the constitutional violations that another

---

[6] The Tenth Circuit's cases upholding non-supervisory liability against actors who knew or reasonably should have known that their conduct would cause others to deprive the plaintiff of his or her constitutional rights have arisen in the context of 42 U.S.C. § 1983, and the Tenth Circuit has not addressed a similar case arising under Bivens. See Martinez v. Carson, 697 F.3d at 1253, 1256-57; Mink v. Knox, 613 F.3d 995, 1001-02 (10th Cir. 2010); Poolaw v. Marcantel, 565 F.3d 721, 732 (10th Cir. 2009); Buck v. City of Albuquerque, 549 F.3d 1269, 1279-1280 (10th Cir. 2008); Trask v. Franco, 446 F.3d at 1046; Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990); Wulf v. City of Wichita, 883 F.2d, 842, 864 (10th Cir. 1989). Both the Tenth Circuit and the Supreme Court recognize that a Bivens suit is the "'federal analog' to § 1983 suits," Dodds v. Richardson, 614 F.3d at 1197 (quoting Ashcroft v. Iqbal, 556 U.S. at 675-76), to the extent that, when the Supreme Court limits supervisory liability in a Bivens suit, the limitations binds § 1983

committed, if the actor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). "In other words, they may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit has applied liability for those defendants who proximately caused an injury complained-of under § 1983, even when the "conduct of other people may have concurrently caused the harm does not change the outcome as to [Defendants]," so long as there was not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).

---

cases as well. See Ashcroft v. Iqbal, 556 U.S. at 675-76 (proscribing the limits of supervisory liability in both Bivens and § 1983 actions, in a matter which arose under Bivens, not § 1983); Mink v. Knox, 613 F.3d at 1002 n.5 (explaining that the Supreme Court's ruling on supervisory liability under Bivens in Ashcroft v. Iqbal has called into question the availability of supervisory liability in Bivens and § 1983 actions). The Court thus concludes that Tenth Circuit's bases for liability in § 1983 and Bivens actions are the same, as Bivens is the "federal analog" to § 1983 cases. Ashcroft v. Iqbal, 556 U.S. at 675.

- 80 -

> "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Id. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, Justice for the Supreme Court of the United States, while he was sitting on the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

> Bodine, 72 F.3d at 400 (other citation omitted).

Trask v. Franco, 446 F.3d at 1046. Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and ... will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)). If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

- 81 -

The Tenth Circuit has found that probation officers, who summoned New Mexico State Police ("NMSP") officers to a home, were not entitled to summary judgment absolving the probation officers for the Fourth Amendment violations the NMSP officers committed. Trask v. Franco, 446 F.3d at 1045 -1047. The Honorable W. Daniel Schneider, United States Magistrate Judge for the District of New Mexico, had found that there was "no affirmative link between Mr. Trask's [the plaintiff's] alleged constitutional deprivations and the probation officers' exercise of control or failure to supervise." 446 F.3d at 1041 (internal quotations omitted). Trask alleged that the probation officers were "responsible for his detention and arrest because . . . they called NMSP Officer Smith to the residence, [and] . . . they falsely represented that they had lawful authority to search the residence." 446 F.3d at 1041. The probation officers maintained that they could not be liable for Trask's alleged constitutional deprivations, because they "did not personally participate in Mr. Trask's detention or arrest," and the NMSP officers "decided to detain Mr. Trask for officer safety," and later "arrested him for obstructing an officer," after the NMSP officers discovered that Trask had lied to them during their search of his residence. 446 F.3d at 1041.

The Tenth Circuit first determined that Trask's alleged unlawful detention and arrest would not have occurred but for the probation officers' conduct. The Tenth Circuit then explained that Trask's "appearance at the door with knives, which required NMSP Officer Smith to handcuff him for officer safety" was another cause of Trask's detention and arrest. 446 F.3d at 1046-47. The Tenth Circuit declined to find, however, that Trask's armed appearance at the door was a "superseding act that limited the probation officer's liability," because the probation officers might have "reasonably foresaw when they first called for police backup" that Trask

would be armed when the NMSP Officers arrived. 446 F.3d at 1047. Thus, Trask's appearance could only have superseded the probation officer's responsibility for his unlawful detention "if the officers, when they called for assistance, did not reasonably foresee detention of Mr. Trask during the search." 446 F.3d at 1047.

Regarding Trask's alleged unlawful arrest, the Tenth Circuit noted that Trask lying to the NMSP officers during their search was an additional cause for his arrest. The Tenth Circuit once again found, however, that the probation officers would still be liable if "it was reasonably foreseeable to the probation officers that Mr. Trask would lie or warrant arrest." 446 F.3d at 1047. The Tenth Circuit noted that the criminality of Trask's lie did not preclude the probation officers from liability, as even "an intervening criminal act is not a superseding act to limit the probation officer's liability if the criminal act was foreseeable." 446 F.3d at 1047. Thus, the Tenth Circuit reversed Judge Schneider's grant of summary judgment granting to the probation officers, and remanded for the district court to determine whether reasonable minds could differ whether the probation officer's conduct was the proximate cause of Trask's alleged unlawful detention and arrest. See 446 F.3d at 1047.

Similarly, the Tenth Circuit recently held, in Martinez v. Carson, that New Mexico Department of Corrections ("NMDC") employees, while on patrol of a high-crime neighborhood as part of a task force with Rio Rancho, New Mexico, police officers, could be liable for the Rio Rancho police's unlawful seizure of two plaintiffs, whom the NMDC employees transferred to the custody of the Rio Rancho police officers after the NMDC employees detained the plaintiffs for only a few minutes. See 697 F.3d at 1253, 1256-57. While detaining the plaintiffs, the NMDC employees forced the plaintiffs to the ground, "handcuffed them, drew weapons, and

- 83 -

conducted a pat-down search," and then handed the plaintiffs over to the custody of Rio Rancho police officers, who held one plaintiff for twelve hours and the other for five hours before release. 697 F.3d at 1254. The Honorable William P. Johnson, United States District Judge for the District of New Mexico, held that the NMDC employees were liable only for the first few minutes of the plaintiffs' unlawful search and seizure, on the grounds that they had not "promoted, suggested, or indirectly caused or conspired with any Rio Rancho DPS personnel to violate Plaintiffs' rights," and did not know, and reasonably should not have known, that the plaintiffs would be deprived of a constitutional right. 697 F.3d at 1255. The Tenth Circuit, citing Trask v. Franco, reversed Judge Johnson, and stated that the NMSP employees "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit concluded that a reasonable jury could find that the NMSP employees' conduct was the proximate cause "of at least some portion of Plaintiffs' prolonged detention following Defendant's transfer of custody to the Rio Rancho officers." 697 F.3d at 1255. The Tenth Circuit noted that a jury had found that the NMSP employees lacked reasonable suspicion when they detained the plaintiffs and transferred them to the Rio Ranch officers, and the Tenth Circuit concluded that a reasonable jury could find that the NMSP officers "knew or should have known their illegal seizure and transfer of custody would result in Plaintiffs' prolonged detention after the transfer of custody." 697 F.3d at 1256.

## LAW REGARDING SOVEREIGN IMMUNITY

"The United States cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.). "Congressional consent -- a waiver of the

traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38.  As with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  Accordingly, the "plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  Garcia v. United States, 709 F. Supp. 2d at 1138.  Accord Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so.");  Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted).  Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994): United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed.  See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).  The United States' agencies also have sovereign immunity absent a waiver.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994)("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").

- 85 -

## ANALYSIS

Mocek's Complaint suffers from pleading deficiencies. He asserts that the TSOs violated his First Amendment "free speech and associational rights" by "unlawfully ordering [him] to cease video and audio recording," and "summoning law enforcement." Complaint ¶ 93, at 21-22. He asserts that the TSOs impeded his constitutionally protected right to gather news. See Response at 6. Mocek has not alleged, however, sufficient facts to show that the TSOs' conduct was unreasonable, and neither Supreme Court nor Tenth Circuit precedent clearly establishes this asserted constitutional violation. The TSOs are thus entitled to qualified immunity as to his First Amendment claims in Count I. Regarding Mocek's Fourth Amendment claims against the TSOs, Mocek first of all has not plead facts which would put the TSOs on notice that he was treated with excessive force, and the excessive force claims, as related to the TSOs, in Count III, are thus dismissed for failure to state a claim. Additionally, the TSOs did not set in motion a series of events which they knew or reasonably should have known would result in a violation of Mocek's rights to be free from an unlawful search or seizure. Mocek asserts that TSOs summoned the AAPD officers because he would not stop filming at the screening checkpoint, in contravention to the TSOs orders. Even though the Court takes as true that Mocek remained calm, did not raise his voice, and did not disrupt other passengers throughout the incident, his calm demeanor does not make summoning law enforcement unlawful when Mocek refused to stop recording at the screening checkpoint. The Court concludes that, upon arrival at the screening checkpoint, under the facts which Mocek has alleged, the AAPD officers had reasonable suspicion to believe that Mocek was engaged in criminal conduct, as the TSOs relayed to the AAPD officers. The AAPD officers were, thus, authorized to demand Mocek's identification, and when he did not, the

- 86 -

AAPD officers then had probable cause to arrest him. Mocek has thus not sufficiently alleged that he suffered a Fourth Amendment violation. Further, the facts of Mocek's case are distinguishable from that of cases in which the Tenth Circuit has found defendants in a non-supervisory role liable for the constitutional violations committed by others. The TSOs are thus entitled to qualified immunity as to Mocek's alleged injuries of an unlawful search and seizure. Lastly, Mocek's requests for declaratory relief against the TSOs in their official capacity fail, because Mocek has not brought this request under a statute which validly shows that the TSA has waived sovereign immunity.

## I. THE COURT WILL NOT RELY ON THE DOCUMENTS THE TSOS ATTACHED TO THE MTD.

The TSOs attached to their MTD statements from Breedon and Schreiner. See The TSO statements. The TSOs assert that these are the statements to which Mocek refers in the Complaint, see Complaint ¶¶ 75-78, at 17-19, and that, because Mocek summarizes the TSO statements in the Complaint, they are allowed to attach the TSO statements to the MTD, see Tr. at 7:11-13 (Martin). Mocek objects to the admission of the TSO statements. See Tr. at 29:13-14 (Boelcke).

"Ordinarily, a '12(b)(6) motion must be converted to a motion for summary judgment if matters outside the pleading are presented to and not excluded by the court and all parties are given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" Larson v. Agos, 449 F. App'x 725, 729 (10th Cir. 2011)(quoting GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997)(internal quotation omitted)). The Tenth Circuit, however, has recognized that "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not

dispute the documents' authenticity." Alvarado v. KOB-TV, LLC, 493 F.3d 1210, 1215 (10th Cir.2007). The Tenth Circuit has explained that this limited exception, which allows a district court to consider matters outside the pleadings without converting a motion to dismiss into a motion for summary judgment, is intended to preclude "a plaintiff with a deficient claim" from surviving "a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." GFF Corp v. Assoc. Wholesale Grocers, Inc., 130 F.3d at 1385.

Although Mocek refers to certain statements that Breedon and Schneider made in his Complaint, these statements are not "central to [his] claims." Alvarado v. KOB-TV, LLC, 493 F.3d at 1215. Mocek refers to Breedon's statement only to point out that Breedon "did not request police involvement until he asked Mocek to cease using his camera," and that Breedon "notably omits the fact that much of the escalation was due to the conduct of the officers and not Mocek." Complaint ¶ 76, at 18. See Statement from Jonathan Breedon at 3. Mocek refers to Schreiner's statement only to contest Schreiner's characterization of Mocek as "hostile" and "belligerent," which Mocek asserts his video footage contradicts. Complaint ¶ 78, at 19. See Statement from Anthony M. Schreiner at 1. Mocek's allegations regarding the statements are not central to his claims alleging violations of his First and Fourth Amendment rights, but appear to be his efforts to preemptively controvert evidence which the TSOs may put forward later in the case. Thus, unless the Court is prepared to convert the motion to dismiss into one for summary judgment, the Court should disregard the TSO statements because Mocek's Complaint does not rest on the TSO statements to the extent that he could "survive a motion to dismiss simply by not attaching" the TSO statements. GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d at 1385. Neither party indicated, at the hearing, that they would like to convert the MTD into a motion for

summary judgment. Mocek did not indicate that he desired to convert the MTD into one for summary judgment. See Tr. at 7:1-13 (Court, Martin); id. at 29:10-30:6 (Court, Boelcke).

There is another sound reason to not consider the TSO statements. Not only does Mocek not rely on them entirely -- like a S-1 in a securities deal, a contract, or an insurance policy -- but he only relies on a portion of them as statements of a party opponent against the opposing party. Mocek is specifically not relying on these statements, because they are contrary to his version of the facts. It is unfair to Mocek, the plaintiff, to have the TSOs rewrite his Complaint with their version of events. Second, because there is a strong conflict with his version of events and the TSOs' version, the Court has to assume that there appears to be a genuine issue of material fact. See Great Am. Ins. Co. v. Crabtree, 2012 WL 3656500, at *22 (disregarding interviews and transcripts attached to motion to dismiss, where the facts set forth in the interviews and transcripts are disputed by the parties and the documents are not incorporated by reference in the complaint). The TSOs' version should not be the basis of their rule 12(b)(6) motion. Such a procedure would turn the Federal Rules of Civil Procedure, especially rule 12(b)(6) and rule 56, on their heads. The most cautious, conservative approach to the statements, despite Mocek's mention of some statements, is to disregard the attached statements. The Court will thus not rely upon the TSO statements, because to do so would convert the MTD into a motion for summary judgment, and neither party has indicated a desire or intention to do so at this point.

## II. THE COURT WILL DISMISS COUNT I, BECAUSE MOCEK HAS NOT ALLEGED A FIRST AMENDMENT RIGHT, AND THE TSOS ARE ENTITLED TO QUALIFIED IMMUNITY.

Mocek asserts that he has a First-Amendment right to "gather information," Response at 6, which the TSOs violated through "unlawfully ordering [him] to cease video and audio

- 89 -

recording of them and summoning law enforcement," Complaint ¶ 93, at 21. Whether construed as a right to newsgathering or to record police conduct in public, the Tenth Circuit or Supreme Court has not recognized either right in a factual situation similar to that set forth in Mocek's Complaint. Further, to the extent either right is recognized, neither the Tenth Circuit nor Supreme Court precedent establishes that the TSOs' conduct was in clear violation of Mocek's First Amendment rights.

### A. MOCEK HAS NOT SUFFICIENTLY ALLEGED THAT THE TSOS PLAUSIBLY VIOLATED HIS FIRST AMENDMENT RIGHT TO GATHER NEWS.

Mocek asserts that his conduct of "using his camera to video record" the TSOs' implementation of an "alternative identification policy," Complaint ¶ 46, at 11, was an exercise of his "long . . . established" First Amendment-protected right to "gather information," Response, at 6. He asserts that the TSOs' orders were in retaliation against him for having video and audio recorded the TSOs. See Complaint ¶ 93, at 21-22. To establish a claim against a defendant, who is not an employer, for retaliation under the First Amendment, Mocek must show that: (i) he was engaged in constitutionally protected activity; (ii) the TSOs' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) that the TSOs' adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. See Worrell v. Henry, 219 F.3d at 1212. Mocek fails to meet this burden.

Although there is an "undoubted right to gather news from any source by means within the law," which the government may not "violate . . . by deterring news sources from communicating information," Houchins v. KQED, Inc., 438 U.S. at 10-12 (internal citation

omitted), the Tenth Circuit has established that there "is no general First Amendment right of access to all sources of information within governmental control," Smith v. Plati, 258 F.3d at 1178. Further, the "right to speak and publish does not carry with it the unrestrained right to gather information." Zemel v. Rusk, 381 U.S. at 16-17. The Tenth Circuit has ruled that "engaging in newsgathering activities" does not exempt a person from Federal Aviation Administration safety regulations. Hill v. Nat'l Transp. Safety Bd., 886 F.2d 1275, 1282 (10th Cir. 1989). Even if Mocek were engaged in newsgathering, an assertion he does not make in his Complaint, his right to do such is not without limitation. Further, if Mocek were exercising his asserted right to record "police officers and officials in the course of carrying out their duties," Response at 11, that right, which the Tenth Circuit has not yet recognized as protected First Amendment activity, is subject to reasonable to "reasonable time, manner, and place restrictions," Smith v. Cumming, 212 F.3d at 133, in the Circuits which do recognize the right. Thus, the Court can determine whether the TSOs' actions caused Mocek to suffer a constitutional violation only by examining whether their action was beyond the limits that may be imposed on this conduct.

The Supreme Court has determined that airport terminals are nonpublic forums, and thus subject to reasonable government restrictions on First Amendment activity. See Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683. In Int'l Soc. for Krishna Consciousness, Inc. v. Lee, the Supreme Court found that an airport's prohibition on solicitation inside the airport terminal did not violate the plaintiff's First Amendment rights, even though the ban precluded the plaintiffs from engaging in their religious ritual of "sankirtan," which consisted of "going into public places, disseminating religious literature and soliciting funds to support the

religion." See 505 U.S. at 674, 678-85. The Supreme Court found that it was "uncontested that the solicitation at issue in this case is a form of speech protected under the First Amendment," yet nonetheless found that the airport's ban on solicitation was a reasonable limitation on the plaintiffs' conduct. 505 U.S. at 677. On the other hand, the Supreme Court has held that the "right to speak and publish does not carry with it the unrestrained right to gather information." Zemel v. Rusk, 381 U.S. at 17. Moreover, the Tenth Circuit recognizes "no general First Amendment right of access to all sources of information within governmental control." Smith v. Plati, 258 F.3d at 1178. Further, if Mocek's filming is viewed as an exercise of his right to record "officials in the course of carrying out their duties" in public, Response at 11, the Supreme Court has not made an unambiguous announcement that such conduct is "uncontested" First Amendment activity. Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 677. Moreover, the Circuits which have found that recording police activity in public is protected under the First Amendment analyze the activity in the context of the right to gather information regarding public officials' activity on public property, and regarding matters of public interest, a right which the Tenth Circuit and the Supreme Court indicate is limited in its scope. Cf. Smith v. Cumming, 212 F.3d at 1333 (finding that the right to record police activity in public flows from the "general right to gather information about what public officials do on public property, and . . . a right to record matters of public interest"); and Fordyce v. City of Seattle, 55 F.3d at 439 (finding that recording a police protest march is included in the First Amendment right to "film matters of public interest"); with Zemel v. Rusk, 381 U.S. at 17 (finding that the "right to speak and publish does not carry with it the unrestrained right to gather information"); and Smith v. Plati, 258 F.3d at 1178 (finding that there is "no general First Amendment right of access to all

sources of information within governmental control"). Thus, accepting Mocek's assertions as true that he was engaged in "newsgathering," or recording the activity of government officials in public, at the screening checkpoint, see Response at 6-8, 11, his recording entails less First Amendment protection than that of the plaintiffs in Int'l Soc. for Krishna Consciousness, Inc. v. Lee, conduct of which a reasonable regulation included a complete prohibition.

Mocek recorded the TSOs at the Albuquerque Sunport's terminal, and in an even more specific location: the screening checkpoint. Moreover, Mocek began recording the TSOs when he was standing in a separate and different line than that which passengers normally use at the checkpoint. See Complaint ¶¶ 44-45, at 10-11. Mocek asserts that he was informed that photography and video recording are not prohibited at the Albuquerque Sunport TSA screening checkpoint, but he was also informed that advance coordination of such activities is encouraged. Complaint ¶¶ 37-42, at 9-10. These assertions fall short of showing that the screening checkpoint has "historically been made available for speech activity." Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 680-81. First, Mocek has not alleged any facts which support a finding that the checkpoint's primary purpose is the "free expression of ideas" or that the TSA has "intentionally open[ed] a nontraditional public forum for public discourse." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 800, 802. Further, Mocek alleges that the incident underlying the Complaint took place in "publicly accessible areas of the airport," Complaint ¶ 56, at 13, but a forum analysis does not turn on whether the public could access the screening checkpoint, but rather on whether the screening checkpoint "has been traditionally open to the public for expressive activity,"[7] or the TSA "expressly dedicated" an

---

[7] The Supreme Court has used the terms of "expressive activity" and "speech activity"

- 93 -

area to speech activity, United States v. Kokinda, 497 U.S. at 726-27. The Supreme Court has already found that airport terminals, which are publicly accessible, are nonpublic fora. See Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 679-83. Indeed, the presence of security checkpoints at airport terminals was one of the factors which the Supreme Court used to differentiate airport terminals from other "transportation nodes," such as railway or bus stations, thus indicating that the TSA screening checkpoint at the Albuquerque Sunport is nonpublic forum, just as the Albuquerque Sunport airport terminal is. 505 U.S. at 680. Rather than the "free expression of ideas," the primary purpose of a screening checkpoint is the facilitation of passenger safety on commercial airline flights, and the safety of buildings and the people for whom a plane can become a dangerous weapons. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 800. See 49 C.F.R. § 1542.201 (explaining that airports are required to "prevent and detect the unauthorized entry, presence, and movement of individuals" from an airport's secured areas). The Court cannot find that the Albuquerque Sunport screening checkpoint is an area traditionally open to the public for expressive activity, nor has it been designated a public forum by government action "intentionally opening a nontraditional public forum for public discourse." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc. 473 U.S. at

---

interchangeably in the context of describing activity that comes under the First Amendment's guarantee of the freedom of speech. See United States v. Kokinda, 497 U.S. at 726 ("Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny." (emphasis added)); Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 678 (referring to the Supreme Court's tripartite test for the regulation of First Amendment activity, and noting that "regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny," whereas, under the last category which includes areas that are neither the traditional public forum nor the designate public forum, "expressive activity conducted on this last category of property must survive only a much more limited review" (emphasis added)).

802.  Thus, taking Mocek's allegations as true and drawing all reasonable inference in his favor, he has not alleged that the Albuquerque Sunport screening checkpoint is different from an airport terminal, an area "where the Government has not dedicated its property to First Amendment activity," and regulation of First Amendment activity therein is "examined only for reasonableness." United States v. Kokinda, 497 U.S. at 726-27.

A reasonable restriction "need not be the most reasonable or the only reasonable limitation." Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683. Mocek asserts that the TSOs unlawfully ordered him to cease recording their alternative screening procedures and summoned law enforcement when he did not comply. See Complaint ¶ 93, at 21-22. The TSOs assert that they acted reasonably in response to Mocek's filming the alternative screening process. See MTD at 13. The Constitution does not require the TSA is not required "'to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'" Ramos v. Carbajal, 508 F. Supp. 2d 905, 913 (D.N.M. 2007)(Browning, J.)(quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800). The Supreme Court has previously upheld a ban on all solicitation within an airport terminal, on the grounds that solicitation has a "disruptive effect" on airport business, because solicitation could cause passengers to be delayed or even miss their flight, thus increasing the airport's overall costs. Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683. Similarly, even if Mocek's recording was not noisy or verbally disruptive to passengers at the screening checkpoint, filming screening procedures could have a disruptive effect, because the TSA employees at the checkpoint must determine whether the filming is being done for

legitimate or illicit purposes.  Mocek declined to notify the TSA employees at the Albuquerque

Sunport in advance that he intended to film at the screening checkpoint.  Moreover, he did not

communicate his purpose while filming the TSOs, nor did he provide them with other guarantees

that he was not videotaping portions of the screening process which the TSA does not believe

should be publicly disseminated, such as the monitors.  Mocek's persisted filming also diverted

the attention of TSA employees, who could have assisted other passengers who had forgotten

their identification and needed to proceed through the alternative screening procedures so as to

be able to board their flights, unlike Mocek, who chose to engage in the alternative screening

procedures so as to document the process.  Mocek's filming could thus have resulted in delays to

other passengers, causing them to incur increased costs, and Mocek distracted the TSA

employees with his filming, which could have allowed a passenger with an illicit purpose to pass

through the screening checkpoint more easily.   The TSOs' order for Mocek to stop and

subsequent summoning of law enforcement is thus unlike the police officers' arrest of the

plaintiff in Glik v. Cunniffe, which was a constitutional violation, in part because the plaintiff

"filmed the officers form a comfortable remove. . . neither spoke to nor molested them in any

way," and did not "interfere with the police officers' performance of their duties."  655 F.3d at

84.  Rather, Mocek's filming required the attention of multiple TSA employees, not only because

he did not relate the purpose of his filming at the screening checkpoint, but also because the

Department of Transportation and TSA have determined that "distractions" to TSA employees at

screening checkpoints which require the employees to "turn away from his or her normal duties

to deal with the disruptive individual," may "affect the screening of other individuals," or may be

evidence that the disruptive individual is "attempting to discourage the screener from being as

thorough as required," and thus such distractions "potentially can be dangerous." 67 Fed. Reg. 8340-01, 8344. Even if Mocek was engaged in conduct that has some First Amendment protection, in light of the potential danger to other passengers which Mocek's filming could have caused, the TSOs' order for Mocek to stop was not likely unreasonable. See Kelly v. Borough of Carlisle, 622 F.3d at 262 (finding that recording police while at a traffic stop is not a clearly established right under the First Amendment, in part because traffic stops are "inherently dangerous" to officers"). The Court cannot, thus, find that ordering Mocek to stop recording an alternative screening procedure was unreasonable, especially when Mocek did not explain why he was recording, nor did he assure the TSA employees that he was not documenting portions of the procedure which the TSA desire to keep from public dissemination, such as the monitors. Mocek's recording could thus have had, or have led to, a "disruptive effect," making a limitation on his recording reasonable. Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 683.

In light of the Supreme Court's decision in Int'l Soc. for Krishna Consciousness, Inc. v. Lee, the Court cannot find that the TSOs' order for Mocek to stop recording was an unreasonable limitation on his right to gather news at the screening checkpoint. Prohibiting Mocek from recording an alternative screening procedure is all the more reasonable than the prohibition upheld in Int'l Soc. for Krishna Consciousness, Inc. v. Lee, given that the screening checkpoint's purpose to maintain passenger safety and the TSOs' desire to keep Mocek from documenting the process so as to develop a way to evade TSA screening protocol. See 67 Fed. Reg. at 8344. Furthermore, Mocek was not without the ability to record TSA employees completely -- his own investigation indicated that, had he notified the TSA in advance of his desire to film at the Albuquerque Sunport screening checkpoint, his request could have been accommodated.

- 97 -

Additionally, just as in <u>Int'l Soc. for Krishna Consciousness, Inc. v. Lee</u>, the Supreme Court found that a prohibition on solicitation inside an airport terminal was reasonable in part because the airport allowed solicitation "on the sidewalk areas outside the terminals," the TSA indicated that Mocek would be allowed to record at the screening checkpoint if he had made advance coordination, and the TSOs' actions did not inhibit his ability to gather news in other areas of the terminal, where the TSA's security concerns are likely less poignant. 505 U.S. at 694. Thus, Mocek has not alleged that the TSOs' order for him to stop recording was an unreasonable restriction on his right to gather news or record government officials' activity in public -- rights subject to reasonable time, place, and manner restrictions. Governmental restrictions on access to a nonpublic forum are valid so long as "the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." <u>Cornelius v. NAACP Legal Def. Fund, Inc.</u>, 473 U.S. at 800. Mocek did not allege in his complaint that the TSOs' order to stop filming and summoning of the police were done in opposition to his viewpoint, as Mocek did not relay his viewpoint to the TSOs while filming, and his only basis for them discriminating against him because of his viewpoint is his argument that the TSOs "assumed what his viewpoint was," Tr. at 21:18-21 (Boelcke), and stopping him without knowing his viewpoint could be discrimination against his viewpoint as well, <u>see</u> Tr. at 23:8-15 (Boelcke).

In <u>Int'l Soc. for Krishna Consciousness, Inc. v. Lee</u>, the Supreme Court found that a ban on the plaintiffs' distribution of their organization's literature and solicitation of funds for the organization was reasonable in an airport terminal, and Mocek's silent recording is much less expressive of a viewpoint than that of the plaintiffs' in <u>Int'l Soc. for Krishna Consciousness, Inc.</u>

v. Lee.  See 505 U.S. at 674, 679-85.  The TSOs' attempts to stop Mocek from recording at the screening checkpoint are, thus, likely reasonable in light of the Supreme Court having upheld a prohibition on conduct which propounded a viewpoint in Int'l Soc. for Krishna Consciousness, Inc. v. Lee.  Without factual assertions in the Complaint that the TSOs ordered Mocek to stop out of opposition to his unstated viewpoint, the Court cannot soundly find that the TSOs' order and summoning of the police were restrictions aimed at suppressing Mocek's viewpoint.  That they had other concerns is just as likely, and, under Ashcroft v. Iqbal and Bell Atl. Corp. v. Twombly, more is needed than just possibilities.  See Ashcroft v. Iqbal, 556 U.S. at 681-82 (noting the allegations in a complaint were "consistent with" the plaintiff's theory that the defendants "purposefully designated detainees of high interest because of their race, religion, or national origin," but that, because the facts did not foreclose the possibility of the defendants having a non-discriminatory motive, the complaint failed to allege discrimination as a "plausible conclusion."); Bell Atl. Corp. v. Twombly, 550 U.S. at 567-68 (finding that a plaintiff failed to sufficiently allege an antitrust violation, because an "obvious alternative explanation" existed for defendants' conduct which "could very well signify illegal agreement" -- "low barriers to entry, sparse competition among large firms dominating separate geographic segments of the market" in an "unregulated industry" -- the explanation being that the conduct was in the defendants' best interests).  Thus, Mocek has not sufficiently stated a plausible claim that the TSOs violated his First Amendment rights in Count I of the Complaint.

### B.    MOCEK'S ALLEGED FIRST AMENDMENT VIOLATIONS DO NOT VIOLATE CLEARLY ESTABLISHED LAW.

Mocek characterizes the right he asserts the TSOs violated by ordering him to cease recording in two ways.  Mocek asserts that  "the right to engage in information gathering is a

right that was clearly established." Response at 10. Mocek also asserts that numerous Circuits have held that "recording police officers and officials in the course of carrying out their duties is directly protected by the First Amendment." Response at 11. The TSOs contest that Mocek's asserted rights are not clearly established, as, the TSOs argue, "there is no Supreme Court or Tenth Circuit decision on point." Reply at 33. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S.Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).

Just as the Court finds that the TSOs did not violate Mocek's right to gather news, which entails some First Amendment protection, neither the Tenth Circuit nor the Supreme Court has found that Mocek's right to gather news in this context is clearly established. See Smith v. Plati, 258 F.3d at 1178 (noting that it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control"). In the specific context of airports, the Supreme Court has not reprimanded airport authorities for restricting First Amendment conduct, but has rather found that, in the nonpublic forum of an airport terminal, restrictions on First Amendment conduct need only be reasonable. See Int'l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. at 679-683. Thus, to the extent the right to gather news has been addressed, precedent indicates that the government may limit the right by a reasonable restriction. Rather than being "so thoroughly developed and consistently recognized under the law as to be indisputable and unquestioned," Lobozzo v. Colorado Dept. of Corrections, 429 F.

- 100 -

App'x at 710, the Supreme Court has upheld reasonable limitations on First Amendment conduct in airport terminals, and thus a reasonable TSA agent in the TSOs' shoes would not likely understand that telling Mocek to stop recording and subsequently summoning the police when he refused to comply violated his rights.

Looking at Mocek's conduct in a different light, Mocek asserts that numerous Circuits have upheld a right under the First Amendment to record "police officers and officials in the course of carrying out their duties," under the First Amendment. Response at 11. Notably, the line of cases to which Mocek refers is distinguishable, factually -- and possibly legally -- because TSA employees are not law enforcement officers. See Reply at 9. Additionally, neither the Tenth Circuit nor the Supreme Court has recognized such a right, and the weight of authority from other circuits has not found the law to be as Mocek maintains. See Currier v. Doran, 242 F. 3d at 923 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

The only case in which the Tenth Circuit has, in passing, addressed a First Amendment right to record law enforcement activity is an unpublished decision, McCormick v. City of Lawrence. The Tenth Circuit affirmed a district court's judgment that destruction of plaintiff's videotapes -- containing recordings of police conduct at a sobriety checkpoint and traffic stop -- was "not a clearly established First Amendment violation." McCormick v. Lawrence, 130 F. App'x at 988. This decision would, if anything, inform a reasonable TSA employee that Mocek's recording at the screening checkpoint was not a First Amendment right that an order to stop would violate. Similarly, where other Circuits have found the right, "reasonable time,

- 101 -

manner, and place restrictions" limit the right to record police conduct in public. <u>Smith v. Cumming</u>, 212 F.3d at 1333. The TSOs' order for Mocek to cease recording in the nonpublic forum of a screening checkpoint was a reasonable limitation as to the time, manner, and place. <u>See</u> <u>Glik v. Cunniffe</u>, 655 F.3d at 82 (noting that the right is not without limitations, such as "reasonable time, place, and manner restrictions). The Third Circuit has noted that recording police activity at a traffic stop raises safety concerns, as traffic stops are "inherently dangerous situations." <u>Kelly v. Borough of Carlisle</u>, 622 F.3d at 262-63 (noting that the right to record matters of public concerns is "not absolute," but rather "subject to reasonable time, place, and manner" limitations). In not finding that the right was clearly established, the Third Circuit noted that the unique safety concern raised at a traffic stop distinguished the facts before the Third Circuit from that of other cases, where safety concerns were not at issue. <u>See</u> 622 F.3d at 262-63. Similarly, recording TSA employees at a screening checkpoint raises safety concerns, because, if Mocek had ill intentions and was able to record information regarding the TSA's screening procedures which would allow someone to evade the procedures, the safety of passengers at commercial airports would be jeopardized. Thus, Mocek's conduct is more like that of the plaintiff in <u>Kelly v. Borough of Carlisle</u>, who did not have a clearly established right to record police while the plaintiff was detained at a traffic stop, than the plaintiff in <u>Glik v. Cunniffe</u>, for whom the First Circuit found the right clearly established to record police officers from a distance, in a public park, without interfering with their duties. <u>See</u> 655 F.3d at 84. The Court cannot thus say that the weight of authority from other Circuits is not "sufficiently clear that every reasonable official would have understood" that ordering Mocek to stop recording at the screening checkpoint would violate his First Amendment right. <u>Ashcroft v. al-Kidd</u>, 131

- 102 -

S.Ct. at 2083. Thus, because Mocek's alleged First Amendment violations were not clearly established, the TSOs are entitled to qualified immunity on his First Amendment claims in Count I.

## III. MOCEK HAS NOT STATED A PLAUSIBLE CLAIM FOR A FOURTH AMENDMENT VIOLATION.

The TSOs assert that they cannot be liable for the injuries which Mocek alleges in Count III of the Complaint, for the alleged violation of his Fourth Amendment rights, because they did not personally participate in, or direct the AAPD officers regarding, the AAPD officers' actions. See MTD at 17-18. Mocek asserts that the TSOs, in their non-supervisory capacity, are liable for his alleged Fourth Amendment injuries, because their conduct is the "'cause in fact between the conduct complained of and the constitutional deprivation.'" Response at 17 (quoting Snell v. Tunnell, 920 F.2d at 700). Although Mocek's statement of the law is incomplete, in that he does not mention that the TSOs must also be the proximate cause of his alleged injuries, the TSOs' cannot escape all liability for Mocek's Fourth Amendment deprivations if, when "alerting members of the AAPD to [Mocek's] behavior," MTD at 18, the TSOs "knew or reasonably should have known," Martinez v. Carson, 697 F.3d at 1255, that the AAPD officers would violate Mocek's rights, notwithstanding the TSOs' non-supervisory role. The Court concludes, however, that Mocek did not suffer a Fourth Amendment violation at the AAPD officers' hands, and thus, the TSOs cannot be liable for Mocek's asserted constitutional deprivations under the Fourth Amendment. Additionally, the Court concludes that the TSOs did not violate clearly established law by summoning the AAPD officers, because they acted reasonably in limiting Mocek's filming and subsequently summoning law enforcement when Mocek did not comply. The Court thus grants the TSOs qualified immunity as to Mocek's claims in Count III of the Complaint.

- 103 -

### A. MOCEK HAS NOT STATED A CLAIM FOR UNREASONABLE SEARCH AND SEIZURE OR EXCESSIVE FORCE.

Mocek asserts that the TSOs' "conduct in summoning law enforcement" resulted in violations of his "rights to be free from unreasonable search and seizure and excessive force as guaranteed by the Fourth Amendment," when the AAPD officer arrested him, searched his belongings, and erased the memory on Mocek's camera. Complaint ¶ 97, at 23. The AAPD officers' arrest of Mocek was unreasonable if the AAPD officers lacked probable cause, based upon "facts and circumstances within" their knowledge "sufficient . . . to warrant a man of reasonable caution in the belief" that Mocek had committed or was currently committing an offense. United States v. Valenzuela, 365 F.3d at 896-97. Mocek alleges that Dilley's incident report describes Mocek as having caused a disturbance by disorderly conduct, refusing to identify himself, and refusing to comply with a criminal trespass order.[8] See Complaint ¶ 68, at 15. Mocek asserts that the AAPD officers did not issue him a criminal trespass order and thus, taking the facts which he has set forth as true, the AAPD officers could not have had probable cause to arrest him for his noncompliance with such an order. See Complaint ¶ 69, at 15. The Court will also take as true that, at all times during the incident, Mocek "remained calm and restrained." Complaint ¶ 5, at 2. On the other hand, based upon the totality of the circumstances, the Court concludes that the AAPD officers had reasonable suspicion that Mocek

---

[8] Mocek was not informed at the time of his arrest why he was being arrested. See Complaint ¶ 55, at 13. Mocek sets forth that Dilley filed an incident report for the arrest, which stated that Mocek was engaged in disorderly conduct, he refused to identify himself, and refused to comply with a criminal trespass order. See Complaint ¶ 68, at 15. Construing the Complaint in the light most favorable to Mocek, the Court thus concludes that Mocek was arrested for the alleged conduct which Dilley describes in his incident report. See Tellabs, Inc. v. Makor Issues & Rights, Ltd, 551 U.S. at 322 (holding that only if a "reasonable person could not draw an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.").

was engaging in criminal conduct, and thus Dilley's demand that Mocek produce identification was a lawful order. Mocek's arrest was, thus, not an unlawful seizure, neither was the search of Mocek incident to his arrest unreasonable. Lastly, the Court finds that Mocek has not alleged sufficient facts to support a claim for excessive force. Because Mocek has failed to sufficiently allege that he suffered a violation of his Fourth Amendment rights, the TSOs' conduct cannot have been the proximate cause of Mocek's alleged injuries. The Court will, thus, dismiss Mocek's claims in Count III of the Complaint against the TSOs.

### 1. The TSOs are the But-For Cause of Mocek's Alleged Fourth Amendment Deprivations.

As non-supervisory defendants, the TSOs can be liable if their summoning of the AAPD officers "set in motion a series of events that the defendants knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights." Trask v. Franco, 446 F.3d at 1046 (internal alterations and quotations omitted). Had the TSOs not summoned the AAPD officers, Mocek would not have been arrested, searched, and allegedly subject to excessive force. The Court thus concludes that the TSOs were the but-for cause of the alleged violations of Mocek's Fourth Amendment rights. See Trask v. Franco, 446 F.3d at 1046 (finding that probation officers are the but-for cause of Trask's alleged unlawful detention and arrest, because the probation officers summoned NMSP officers after inspecting Carly Bliss' residence). The Court's inquiry does not end with the TSOs' but-for causation, however, because the TSOs may be liable only for the harm they have "proximately or legally caused." Trask v. Franco, 446 F.3d at 1046. The Court must examine whether Mocek suffered a constitutional deprivation, and if so, whether the TSOs' conduct was the proximate cause of Mocek's injuries, or whether an unforeseeable intervening force relieves the TSOs of any liability.

## 2.    The AAPD Officers had Probable Cause to Arrest Mocek.

Mocek alleges that he did not comply with Dilley's request to produce identification when Dilley informed him that he was "part of a criminal investigation" for "disturbing the police."  Complaint ¶ 54, at 12.  Under New Mexico law, the crime of concealing identity is described as follows:

> Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.

> Whoever commits concealing identity is guilty of a petty misdemeanor.

N.M.S.A. 1978 § 30-22-3.  Police officers "lacking 'reasonable suspicion to believe [a person] was engaged or had engaged in criminal conduct' may not demand identification and arrest the person for failing to provide it."  Romero v. Schum, 413 F. App'x 61, 64 (10th Cir. 2011)(alterations in original)(quoting Brown v. Texas, 443 U.S. 47, 53 (1979).  The Tenth Circuit has stated that this requirement of reasonable suspicion to order identification "remains black letter Fourth Amendment law."  Romero v. Schum, 413 F. App'x at 64.  See Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)(holding, following Brown v. Texas, that, "to arrest for concealing identity, there must be reasonable suspicion of some predicate, underlying crime").  Thus, the AAPD officers had the authority to order Mocek to produce identification if they also had reasonable suspicion that he was, or had been, engaging in criminal conduct.

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for

making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir.2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir.2004)). This standard is met by information "falling 'considerably short' of a preponderance standard." United States v. Winder, 557 F.3d at 1134. See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

For reasonable suspicion to exist, officers are not required "to observe the equivalent of direct evidence of a particular specific crime" as long as "there is reasonable suspicion of criminal activity." United States v. Pack, 612 F.3d 341, 357 (5th Cir.2010). "Likewise, to establish that reasonable suspicion exists, officers have no obligation to articulate a specific offense which they believe the suspect may have committed." United States v. Harmon, 871 F. Supp. 2d 1125, 1160 (D.N.M. 2012)(Browning, J.). See United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(not requiring evidence of a specific crime when the defendant "showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home"); United States v. Reyes-Vencomo, No. CR 11-2563, 2012 WL 843611, at *16 (D.N.M. Feb. 13, 2012)(Browning, J.)(stating that, in United States v. Ceballos, "[t]he Tenth Circuit did not require the officer to identify the particular crime of which he she had reasonable suspicion, or even to acknowledge that he had reasonable suspicion"). Additionally, when analyzing the reasonableness of an officer's suspicion, a court should examine whether "the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed," and the Tenth Circuit has

- 107 -

stated that "that the officer's 'subjective characterization of his actions is irrelevant.'"  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1274 (D.N.M. 2011)(Browning, J.)(quoting United States v. Ceballos, 355 F. App'x at 227-29).

Mocek alleges that, when the AAPD officers arrived at the scene, TSA employees informed the AAPD officers that Mocek was "causing a disturbance," would not "put his camera down," and was "taking pictures of all" of the TSA employees.  Complaint ¶ 49, at 11-12. Taking Mocek's facts as true, Mocek remained calm and did not raise his voice throughout the entire incident.  On the other hand, his calm demeanor does not necessarily contradict TSA employees' statements that he was causing a disturbance.  The term "disturbance" does not have a specific meaning that would include only noisy or boisterous conduct.  See Webster's Third New Int'l Dictionary 661 (Philip B. Gove, et. al.)(1993)(defining a "disturbance" as "the act or process of disturbing or the state of being disturbed."); Webster's Third New Int'l Dictionary 661 (defining "disturb" as "to turn or distract (a person) by disturbance").  The Court has concluded that Mocek's recording was a distraction to the TSOs, and his recording could have raised safety concerns at the screening checkpoint.  Passengers are prohibited from interfering with, assaulting, threatening, or intimidating TSA screening personnel in the performance of their duties at a screening checkpoint.  See 49 C.F.R. § 1540.109.  Passengers are also prohibited from tampering with or interfering with the screening procedures at screening checkpoint.  See 49 C.F.R. § 1540.105.  Furthermore, the TSA at the Albuquerque Sunport is required to have a security program, which provides for law enforcement personnel "in the number and manner adequate to support each system for screening persons and accessible property."  49 C.F.R. § 1542.215.  The TSA has contemplated that summoning law enforcement personnel may be

necessary when an individual interferes with a TSA employees' duties at the screening checkpoint, or otherwise distracts TSA employees from the screening procedures. <u>See</u> 67 Fed. Reg. 8344. Thus, the TSOs could truthfully tell the AAPD officers that Mocek was causing a disturbance in so far as his conduct was distracting the TSOs from their normal duties, and his conduct could have been interpreted as having a ulterior purpose of allowing others to pass through the screening checkpoint unnoticed because of the TSOs' distraction. Mocek's informing the TSOs that he was not trying to stop them from doing their jobs does not obviate that his Complaint also sets forth that his recording caused at least two TSA employees, and three AAPD officers, to divert their attention onto him. <u>See</u> Complaint ¶ 51, at 12. Further, the AAPD officers observed Mocek not complying with the TSOs' order that Mocek cease filming, a reasonable order under the circumstances, because Mocek's right to film at the checkpoint is subject to reasonable time, place, and manner restrictions. <u>See</u> Complaint ¶ 52, at 12. Mocek alleges that he contested the AAPD officers' assertions that he could not film at the screening checkpoint. <u>See</u> Complaint ¶ 52, at 12. Additionally, after Dilley requested Mocek to produce identification, Mocek did not initially comply, but rather asserted that he "had not disturbed the peace." Complaint ¶ 54, at 12.

Thus, upon arriving at the screening checkpoint, a potentially dangerous location, the AAPD officers: (i) were truthfully and actually informed by TSA employees that Mocek's actions were causing a disturbance; (ii) were informed by TSA employees that Mocek would not comply with their order to cease filming; (iii) observed Mocek refusing to comply with the TSOs' and the AAPD officers' orders; and (iv) observed that Mocek's conduct had drawn at least two TSA employees away from their normal duties. The AAPD officers need not "observe the

- 109 -

equivalent of direct evidence of a particular crime" to have reasonable suspicion of criminal activity. United States v. Pack, 612 F.3d at 357. The TSOs' summoning of the AAPD officers is one basis upon which the AAPD officers could form reasonable suspicion, given that screening checkpoints are potentially dangerous locations when TSA employees are distracted from their screening duties and TSA employees informed the AAPD officers that Mocek would not comply with their orders during an alternative screening procedure. See 67 Fed. Reg. 8344 (noting that screening checkpoint disruptions can be "potentially dangerous" when the disruption requires a TSA employee to turn away from his or her normal duties, and that summoning law enforcement may be appropriate in such situations). Under a totality of the circumstances, the AAPD officers were summoned to a potentially dangerous screening checkpoint in response to Mocek's conduct, which had distracted at least two TSA employees from their duties, and a reasonable police officer could form reasonable suspicion that Mocek had an intent to film sensitive screening procedures, or otherwise disrupt the screening procedures so that another could evade the TSA employees' screening procedures. Although, taking the facts set forth in the Complaint as true, Dilley was incorrect in describing Mocek as having raised his voice and refused to lower it, see Complaint ¶ 68, at 15, Dilley's "subjective characterization" of Mocek's actions is irrelevant in assessing reasonable suspicion, United States v. Ceballos, 355 F. App'x at 227-29. Mocek's conduct may fall short of the crime of disorderly conduct, which, under New Mexico law requires that a person was "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace," N.M.S.A. 1978 § 30-20-1, but the AAPD officers may still have had reasonable suspicion even if his conduct did not make him culpable under the crime with which he was charged. The AAPD

officers "have no obligation to articulate a specific offense which they believe" Mocek committed for their suspicion to have been reasonable. United States v. Harmon, 871 F. Supp. 2d at 1160. The Court has previously found that, when police are summoned to a convenience store in response to a 911 call, although the call does not impart reasonable suspicion alone, when the police observe individuals with partially concealed firearms, and the caller informed the police that the individuals were showing the guns to each other inside the convenience store, the police had reasonable suspicion to believe that the individuals were carrying concealed firearms without a license, in contravention of New Mexico law. See United States v. Rodriguez, 836 F. Supp. 2d 1258, 1282 (D.N.M. 2011)(Browning, J.). Here, the AAPD officers were informed that Mocek was causing a disturbance, and arrived and saw that he was not complying with the TSOs' orders, and Mocek subsequently refused to comply with the AAPD officers' order that he cease filming. That the TSOs, government agents charged with assessing "current and potential threats to the domestic air transportation system," informed the AAPD officers that Mocek was causing a problem makes the information which they relayed to the AAPD officers all the more weighty than that of a 911 caller in assessing whether the AAPD officers had reasonable suspicion. 49 U.S.C. § 44904(a). The AAPD officers were not required to rule out the possibility that Mocek was engaged in innocent recording to have reasonable suspicion that his filming of the TSOs, which drew them away from their duties, was done with an ulterior motive to secure sensitive information, create a disturbance that allowed others to evade screening procedures, or to commit a crime at the screening checkpoint where such disruptions are potentially dangerous. Thus, under a totality of the circumstances, and taking all of the facts which Mocek has alleged as true, the Court cannot soundly find that the AAPD officers were without reasonable suspicion

that Mocek had been, or currently was, engaging in criminal activity when Dilley demanded his identification.

Because the Court concludes that the AAPD officers had reasonable suspicion that Mocek was engaging in criminal activity at the screening checkpoint, the Court further concludes that Mocek's arrest was lawful. The AAPD officers could legally demand Mocek to produce identification, because they had reasonable suspicion that he was engaged in criminal activity. His failure to produce that identification thus gave the AAPD officers probable cause to arrest him. Concealing one's identity is a misdemeanor, for which the AAPD officers lawfully arrested Mocek, because it was committed in the AAPD officers' presence. See Tanner v. San Juan Cnty. Sheriff's Office, 864 F. Supp. 2d 1090, 1124 n.23 (D.N.M. 2012)(Browning, J.)(recognizing that "New Mexico . . . follows the 'misdemeanor arrest rule' that 'an officer may only arrest without a warrant one guilty of a misdemeanor if committed in his presence.' City of Santa Fe v. Martinez, 2010-NMSC-033 ¶ 6, 148 N.M. 708, 710-11, 242 P.3d 275, 277-78 (2010)"). Further, "[f]or a search incident to an arrest to be legitimate, the following must be true: '(1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search.'" United States v. Giangola, No. CR 07-0706 JB, 2008 WL 6020505, *17 (D.N.M. July 24, 2008)(Browning, J.)(quoting United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir. 1998)). The Court concludes that the search incident to Mocek's arrest was valid, because the AAPD officers had probable cause to arrest him, and because, as Mocek alleges, he was searched as soon as he was taken to the AAPD offices, immediately after his arrest. See Complaint ¶ 57, at 13. The Court thus concludes that Mocek has not stated a violation of his Fourth Amendment right to be free from unreasonable search and seizure. Because Mocek has not sufficiently

- 112 -

alleged the violation of his right to be free from unreasonable search and seizure, the TSOs' summoning of the AAPD officers cannot have been the proximate cause of Mocek's alleged injury, as the Court concludes that Mocek did not suffer such an injury.

### 3. Mocek has not Stated a Claim for Excessive Force.

As the Tenth Circuit has explained:

[I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127 (emphasis added). The Court concludes that Mocek's arrest was lawful, thus precluding him from receiving damages from any force used in effectuating his arrest. Further, Mocek's Complaint contains no allegations that the AAPD officers used more force than was reasonably necessary in arresting him.

A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)(internal quotation marks omitted). Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396. Mocek does not assert that any of the AAPD officer touched him or that a pat-down search was

- 113 -

conducted. See Complaint ¶¶ 51-58, at 12-13. Mocek states that the AAPD officers "walked [him] across the airport to the Aviation Police Department office." Complaint ¶ 57, at 13. Although Mocek characterizes his holding cell at the AAPD offices as "small," he provides no factual basis for finding that his remaining in a "small" holding cell for two hours was an unreasonable use of force. Complaint ¶¶ 57-58, at 13. On the limited allegations in the Complaint, this conduct was not objectively unreasonable, and strikes much more closely to the reasonable level of force which police use in effectuating a lawful arrest for Mocek's refusal to provide identification. See Ashcroft v. Iqbal, 556 U.S. at 681-82 (noting the allegations in a complaint were "consistent with" the plaintiff's theory that the defendants "purposefully designated detainees of high interest because of their race, religion, or national origin," but that, because the facts did not foreclose the possibility of the defendants having a non-discriminatory motive, the complaint failed to allege discrimination as a "plausible conclusion."). The facts in Mocek's Complaint, thus, do not support a plausible conclusion that he was subjected to excessive force, in violation of his Fourth Amendment rights. Because Mocek has not sufficiently alleged that he suffered a violation of his right to be free from excessive force, the TSOs' summoning of the AAPD officers did not proximately cause Mocek a constitutional deprivation, as he has failed to sufficiently allege such an injury.

### C. THE TSOS' CONDUCT DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

Mocek asserts that the TSOs are liable for his Fourth Amendment deprivations, committed at the hands of the AAPD officers, because the TSOs "set in motion a series of events that [they] knew or reasonably should have known would cause others to deprive [Mocek] of [his] constitutional rights." Response at 17 (citing Snell v. Tunnell, 920 F.2d at 700). The TSOs

assert that they cannot be liable for Mocek's alleged Fourth Amendment violations, because Mocek "does not allege that the [TSOs] personally participated in or directed the [AAPD officers] in this case to search or seize [Mocek] or his belongings." MTD at 18. The TSOs are correct that a plaintiff must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," to survive a motion to dismiss that a defendant in a supervisory capacity brings. Ashcroft v. Iqbal, 556 U.S. at 676. Thus, had Mocek alleged that the TSOs were liable for the AAPD officer's constitutional violations based upon the TSOs supervisory role over the AAPD officers, the Court would undertake a different analysis. Mocek's theory of liability for the TSOs is not supervisory liability, but rather, is non-supervisory liability, for the TSOs having "set in motion a series of events" that they knew or reasonably should have known would cause the deprivation of Mocek's rights, a causal connection forming the basis of the TSOs' liability. Trask v. Franco, 446 F.3d at 1046.[9] The Court concludes, however, that Mocek did not suffer a constitutional violation when the AAPD officer arrested him, and thus the TSO have satisfied the first prong of the qualified-immunity analysis in their favor. See Pearson v. Callahan, 555 U.S. at 231. Additionally, the Court

---

[9] The Tenth Circuit has upheld this basis for non-supervisory liability after Ashcroft v. Iqbal, indicating that the Supreme Court's limitation on supervisory liability did not extinguish this theory of liability. See Martinez v. Carson, 697 F.3d at 1255 (holding that NMDC employees may be liable for the constitutional violations Rio Rancho public safety officers committed, even though the NMDC employees were not acting in a supervisory role and did not personally participate in the Rio Rancho public safety officers' actions, on the basis that the NMDC employees may be liable if they "knew or reasonably should have known" that their conduct would deprive a plaintiff of his constitutional rights, and there was "no unforeseeable intervening acts superseding their liability."). See also Mink v. Knox, 613 F.3d at 1002 n.5 (distinguishing liability for a defendant who "knew or reasonably should have known" that her actions "would cause others to deprive the plaintiff of her constitutional rights," which is "not . . . supervisory liability," from Ashcroft v. Iqbal's holding that for a governmental official charged under supervisory liability "is only liable for his or her own misconduct," 556 U.S. at 677).

- 115 -

concludes that the TSOs' conduct is factually distinguishable from that of the defendants whom the Tenth Circuit has determined may be liable in a non-supervisory capacity for the constitutional violations other commit, and the Court thus grants the TSOS qualified immunity from Mocek's alleged Fourth Amendment violations.

The Tenth Circuit has applied non-supervisory liability to find defendants liable for the constitutional violations committed by others where the defendants' initial action was itself in tortious or a violation of the law. See Trask v. Franco, 446 F.3d at 1046 (noting that probation officers may be liable for the constitutional violations proximately caused by their unlawful search of Bliss' residence); Martinez v. Carson, 697 F.3d at 1252 (finding that NMDC employees may be liable for the constitutional violations Rio Rancho police officers committed, because the NMDC employees lacked reasonable suspicion to detain the plaintiffs before handing the plaintiffs over to the Rio Rancho police officers). Indeed, the chain of causation leading to any alleged injury which Mocek suffered can only be initiated if the TSOs' initial conduct was itself "some negligent act or omission." Wilcox v. Homestake Mining, Co., 619 F.3d 1165, 1167 (10th Cir. 2010). See Restatement (Third) of Torts § 26 (2010)(defining "tortious conduct" as "the act, omission, or activity of an actor that satisfies the conduct requirement for a prima facie action in tort for physical or emotional harm based on intent, negligence, or strict liability.").

In Trask v. Franco, the Tenth Circuit found that probation officers who summoned NMSP officers to a home could be liable for the Fourth Amendment violations that the NMSP officers committed if the probation officers reasonably foresaw that the NMSP officers would violate Trask's rights. See 446 F.3d at 1047. The probation officers had been conducting a field inspection at the residence of Carly Bliss, whom they mistakenly believed was still on probation,

when her probation had been terminated several months before the incident at issue in the case. The probation officers summoned NMSP officers to assist with the search. See 446 F.3d at 1039-40. The Court has concluded that, as alleged in Mocek's Complaint, the TSOs' order that Mocek cease recording was a reasonable limitation on his activity at the screening checkpoint. Thus, unlike the probation officers in Trask v. Franco, who lacked the authority to search Bliss' residence, and subsequently could not authorize the NMSP officers to search her residence, the TSOs were acting reasonably and within their authority when they ordered Mocek to cease recording. See 49 C.F.R. § 1540.109 ("No person may interfere with, assault, threaten, or intimidate screening personnel in the performance of their screening duties under this subchapter."). The TSA contemplated that, when TSA employees are distracted from their duties at a screening checkpoint, summoning law enforcement may be required. See 47 Fed. Reg. 8344 (stating that, when TSA employees at a screening checkpoint are distracted because of an individual's interference with their duties, as is described in 49 C.F.R. § 1540.109, TSA employees may need to summon law enforcement to help handle the disruptive individual). Construing the TSOs' conduct differently, the TSOs' allowance of the AAPD officers to question Mocek is also unlike the NMDC employees' conduct in Martinez v. Carson, which the Tenth Circuit determined a reasonable NMDC employee could have reasonably foresaw would lead to a deprivation of the plaintiffs' rights, because the NMDC employees lacked reasonable suspicion that the plaintiffs were engaging in criminal activity when the NMDC employees detained the plaintiffs. See 697 F.3d at 1255-56. The Tenth Circuit determined that the "facts and circumstances" of the plaintiffs' detention "could support a jury finding that" the NMDC employees "knew or should have known their illegal seizure and transfer of custody would result

- 117 -

in Plaintiffs' prolonged detention after the transfer of custody."  697 F.3d at 1256.  On the other hand, the TSOs acted reasonably in limiting Mocek's filming at the screening checkpoint, and thus, when the AAPD officers arrived at the screening checkpoint and began questioning Mocek at the TSOs' request, and because their impetus for summoning the AAPD officers was reasonable, they are unlike the NMDC employees who initially lacked reasonable suspicion and nonetheless turned the plaintiffs over to the custody of the Rio Rancho police officers.  The TSOs' conduct is thus unlike that of the defendants whom the Tenth Circuit has determined could be liable, in a non-supervisory role, for the constitutional deprivations committed by others.

Mocek asserts that, when the AAPD officers arrived at the screening checkpoint, the TSOs informed the AAPD officers that Mocek was "causing a disturbance."  Complaint ¶ 49, at 11.  The Complaint sets forth in numerous instances that he was not raising his voice, yelling, or otherwise disturbing the passengers who attempted to pass through the screening checkpoint. See Complaint ¶ 5, at 2; id.  ¶¶ 69, 71, 73, at 15-17.  The TSOs contest this assertion as "conclusory."  Tr. at 7:8-10 (Martin).  The Court's analysis does not rest on Mocek's use of the term "disturbance" in the Complaint.  Taking Mocek's allegations as true, Mocek did not raise his voice, yell, or disrupt the passengers proceeding through the screening checkpoint during the entire incident.  Also taking Mocek's allegations as true, Mocek refused to cease recording when the TSOs and the AAPD officers ordered him to stop.  The Court has already concluded that the TSOs' order for Mocek to cease was reasonable under the circumstances, and is a situation which the TSA believes may warrant the summoning of law enforcement for assistance.  See 67 Fed. Reg. 8344.  The Court's analysis of the TSOs' qualified immunity does not rest upon whether

- 118 -

Mocek was distracting passengers or whether he raised his voice at the screening checkpoint, but rather is determined by Mocek's admitted refusal to cease recording at the screening checkpoint, where his right to do so is subject to reasonable time, place, and manner limitations.

Taking the facts in the Complaint as true, and construing all inferences in Mocek's favor, the TSOs' conduct did not violate clearly established Tenth Circuit or Supreme Court law. The TSOs had the authority to order Mocek to cease filming, under the circumstances, and thus the TSOs' conduct is unlike that of the defendants in Trask v. Franco, who lacked the authority to search the plaintiffs' home, or the defendants in Martinez v. Carson, who lacked reasonable suspicion that the plaintiffs were engaging in criminal activity. The TSOs are thus not liable for the harm Mocek complains of in Count III for multiple reasons: (i) their action in summoning the AAPD officers was not tortious, such that it could set in motion a series of events which they knew or reasonably should have known would lead to a violation of Mocek's constitutional rights; (ii) Mocek has not sufficiently alleged that he suffered a violation of his Fourth Amendment rights at the AAPD officers' hands; and, therefore, (iii) even if there is no superseding intervening force to preclude the TSOs' from liability, the TSOs cannot be liable to Mocek for the violation of his Fourth Amendment rights because he has not sufficiently alleged that those rights were violated. The Court thus grants the TSOs qualified immunity as to Mocek's claims in Count III of the Complaint.

## IV. THE COURT DOES NOT HAVE JURISDICTION TO ENTERTAIN MOCEK'S CLAIMS AGAINST THE TSOS IN THEIR OFFICIAL CAPACITY FOR DECLARATORY RELIEF.

Mocek asserts that, even if his claims against the TSOs in their individual capacity are dismissed, Count VIII should remain, because he brings that claim against the TSOs in their

official capacity. See Tr. at 54:6-11 (Boelcke). "An action against federal employees in their official capacities is in effect a suit against the United States for which a waiver of sovereign immunity must exist." Cortez v. E.E.O.C., 585 F. Supp. 2d 1273, 1287 (D.N.M. 2007)(Browning, J.). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). "[A]n official capacity suit is 'only another way of pleading an action against an entity of which an officer is an agent.'" Johnson v. Bd. of Cnty Comm'rs for Cnty of Fremont, 85 F.3d 489, 493 (10th Cir.1996)(quoting from Kentucky v. Graham, 473 U.S. 159, 165 (1985)).

Mocek asserts that the Court has jurisdiction over his Complaint under 28 U.S.C. §§ 1331, 1332, 1343, and 2201. The Court has previously held that Congress' grants of jurisdiction over federal questions and declaratory actions do not waive the United States' sovereign immunity.

> Section 1331 of Title 28 of the United States Code is a general grant of jurisdiction which provides that the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treatises of the United States. See 28 U.S.C. § 1331. Section 2201 of Title 28 addresses the jurisdiction of "any court of the United States" over declaratory actions. 28 U.S.C. § 2201. Neither of these statutes waives the sovereign immunity of the United States or confers jurisdiction on the district courts over the United States.

La Casa de Buena Salud v. United States, No. CIV 07-238, 2008 WL 2323495, at *6 (D.N.M. Mar. 21, 2008)(Browning, J.). Section 1332 of Title 28 of the United States Code similarly does not waive the United States' sovereign immunity. See 28 U.S.C. § 1332. Lastly, this Court has previously found that 28 U.S.C. § 1343 is not a waiver of the federal government's sovereign immunity. See La Casa de Buena Salud v. United States, 2008 WL 2323495, at *6 (noting that § 1343 "may not be construed to constitute [a] waiver[] of the federal government's defense of

- 120 -

sovereign immunity" (citing <u>Beagle v. Blount</u>, 461 F.2d 1133, 1138 (5th Cir. 1972)). Additionally, Mocek's <u>Bivens</u> claims do not grant the Court jurisdiction over the TSOs in their official capacity. <u>See</u> <u>Simmat v. United States Bureau of Prisons</u>, 413 F.3d 1225, 1231 (10th Cir. 2005)("There is no such animal as a <u>Bivens</u> suit against a public official tortfeasor in his or her official capacity." (internal quotation omitted)).

Because "[s]overeign immunity is jurisdictional in nature," and Mocek has not pled a statute under which the United States or the TSA has waived its sovereign immunity, the Court does not have jurisdiction to entertain his claims for declaratory relief. <u>F.D.I.C. v. Meyer</u>, 510 U.S. at 475. The Court will thus dismiss Mocek's claims in Count VIII against the TSOs in their official capacity.

Taking the facts which Mocek sets forth as true, and reading the Complaint in the light most favorable to him, Mocek's First Amendment allegations against the TSOs fall short of plausibility, but the Court may "draw the reasonable inference" that the TSOs are liable for Mocek's alleged Fourth Amendment deprivations. <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. Mocek has not stated that the TSOs plausibly violated his First Amendment rights, as he has not shown that the TSOs' order for him to cease recording at the screening checkpoint was an unreasonable restraint on his right to gather news, a right with only limited constitutional protection. Additionally, Mocek has not shown that the TSOs acted in retaliation towards Mocek's viewpoint, as he did not express a viewpoint while filming the TSOs. Further, any right which Mocek has to gather news in the nonpublic forum of an airport terminal or to record police activity at a screening checkpoint was not clearly established at the time of the incident and thus the TSOs are entitled to qualified immunity on Mocek's First Amendment allegations.

- 121 -

Additionally, Mocek has failed to allege that he suffered Fourth Amendment violations at the hands of the AAPD officers, whom the TSOs summoned to the screening checkpoint. The Court concludes that the AAPD officers' had reasonable suspicion that Mocek was engaging in criminal activity at the screening checkpoint, given that the TSOs summoned the AAPD officers to assist with Mocek's refusal to comply with the TSOs' orders, the AAPD officers observed Mocek refusing to comply with the TSOs' orders, and Mocek refused to comply when the AAPD officers ordered Mocek to cease filming. The TSA has determined that distracting situations at screening checkpoints can be potentially dangerous, and thus, in light of the totality of Mocek's actions at the screening checkpoint, the AAPD officers were reasonable to suspect that Mocek was engaged in some form of unlawful conduct. Dilley was, thus, within the parameters of the law to demand Mocek's identification, and when Mocek refused, Dilley then had probable cause to arrest Mocek for his misdemeanor committed in Dilley's presence. Because Mocek's arrest was lawful, the search of him incident to his arrest was similarly lawful. Moreover, Mocek has not alleged any facts which would support his contention that he was subjected to excessive force when the AAPD officers effectuated his arrest. Although the TSOs' summoning of the AAPD officers was the but-for cause of Mocek's alleged constitutional injuries, because Mocek has failed to sufficiently allege any Fourth Amendment violations at the hands of the AAPD officers, the TSOs cannot be liable for any injury which their summoning proximately caused. Further, the TSOs' conduct did not violate clearly established Tenth Circuit or Supreme Court law, because the TSOs' initial order for Mocek to cease recording was reasonable, and the TSA has contemplated that summoning law enforcement may be necessary when individuals cause interferences at a TSA screening checkpoint. The TSOs thus did not act unreasonably, far less

unlawfully, by summoning the AAPD officers to assist with Mocek when Mocek refused to comply with the TSOs' orders.  The TSOs are thus entitled to qualified immunity as to Mocek's claims in Count III of the Complaint.

Lastly, Mocek has not pled a basis for the Court to have jurisdiction over his claim for declaratory relief from the TSOs in their official capacity in Count VIII.  Because suits against federal agents in their official capacity are suits against the United States, which is entitled to sovereign immunity, and the United States has not waived its sovereign immunity in any of the statutes under which Mocek brings his Complaint, the Court has no jurisdiction over these claims.  The Court will thus dismiss Mocek's claim in Count VIII for declaratory relief from the TSOs in their official capacity.

**IT IS ORDERED** that the Individual Federal Defendants' Motion to Dismiss, filed June 1, 2012 (Doc. 25), is granted.  The Court will dismiss Count I and Count III of the Complaint.  The Court will also dismiss Count VIII of the Complaint against the TSOs in their official capacity.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Geoffrey King
James Wheaton
Lowell Chow
First Amendment Project
Oakland, California

--and--

William Simpich
Law Office of William Simpich
Oakland, California

--and--

Mary Louise Boelcke
Law Office of Mary Louise Boelcke
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Jeffrey L. Baker
Renni Zifferblatt
The Baker Law Firm
Albuquerque, New Mexico

      *Attorneys for Defendants City of Albuquerque, Albuquerque Aviation Police*
         *Department, and Marshall Katz, Robert F. Dilley A/k/a Bobby Dilley,*
         *Landra Wiggins, and Julio De La Pena*

Edward J. Martin
United States Department of Justice
Civil Division
Washington, D.C.

--and--

Kenneth J. Gonzales
  United States Attorney
Manuel Lucero
  Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

      *Attorneys for Defendants Jonathon Breedon, Gerald Romero,*
         *and Anthony Schreiner*