DAVID LOY (CA SBN 229235)
davidloy@aclusandiego.org
MITRA EBADOLAHI (CA SBN 275157)
mebadolahi@aclusandiego.org
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, California 92138-7131
Telephone: 619.232.2121

M. ANDREW WOODMANSEE (CA SBN 201780)
mawoodmansee@mofo.com
KIMBERLY R. GOSLING (CA SBN 247803)
kgosling@mofo.com
MARY PRENDERGAST (CA SBN 272737)
mprendergast@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100

Attorneys for Plaintiffs
RAY ASKINS AND CHRISTIAN RAMIREZ

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY ASKINS and CHRISTIAN RAMIREZ,<br><br>               Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; R. GIL KERLIKOWSKE, Commissioner of United States Customs and Border Protection; BILLY WHITFORD, Director, Calexico Port of Entry; SIDNEY K. AKI, Director, San Ysidro & Otay Mesa Ports of Entry,<br><br>               Defendants. | Case No. 3:12-cv-02600-W-BLM<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

sd-671607

Plaintiffs Ray Askins and Christian Ramirez (collectively, "Plaintiffs") bring this First Amendment action against the U.S. Department of Homeland Security and, in their official capacities, U.S. Customs and Border Protection Commissioner R. Gil Kerlikowske, Calexico Port Director Billy Whitford, and San Ysidro Port Director Sidney Aki (collectively, "Defendants"), and allege as follows.

## NATURE OF THE ACTION

1.      This is a civil rights action to remedy violations of Plaintiffs' First Amendment rights by officers and agents of U.S. Customs and Border Protection ("CBP"), an agency within the U.S. Department of Homeland Security ("DHS").

2.      The right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment. This right is further grounded in the Petition Clause of the First Amendment (if the purpose of gathering, receiving, or recording the information is to use it to petition the government for redress of grievances), and the Free Press Clause of the First Amendment (if the purpose of gathering, receiving, or recording the information is to publish and disseminate it to other people).

3.      The First Amendment guarantees the right to take photographs of and otherwise record law enforcement officers engaged in the public discharge of their duties and other matters or events exposed to public view. For convenience, the terms "photograph" and "photography" as used in this Complaint encompass all forms of recording matters or events, including but not limited to still photography and video recording.

4.      The public has a significant interest in monitoring and recording government officials at ports of entry, including CBP officers and their agents, "who are granted substantial discretion that may be misused to deprive individuals of their liberties." *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

sd-671607

5.     CBP routinely and consistently denies public access to basic information about its operations, including whether officers engaged in misconduct are disciplined in any way, thus shielding both the agency and individual officials from public accountability for abusive policies and practices. *See, e.g.*, Fernanda Santos, *Border Patrol Accused of Profiling and Abuse*, N.Y. TIMES, Oct. 14, 2015, *available at* http://nyti.ms/1GeW0E7; Garrett M. Graff, *The Green Monster: How the Border Patrol Became America's Most Out-of-Control Law Enforcement Agency*, POLITICO, Nov./Dec. 2014, *available at* http://politi.co/1tlB4CS; Carrie Johnson, *Former Border Protection Insider Alleges Corruption, Distortion in Agency*, NAT'L PUB. RADIO, Aug. 28, 2014, *available at* http://n.pr/1wGGPdv; *see also* AMERICAN IMMIGRATION COUNCIL, NO ACTION TAKEN: LACK OF CBP ACCOUNTABILITY IN RESPONDING TO COMPLAINTS OF ABUSE (2014), *available at* http://bit.ly/SwNbye.

6.     In recent years, the physical abuse of persons at or near the border by CBP has been rampant. *See, e.g.*, Joseph Tanfani, et al., *Special Report: How Tasers Became Instruments of Excessive Force for the Border Patrol*, L.A. TIMES, Oct. 30, 2015, *available at* http://lat.ms/1M5U2GF. Such abuse has further fueled the public's interest in monitoring and recording public actions of CBP officials at ports of entry. For example, CBP officials' excessive use of force has resulted in a record number of deaths, including the deaths of U.S. citizens and lawful permanent residents. *See, e.g.*, Brian Bennett, *Border Patrol Absolves Itself In Dozens of Cases of Lethal Force*, L.A. TIMES, June 15, 2015, *available at* http://lat.ms/1Xxf3hA; Charles Davis, *U.S. Customs and Border Protection Has Killed Nearly 50 People in 10 Years. Most Were Unarmed. And Not One Officer Has Been Disciplined.* NEW REPUBLIC, Jan. 4, 2015, *available at* http://bit.ly/1BBYcyn. In view of CBP's unwillingness or inability to timely discipline officials for misconduct and abuse,

FIRST AMENDED COMPLAINT

sd-671607

the importance of public access to information regarding CBP's actions cannot be overstated.

7.    Along the U.S.-Mexico border, DHS either owns or leases from other federal government agencies large swaths of property, including ports of entry and areas surrounding ports of entry. For convenience, the terms "port of entry" or "port of entry property" as used in this Complaint encompass all such property, whether owned or leased by DHS and/or CBP, to which Defendants assert their photography policies, described below, apply.

8.    CBP has a national policy that prohibits photography on any port of entry property without advance official permission. *See* U.S. Customs and Border Protection, Office of Public Affairs, Roles, Functions and Responsibilities, CBP Directive No. 5410-001B (Mar. 18, 2009) (attached as Exhibit A) (hereinafter "Policy").

9.    According to the Policy, authorization of photography "at CBP facilities shall be made in consultation with the appropriate Public Affairs Specialist and with the concurrence and control of the appropriate CBP supervisor." *Id.* at Part 6.2.3. The Policy contains no standards or criteria limiting CBP officials' discretion to grant or deny permission to take photographs on port of entry property.

10.    Likewise, CBP's media "ground rules" for "Southern California ports of entry"—which CBP applies to photography by any person in the areas at issue in this action—require individuals to obtain advance authorization from CBP officials in order to take photographs on any port of entry property. *See* U.S. Customs and Border Protection, Ground Rules for News Media Representatives When Visiting Southern California Ports of Entry (attached as Exhibit B) (hereinafter "Ground Rules"). The Ground Rules contain no standards or criteria limiting CBP officials' discretion to grant or deny permission to take photographs on port of entry property.

FIRST AMENDED COMPLAINT

sd-671607

11.    The Policy and Ground Rules are currently in effect and were in effect at all times relevant to this action.

12.    Both individually and taken together, the Policy and Ground Rules violate the First Amendment by (a) conferring unlimited discretion upon CBP officials to grant or deny permission to take photographs on port of entry property, including areas of that property that constitute a traditional public forum, and (b) unreasonably restricting the right to take photographs of matters or events exposed to public view from exterior or outdoor areas of port of entry property, including areas of that property that constitute a traditional public forum.

13.    Acting pursuant to the Policy and Ground Rules, CBP officers violated Plaintiff Ray Askins's First Amendment rights by directing him to cease taking photographs of the exterior of the Calexico West port of entry building from a location outside that building, and by erasing all but one of the photographs he did take of said exterior.

14.    Acting pursuant to the Policy and Ground Rules, CBP officers and their agents violated Plaintiff Christian Ramirez's First Amendment rights by directing him to cease taking photographs of matters and events exposed to public view in outdoor areas of the San Ysidro port of entry, and by erasing all of the photographs he did take of said events.

15.    As enforced by CBP, the Policy and Ground Rules unconstitutionally prevent Mr. Askins and Mr. Ramirez from freely exercising their First Amendment rights to photograph and record matters and events exposed to public view from exterior or outdoor areas of CBP ports of entry.

16.    Plaintiffs' cases are not unique. CBP officers and their agents frequently deter or prevent individuals from documenting potential misconduct by CBP officers and other matters of public interest, and destroy photo or video evidence of the same.

FIRST AMENDED COMPLAINT

sd-671607

17.    As enforced by CBP, therefore, the Policy and Ground Rules chill and deter reasonable persons from exercising their First Amendment rights to photograph and record matters exposed to public view from exterior or outdoor areas of CBP ports of entry.

18.    Perhaps the most well-known recent example of this unconstitutional interference occurred in May 2010, when CBP officers confronted individuals who captured video footage of the government's lethal beating of Anastasio Hernandez Rojas at the San Ysidro port of entry. CBP officers demanded that some of these eyewitnesses hand over their cell phones or delete the video they had just recorded of the incident. *See, e.g.*, R. Stickney, *Judge Clears Way for Family's Civil Suit in Border Beating Death*, NBC SAN DIEGO, Oct. 7, 2014, *available at* http://bit.ly/1MSRJYl (noting that, when members of the public gathered to record the fatal beating of Hernandez Rojas, one federal officer confiscated witness cell phones and erased images and videos recorded thereupon); Cristina Costantini & Elise Foley, *Anastasio Hernandez-Rojas Death: Border Patrol Tasing Incident Complicated by New Footage (VIDEO)*, HUFFINGTON POST (updated Apr. 24, 2012, 12:40 PM EDT), http://huff.to/1jzwlfu.

19.    After eyewitness videos of Hernandez Rojas's brutal beating surfaced, sixteen members of Congress sent a letter to CBP seeking information about the agency's use-of-force policies and internal investigation protocols. *See* Press Release, Congressman José E. Serrano, Sixteen Members of Congress Call for Justice in Hernandez-Rojas Case (May 10, 2012), *available at* http://1.usa.gov/1HvbeQE. Subsequent public pressure led CBP to undertake a three-pronged review of its use-of-force policies and, ultimately, to release those policies to the public. *See, e.g.*, Adrian Carrasquillo, *Border Patrol Finally Releases Report Critical of Use of Deadly Force*, BUZZFEED NEWS (May 30, 2014, 1:25 PM PST), http://bzfd.it/1PSKkcv.

FIRST AMENDED COMPLAINT

sd-671607

20.    Plaintiffs seek declaratory and injunctive relief to protect their First Amendment rights. Specifically, Plaintiffs seek a declaration that the Policy and Ground Rules violate the First Amendment by (a) conferring unlimited discretion upon CBP officials to grant or deny permission to photograph and (b) unreasonably prohibiting photography of matters or events exposed to public view from exterior or outdoor areas of ports of entry. Plaintiffs also seek an injunction prohibiting Defendants from preventing Plaintiffs from photographing matters or events exposed to public view from exterior or outdoor areas of ports of entry.

## THE PARTIES

21.    Plaintiff Ray Askins is, and at all relevant times was, a citizen of the United States. Since at least 2008, Mr. Askins has researched environmental health hazards in Imperial County and, in particular, in Calexico along the U.S.-Mexico border. He has also served on the Imperial-Mexicali Air Quality Task Force since at least 2009.

22.    Plaintiff Christian Ramirez is, and at all relevant times was, a citizen of the United States. Since 2012, he has served as the Human Rights Director for Alliance San Diego, an organization focused on building coalitions to promote social justice and social change. He also serves as the Director of the Southern Border Communities Coalition, which brings together more than sixty organizations reaching from San Diego, California to Brownsville, Texas to promote policies and solutions that improve the quality of life in border communities.

23.    Defendant U.S. Department of Homeland Security is an executive department of the United States.

24.    U.S. Customs and Border Protection is an agency within DHS. The agency employs more than 60,000 individuals and is one of the world's largest law enforcement organizations.

7                           FIRST AMENDED COMPLAINT

sd-671607

25. Defendant R. Gil Kerlikowske is Commissioner of CBP. He is sued here in his official capacity.

26. Defendant Billy Whitford is Director of the Calexico port of entry. He is sued here in his official capacity.

27. Defendant Sidney Aki is Director of the San Ysidro and Otay Mesa ports of entry. He is sued here in his official capacity.

28. Plaintiffs seek declaratory and injunctive relief against each Defendant, as well as each Defendant's agents, assistants, successors, employees, attorneys, and all persons acting in concert or cooperation with any of them or at the direction or under the control of any of them.

## JURISDICTION AND VENUE

29. The Court has jurisdiction under 28 U.S.C. § 1331 because Defendants are acting on behalf of the United States and this action arises under the First Amendment to the United States Constitution.

30. The Court may grant declaratory and injunctive relief for the constitutional violations alleged here pursuant to 5 U.S.C. § 702, which waives the sovereign immunity of the United States for relief other than money damages; 28 U.S.C. § 2201; and/or Federal Rules of Civil Procedure 57 and 65.

31. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (e), because the events that give rise to this action occurred within this district, and because one or more of the Defendants reside in this district.

## FACTS

### A.   PLAINTIFF RAY ASKINS

#### I.   PERSONAL AND PROFESSIONAL BACKGROUND

32. Mr. Askins is a U.S. citizen living primarily in Mexicali, Baja California, Mexico. He retired from his job as an insurance broker in November 2001. Nowadays, he travels frequently to the United States, often to attend

FIRST AMENDED COMPLAINT

sd-671607

governmental and policy meetings in Imperial County. He usually crosses into the United States through the Calexico West port of entry.

33.    Mr. Askins is deeply concerned with environmental and environmental health issues affecting the U.S.-Mexico border region generally and Imperial County in particular. He himself suffers from chronic obstructive pulmonary disease, a progressive disease which makes it difficult for him to breathe.

34.    Imperial County and its constituent communities, including the City of Calexico, suffer from high rates of poverty and pollution, which together contribute to significant public health and environmental problems. *See, e.g.*, Tony Perry, *Deepening Woes for the Imperial Valley*, L.A. TIMES, Apr. 27, 2009, *available at* http://lat.ms/1N9Q1xp (detailing historic, persistent poverty and environmental pollution afflicting Imperial County).

35.    A higher proportion of Imperial County residents live at or below the federal poverty level compared to other California counties, which, according to the county's Community and Economic Development Department, means that residents "face many challenges in meeting basic health needs." *See* U.S. CENSUS BUREAU, STATE & COUNTY QUICK FACTS: IMPERIAL COUNTY, http://1.usa.gov/1ieEVPk (last visited Nov. 2, 2015); IMPERIAL CNTY. CMTY. & ECON. DEV. DEP'T, COMPREHENSIVE ECONOMIC DEVELOPMENT STRATEGY 2014– 2015 ANNUAL UPDATE 25 (2015), *available at* http://bit.ly/1MgQg9l (hereinafter "CEDS 2014–15"). "Much of Imperial County is designated as a medically underserved area." CEDS 2014–15 at 25.

36.    According to the California Department of Public Health, Imperial County's poor air quality, combined with many residents' lack of access to primary health care providers, have contributed to very high rates of asthma in the area. *See* Patricia Leah Brown, *The Air is Dark and Asthma is Deadly Along the Mexico Border*, REVEAL: CTR. FOR INVESTIGATIVE REPORTING, Apr. 21, 2015, *available at*

FIRST AMENDED COMPLAINT

sd-671607

http://bit.ly/1XxwSgv. A recent study by a San Diego State University environmental health professor found "that diesel and gasoline from Mexicali, Mexico, most likely from idling vehicles at the border crossing, is the No. 1 source of particulate matter in Calexico, California, increasing in intensity when the wind blows into the Imperial Valley from the south." *Id.* Calexico residents are exposed to high levels of harmful particulate matters in the air; the highest levels, and the most destructive particulates, are found near the border crossing, through which more than seven million trucks and passenger vehicles commute annually. *Id.*

37.    Health experts have long acknowledged a link between high-traffic areas and asthma severity. *See, e.g.*, YING-YING MENG, ET AL., UCLA HEALTH POLICY RESEARCH BRIEF: LIVING NEAR HEAVY TRAFFIC INCREASES ASTHMA SEVERITY 1 (2006), *available at* http://bit.ly/1S83ABS. For adults with asthma, medium to high traffic exposure has been found to increase the likelihood of chronic symptoms by approximately forty to eighty percent. *Id.* Latino children with asthma are nearly two-and-a-half times more likely than White children to live near high-traffic areas. *Id.* at 4.

38.    Hospitalization rates for asthma in Imperial County are among the highest in the state, especially for children. Whereas the rate of emergency hospital visits for asthma in California as a whole is 46.1 per 10,000 residents, in Imperial County, it is more than double: 91.0 per 10,000 residents. CEDS 2014–2015 at 26; *see also, e.g.*, Anna Gorman, *Imperial County Leads State in Treatment of Children with Asthma*, L.A. TIMES, July 16, 2012, *available at* http://lat.ms/1Nmo7AT.

39.    Mr. Askins's environmental advocacy work involves extensive research, investigation, and analysis of CBP border activities, including in particular activities at or near U.S.-Mexico ports of entry. He is especially interested in how emissions from idling vehicles awaiting primary or secondary

FIRST AMENDED COMPLAINT

sd-671607

inspection at the ports of entry contribute to environmental pollution and health problems in Imperial County and Mexicali.

40.     For several years, beginning in 2008, Mr. Askins maintained and contributed regularly to a blog (now defunct) that addressed environmental issues and human rights abuses in the U.S.-Mexico border region.

41.     Since at least March 2008, Mr. Askins has contributed to or co-authored numerous reports relating to the environmental consequences of law enforcement activities at or near U.S.-Mexico ports of entry.

42.     Mr. Askins has submitted various environmental bulletins and reports based on his research to public officials, including: (a) members of the U.S. Environmental Protection Agency; (b) the Imperial County Board of Supervisors; and (c) Bob Filner, during his tenure as U.S. Representative for California's 51st congressional district, which includes all of Imperial County and the southern portions of San Diego County.

43.     Since at least 2009, Mr. Askins has served on the Imperial-Mexicali Air Quality Task Force.

44.     In April 2014, Dr. Paul English, MPH, Ph.D., invited Mr. Askins to join the Imperial County Community Air Monitoring Project of the California Environmental Health Tracking Program. As a member of this project, Mr. Askins has worked in a team to place forty air quality monitors throughout Imperial County, including one such monitor near the Calexico West port of entry.

## II.     2012 INCIDENT

45.     In the spring of 2012, Mr. Askins was preparing a presentation for a conference entitled "Health Impacts of Border Crossings," which was scheduled for May 3 and 4, 2012 in San Ysidro, California.

46.     The conference was funded by the Southwest Consortium on Environmental Research and Policy, through a cooperative agreement with the U.S.

11                      FIRST AMENDED COMPLAINT

Environmental Protection Agency. Conference organizers described the event as one that

> focused on local health impacts of the U.S.-Mexico border. The emphasis was on avenues for reduction of exposures to traffic pollutants experienced by people crossing the border at the U.S.-Mexico Ports of Entry, workers and the community on both sides of the border. The conference included participation of researchers and stakeholders from the San Diego-Tijuana region and other areas along the U.S.-Mexico border with similar issues.

Exhibit C (Health Impacts of Border Crossings Conference 2012).

47.     To prepare for a presentation at this conference, Mr. Askins planned to visit the Calexico West port of entry. Specifically, Mr. Askins intended to photograph the secondary vehicle inspection area of the port of entry to demonstrate that CBP did not make full and proper use of this area, leading to longer delays and, consequently, more emissions pollution from vehicles waiting to cross the border.

48.     On or about April 18, 2012, Mr. Askins contacted CBP Officer John Campos by phone and requested permission to take three or four photographs inside the secondary inspection area at the Calexico port of entry the next day. Officer Campos said that this would be inconvenient, but otherwise did not object to the request.

49.     On or about April 19, 2012, Mr. Askins called Officer Campos to follow up. When Officer Campos did not answer, Mr. Askins left a voicemail message stating that, instead of taking photographs inside the Calexico port of entry building, Mr. Askins would stand on the street outside that building and take photographs of the exit of the secondary inspection area.

50.     On or about April 19, 2012, at approximately 3:10 p.m., Mr. Askins was standing near the shoulder of a public street in Calexico, California, approximately fifty to 100 feet from the exit from the secondary inspection area at

FIRST AMENDED COMPLAINT
sd-671607

the Calexico West port of entry. More precisely, Mr. Askins was standing near the shoulder of the public street at the intersection of First Street and Paulin Avenue.

51.     Immediately behind Mr. Askins was the Genaro Teco Monroy Memorial International Border Friendship Park, a small public park with grass lawns and concrete benches overlooking the Calexico West port of entry secondary inspection area.

52.     Both the public street and the park are public forums open to speech and expressive activity by tradition and past usage. Upon information and belief, Defendants consider some or all of these areas to be part of the Calexico West port of entry.

53.     From this vantage point, outdoors and outside any port of entry building or structure, Mr. Askins took three or four photographs of the exit of the secondary inspection area, including the following photograph:



54.     While taking these photographs, Mr. Askins was not engaged in any form of commercial speech or activity. Mr. Askins took these photographs for political and/or other non-commercial purposes.

sd-671607

55.     The building exterior photographed by Mr. Askins was exposed to public view from exterior and outdoor areas of both port of entry property and adjacent property.

56.     Additionally, when taking these photographs, Mr. Askins was not engaged in the act of crossing the border. Rather, Mr. Askins was standing outdoors on the U.S. side of the border when taking the photographs.

57.     Shortly after Mr. Askins took the photographs, a number of male CBP officers approached him. One or two of the officers demanded that Mr. Askins delete the photographs. Mr. Askins stated that he would not do so.

58.     One or more of the CBP officers then stated that they would smash Mr. Askins's camera if he did not delete the photographs. Mr. Askins again declined to delete the photographs, explaining that they were his property.

59.     One or more of these officers then handcuffed Mr. Askins from behind and took his camera, passport, car keys, and hat.

60.     Throughout this encounter, the CBP officers spoke to Mr. Askins in an aggressive and threatening manner, despite the fact that Mr. Askins at no point posed a threat to the safety of the officers and at no point actively resisted arrest. Furthermore, Mr. Askins committed no crime and took no actions giving rise to a reasonable suspicion or probable cause that he had committed or was about to commit a crime under any law that could constitutionally have been applied to him. To the extent Mr. Askins may have violated any law making his photography illegal, that law is unconstitutional as applied to him.

61.     After Mr. Askins was handcuffed and his possessions taken, one officer forcefully led him into a small room inside the secondary inspection area, holding Mr. Askins's right arm in a tight grip that caused significant pain and bruising on the inside of Mr. Askins's arm. The officer told Mr. Askins to sit down. Mr. Askins was not free to leave the room.

FIRST AMENDED COMPLAINT

sd-671607

62.     After about twenty minutes, the same officer led Mr. Askins to a separate room, where he subjected Mr. Askins to an invasive and embarrassing physical search. During the search, Mr. Askins remained clothed while the officer used his hands to pat Mr. Askins's entire body. Mr. Askins felt that he was being groped, and experienced particular discomfort when the officer unnecessarily squeezed and touched Mr. Askins's groin area several times.

63.     One or more CBP officers then told Mr. Askins that he was free to go and returned his belongings, and one officer escorted him to the exit. From the moment CBP officers first detained Mr. Askins to the moment they told him he was free to go, approximately twenty-five to thirty-five minutes elapsed. The officers had no warrant or other constitutional justification for the search and/or seizure of Mr. Askins's person or property.

64.     When Mr. Askins later scrolled through the pictures on his digital camera, he discovered that all but one of the photographs he just had taken of the port of entry had been deleted.

65.     On April 20, 2012, Mr. Askins sent a letter of complaint to Port Director Billy Whitford regarding the April 19 incident. That same day, Director Whitford responded in writing, stating:

> In response to the issues raised in your complaint, the area in question is currently under the jurisdiction of GSA [(General Services Administration)] and CBP. CBP security policies prohibit visitors at CBP-controlled facilities from using cameras and video recording devices without the prior approval from the senior CBP official (Port Director or designee).
>
> The officer perceived your actions as a security violation and detained you briefly until a supervisor was contacted and it was determined that you posed no threat to the facility, the public, or the officers. I regret that this incident occurred and hope that all officers conducted themselves in a professional manner at all times.

*See* Exhibit D (Email from Billy B. Whitford to Ray Askins (Apr. 20, 2012)).

sd-671607

## III.   NECESSITY OF AND ENTITLEMENT TO INJUNCTIVE RELIEF

66.     Mr. Askins wants to continue photographing matters and events exposed to public view from outdoor and exterior areas of the Calexico port of entry. As a result of his experience and in light of the Policy and Ground Rules, however, Mr. Askins has a reasonable fear that if he does continue such photography, he will again be subject to interference by CBP officers and/or their agents. Such interference may include Mr. Askins's detention or arrest and the loss of his personal property, such as his camera and photographs.

67.     Mr. Askins seeks to photograph and record matters and events exposed to public view in the area immediately surrounding the Calexico port of entry building, including vehicular traffic and CBP officers engaged in the public discharge of their duties, in order to document air and other environmental pollution as well as human rights abuses.

68.     Unless enjoined by this Court, CBP can and will continue to enforce the Policy and Ground Rules to prohibit Mr. Askins from photographing matters and events exposed to public view from outdoor or exterior areas of the Calexico port of entry, including vehicular traffic and CBP officers engaged in the public discharge of their duties.

69.     As a result of CBP's enforcement of the Policy and Ground Rules, Mr. Askins has been chilled, hindered, deterred, and prevented from freely exercising his First Amendment right to photograph matters and events exposed to public view from outdoor or exterior areas of the Calexico port of entry, including vehicular traffic and CBP officers engaged in the public discharge of their duties.

70.     Mr. Askins is thus suffering, and will continue to suffer, irreparable harm as a result of the violation of his First Amendment rights.

71.     Mr. Askins has no adequate remedy at law.

FIRST AMENDED COMPLAINT

sd-671607

**B.     PLAINTIFF CHRISTIAN RAMIREZ**

**I.     PERSONAL AND PROFESSIONAL BACKGROUND**

72.     Mr. Ramirez is a U.S. citizen living in San Diego, California. He is a nationally-recognized border policy advocate and a leading expert on border-related civil and human rights abuses.

73.     Since 2012, Mr. Ramirez has served as the Human Rights Director at Alliance San Diego, a non-profit, non-partisan organization whose stated mission is to provide a means for diverse individuals to share information, collaborate on issues, and mobilize for change in the pursuit of social justice, especially in low-income communities and communities of color. Alliance pursues its mission through targeted civic engagement programs and strategic coalitions that focus on specific issues and policy reforms, including issues related to human and immigrant rights along the U.S.-Mexico border.

74.     Since 2012, Mr. Ramirez also has served as the Director of the Southern Border Communities Coalition, which brings together more than sixty organizations reaching from San Diego, California to Brownsville, Texas to promote policies and solutions that improve the quality of life in border communities.

75.     Mr. Ramirez regularly travels to the U.S.-Mexico border, both to visit family members living in Mexico and to observe law enforcement activity and monitor human rights issues. He does this not only for work but also out of a sense of personal responsibility as a lifelong member of the border community.

76.     The San Ysidro port of entry is the busiest land port in the Western Hemisphere. *See, e.g.*, U.S. General Services Administration, San Ysidro Port of Entry, http://1.usa.gov/1H8W8jA (last visited Nov. 5, 2015). An estimated 25,000 northbound pedestrians cross from Mexico into the United States through the San Ysidro port of entry each day. *Id.*

17                    FIRST AMENDED COMPLAINT

sd-671607

77.     As explained, the incidence of civil and human rights violations along the U.S.-Mexico border, including at or near the San Ysidro port of entry, and the lack of CBP accountability for such abuses, are matters of grave public concern.

78.     Members of the public, like Mr. Ramirez, seek to document CBP activity at or near the San Ysidro port of entry to safeguard against civil and human rights abuses, including excessive use of force and racial profiling.

**II.     2010 INCIDENT**

79.     On June 20, 2010—Father's Day—Mr. Ramirez and his wife crossed the border into Mexico to visit his father. They parked on the U.S. side of the border and walked into Mexico through the pedestrian entrance at San Ysidro.

80.     Mr. Ramirez and his wife returned to the United States the same afternoon. They passed through primary inspection at the San Ysidro port of entry without incident. Once inside the United States, they walked toward their vehicle, crossing a pedestrian bridge that passed over the southbound lanes of Interstate 5.

81.     While crossing this pedestrian bridge, Mr. Ramirez noticed that women were being inspected and patted down by male CBP officers at a southbound security checkpoint below him. The officers appeared to be pulling aside only women for inspection.

82.     Mr. Ramirez observed the checkpoint for approximately ten to fifteen minutes. During that time he took approximately ten photographs using his cell phone camera, out of concern that the CBP officers might have been acting inappropriately.

83.     While taking these photographs, Mr. Ramirez was not engaged in any form of commercial speech or activity. Mr. Ramirez took these photographs for political and/or other non-commercial purposes.

84.     Additionally, when taking these photographs, Mr. Ramirez was not engaged in the act of crossing the border, nor was he inside any port of entry

sd-671607

building. Rather, Mr. Ramirez was standing outdoors on the U.S. side of the border when taking the photographs.

85.     The events and individuals photographed by Mr. Ramirez were exposed to public view in exterior and outdoor areas of the San Ysidro port of entry property.

86.     While observing the checkpoint, Mr. Ramirez and his wife were approached by two men who appeared to be private security officers.

87.     One of the private security officers asked for Mr. Ramirez's personal identification documents. Mr. Ramirez explained that he and his wife had already passed through inspection and declined to hand over his documents again.

88.     One of the private security officers then ordered Mr. Ramirez to stop taking photographs. Mr. Ramirez refused and took a picture of the private security officer. Acting aggressively, the private security officer attempted to grab Mr. Ramirez.

89.     Mr. Ramirez stopped taking photographs and said "let's go" to his wife; the two began to descend from the pedestrian bridge. The private security officers, whom Mr. Ramirez heard make a radio call for backup, followed them.

90.     At the bottom of the pedestrian bridge, approximately five to seven CBP officers were waiting. They asked whether and why Mr. Ramirez had taken any photographs. Mr. Ramirez responded that he had taken photographs because he had witnessed what he believed to be inappropriate activity by CBP officers at the checkpoint—namely, the patting down of women by male officers.

91.     The CBP officers at the bottom of the bridge asked Mr. Ramirez to turn over his phone. Mr. Ramirez refused and explained that he was willing only to show them the photographs.

92.     An officer in plain clothes, who later identified himself as a U.S. Immigration and Customs Enforcement ("ICE") officer, confronted Mr. Ramirez

FIRST AMENDED COMPLAINT

sd-671607

and asked for Mr. Ramirez's personal identification documents. Mr. Ramirez refused to turn over his documents and explained that he and his wife had already been inspected.

93.     The ICE officer then said to Mr. Ramirez, "Give me one other reason to take you down." He took Mr. Ramirez's and Mr. Ramirez's wife's passports out of Mr. Ramirez's shirt pocket, without Mr. Ramirez's consent, and went to a nearby office.

94.     A CBP officer then confiscated Mr. Ramirez's cell phone, again without Mr. Ramirez's consent, and scrolled through the photographs. As he did so, the officer made comments about Mr. Ramirez's personal pictures.

95.     The CBP officer eventually found the photographs Mr. Ramirez had taken from the pedestrian bridge. The officer then proceeded to delete these images, without Mr. Ramirez's consent. After deleting the photographs, the CBP officer returned the cell phone to Mr. Ramirez.

96.     When Mr. Ramirez later looked through the contents of his cell phone, he confirmed that the CBP officer had deleted all of the photographs that Mr. Ramirez had just taken, without Mr. Ramirez's consent or permission.

97.     Throughout this encounter, which lasted ten to fifteen minutes after Mr. Ramirez and his wife had reached the bottom of the pedestrian bridge, Mr. Ramirez and his wife were separated from each other by CBP officers. The officers essentially created a buffer area around Mr. Ramirez while they questioned him and took his cell phone.

98.     Moreover, the officers spoke to Mr. Ramirez in an aggressive and threatening manner throughout this encounter, despite the fact that Mr. Ramirez at no point posed a threat to the safety of the officers and at no point actively resisted arrest. Furthermore, Mr. Ramirez committed no crime and took no actions giving rise to a reasonable suspicion or probable cause that he had committed or was about

sd-671607

to commit a crime under any law that could constitutionally have been applied to him. To the extent Mr. Ramirez may have violated any law making his photography illegal, that law is unconstitutional as applied to him.

99.   Approximately ten to fifteen minutes after confiscating the passports, the ICE agent returned with the documents and gave them back to Mr. Ramirez. Mr. Ramirez and his wife were then allowed to continue on their way.

100.   Neither Mr. Ramirez nor his wife felt free to leave at any point during this encounter. The officers had no warrant or other constitutional justification for the search and/or seizure of Mr. Ramirez's person or property.

### III.   RECONSTRUCTION OF SAN YSIDRO PORT OF ENTRY

101.   In or around late 2007, a three-phase, multi-million dollar project commenced to reconstruct the San Ysidro port of entry. *See* GSA Fact Sheet: Reconfiguration and Expansion of the Existing Port of Entry (Sept. 2007), *available at* http://bit.ly/1XkvNZe (last visited on Nov. 5, 2015). The project is currently expected to be completed by Summer 2016. *See* U.S. General Services Administration, San Ysidro Port of Entry, http://1.usa.gov/1H8W8jA (last visited Nov. 5, 2015).

102.   As part of this project, the old pedestrian bridge connecting the United States to Mexico, upon which Mr. Ramirez was standing at the time of the 2010 incident, has been decommissioned.

103.   In 2011, a new pedestrian bridge replaced the old bridge.

104.   The new bridge runs east to west on the U.S. side of the border, connecting the transit plaza on San Ysidro Boulevard to the east and Camiones Way to the west. Like the old bridge, the new bridge passes over Interstate 5. *See* Elizabeth Aguilera, *San Ysidro's New Pedestrian Bridge Opens Friday*, SAN DIEGO UNION TRIBUNE, Apr. 14, 2011, *available at* http://bit.ly/1OSWzEY.

FIRST AMENDED COMPLAINT

sd-671607

105.   The bridge is open to and used by the public to cross over Interstate 5. It does not connect to the border crossing or any port of entry building or edifice; members of the public can and do frequently cross the bridge without crossing the border or entering or exiting any port of entry building.

106.   The outdoor vehicle inspection areas where CBP officers conduct primary and secondary inspections are visible from this new bridge, as are portions of the City of San Diego and United States to the north and City of Tijuana and Mexico to the south.

107.   Under the current configuration of the San Ysidro port of entry, Mr. Ramirez wishes to exercise his First Amendment rights to photograph and otherwise record matters exposed to public view, including CBP officers engaged in the public discharge of their duties, from one or more of the following outdoor areas:

(a)   The transit plaza on San Ysidro Boulevard and adjacent sidewalk. This transit plaza and adjacent sidewalk are outdoors and open to and used by the public. Members of the public can and frequently do use the transit plaza and adjacent sidewalk without crossing the border or entering or exiting any port of entry building. The exit of the San Ysidro port of entry building—where individuals crossing the border on foot first enter into the United States—is readily visible to pedestrians in the transit plaza and adjacent sidewalk. Upon information and belief, part or all of the transit plaza and adjacent sidewalk is a public forum open to speech and expressive activity by tradition and past usage.

(b)   The east-to-west pedestrian bridge connecting San Ysidro Boulevard to the east and Camiones Way to the west. As

sd-671607

explained, this bridge crosses over Interstate 5, so the outdoor vehicle inspection areas where CBP officers conduct primary and secondary inspections are visible to pedestrians.

(c)     The footpath leading from the transit plaza and adjacent sidewalk to Mexico. This footpath lies to the southeast of the transit plaza, behind certain businesses lining the east side of San Ysidro Boulevard. The eastern side of the footpath is the base of a small hill and is lined with a concrete wall, above which there is a railroad. The western side of the footpath includes chainlink fence overlooking parking lots used by government officials. Approximately halfway down the footpath, there is a small tent behind the eastern concrete wall. This tent is staffed by CBP officials, who sometimes leave the tent to question pedestrians on the path as they move toward the entrance to Mexico. The footpath terminates at a structure through which pedestrians must pass to enter Mexico, which is staffed by Mexican officials, including Mexican law enforcement officers. Members of the public can walk along this footpath without crossing the border or entering or exiting any port of entry building; it is possible to turn around and walk back towards the transit plaza and adjacent sidewalk at any point prior to crossing into the Mexican border building.

108.   In or near the transit plaza and adjacent sidewalk, the pedestrian bridge, and the footpath, there are several official U.S. government signs posted that appear to prohibit any form of photography from those outdoor areas.

109.   The ongoing reconstruction of the San Ysidro port of entry has neither lessened nor eliminated public concern about civil and human rights violations

sd-671607

along the U.S.-Mexico border. Indeed, given that improved infrastructure at the San Ysidro port of entry will accommodate a greater number of border crossers each day, public oversight of federal law enforcement activity at the port is indispensable.

110. Mr. Ramirez remains deeply committed to documenting civil and human rights violations throughout the border region, including San Ysidro. He is particularly concerned about the lack of adequate oversight, transparency, and accountability within CBP, and about incidents involving CBP officials' excessive or unwarranted use of force (or other abusive behavior) and racial and religious profiling.

## IV.   NECESSITY OF AND ENTITLEMENT TO INJUNCTIVE RELIEF

111. Since the 2010 incident, Mr. Ramirez has refrained from photographing matters and events exposed to public view from outdoor and exterior areas of the San Ysidro port of entry, including CBP officers engaged in the public discharge of their duties.

112. As a result of his experience, and in light of the Policy and Ground Rules, Mr. Ramirez has a reasonable fear that if he attempts to photograph matters and events exposed to public view from the transit plaza and adjacent sidewalk, the pedestrian bridge, or the footpath, he will again be subject to interference by CBP officers and/or their agents. Such interference may include Mr. Ramirez's detention or arrest and the loss of his personal property, such as his cell phone and photographs.

113. To document CBP officers' official actions, including potential civil and human rights abuses, Mr. Ramirez is prepared, and intends, to resume photographing matters and events exposed to public view at San Ysidro port of entry (from the transit plaza and adjacent sidewalk, the pedestrian bridge, and the footpath) as soon as he is able to do so without CBP interference.

sd-671607

114.   Unless enjoined by this Court, CBP can and will continue to enforce the Policy and Ground Rules to prohibit Mr. Ramirez from photographing matters and events exposed to public view from the transit plaza and adjacent sidewalk, the pedestrian bridge, and the footpath.

115.   As a result of CBP's enforcement of the Policy and Ground Rules, Mr. Ramirez has been chilled, hindered, deterred, and prevented from freely exercising his First Amendment right to photograph matters and events exposed to public view from the transit plaza and adjacent sidewalk, the pedestrian bridge, and the footpath, including CBP officers or their agents engaged in the public discharge of their duties.

116.   Mr. Ramirez is thus suffering, and will continue to suffer, irreparable harm as a result of refraining from exercising his First Amendment rights.

117.   Mr. Ramirez has no adequate remedy at law.

## CLAIMS FOR RELIEF

## CLAIM ONE

## (VIOLATION OF THE FIRST AMENDMENT—FREEDOM OF SPEECH— BY BOTH PLAINTIFFS AGAINST ALL DEFENDANTS)

118.   Plaintiffs re-allege and incorporate by reference each preceding paragraph, as if fully set forth herein.

119.   The Policy and Ground Rules are prior restraints that violate the First Amendment because they require advance permission to take photographs of matters or events of public interest exposed to public view in exterior and outdoor areas of port of entry property and provide unlimited discretion for CBP officials to grant or deny permission to take such photographs. Such limitless discretion inherently creates an unacceptable risk of viewpoint discrimination, regardless of whether or how it is in fact exercised.

FIRST AMENDED COMPLAINT

sd-671607

1

### CLAIM TWO

2

3

**(VIOLATION OF THE FIRST AMENDMENT—FREEDOM OF SPEECH—BY PLAINTIFF ASKINS AGAINST ALL DEFENDANTS EXCEPT SIDNEY AKI)**

4

5

120.   Plaintiffs re-allege and incorporate by reference each preceding paragraph, as if fully set forth herein.

6

7

121.   As enforced by CBP, the Policy and Ground Rules violate the First Amendment by unreasonably restricting Mr. Askins's right to take photographs of

8

9

matters and events of public interest exposed to public view from exterior or

10

outdoor areas of the Calexico port of entry, because it is irrational to prohibit

11

photography of such matters and events, regardless of the nature of the forum from which they are taken.

12

13

122.   To the extent CBP enforces the Policy and Ground Rules to prevent

14

photography of matters or events of public interest in any area of Calexico that is a

15

traditional or designated public forum, such enforcement violates the First

16

Amendment because it is not narrowly tailored to any substantial governmental

interest and does not leave open ample alternative channels for expression.

17

### CLAIM THREE

18

19

**(VIOLATION OF THE FIRST AMENDMENT—FREEDOM OF SPEECH—BY PLAINTIFF RAMIREZ AGAINST ALL DEFENDANTS EXCEPT BILLY WHITFORD)**

20

21

123.   Plaintiffs re-allege and incorporate by reference each preceding paragraph, as if fully set forth herein.

22

23

124.   As enforced by CBP, the Policy and Ground Rules violate the First

24

Amendment by unreasonably restricting Mr. Ramirez's right to take photographs of

matters and events of public interest exposed to public view from exterior or

25

outdoor areas of the San Ysidro port of entry, because it is irrational to prohibit

26

27

photography of such matters and events, regardless of the nature of the forum from

which they are taken.

28

26                              FIRST AMENDED COMPLAINT

125.   To the extent CBP enforces the Policy and Ground Rules to prevent photography of matters or events of public interest in any area of San Ysidro that is a traditional or designated public forum, such enforcement violates the First Amendment because it is not narrowly tailored to any substantial governmental interest and does not leave open ample alternative channels for expression.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare Defendants' enforcement of the Policy and Ground Rules unconstitutional as applied to photography of matters and events exposed to public view from exterior or outdoor areas of the Calexico and San Ysidro ports of entry;

B.     Preliminarily and permanently enjoin all Defendants, their successors, agents, servants and employees, and anyone acting in concert with Defendants or any of the foregoing persons, from preventing, impeding, or otherwise interfering with Plaintiffs' First Amendment rights to make and retain photographs, video recordings, or any other recordings of matters or events exposed to public view from exterior or outdoor areas of the Calexico and San Ysidro ports of entry;

C.     Award Plaintiffs' costs, including reasonable attorneys' fees; and

D.     Award such other relief as the Court deems proper.


Dated:       November 5, 2015       By:   /s Mitra Ebadolahi
                                          MITRA EBADOLAHI
                                          mebadolahi@aclusandiego.org

                                          Attorney for Plaintiffs
                                          RAY ASKINS and CHRISTIAN
                                          RAMIREZ

FIRST AMENDED COMPLAINT

sd-671607